**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

DANIEL HUBERT, individually and on
behalf of all other persons similarly
situated,

                  Plaintiff,

    v.

GENERAL NUTRITION CORPORATION,

                  Defendant.

Civil Action  No.:

**COMPLAINT AND
JURY DEMAND**

**CLASS ACTION COMPLAINT**

Plaintiff Daniel Hubert, individually and on behalf of a class of persons similarly situated (the "Class" or "Class Members"), brings this class action against GENERAL NUTRITION CORPORATION. The basis for and the relief sought is set forth below.

**PRELIMINARY STATEMENT**

1. This is a lawsuit by Daniel Hubert against GENERAL NUTRITION CORPORATION ("GNC" or "Defendant") for (1) Violations of Texas Deceptive Trade Practices and Consumer Protection Law Act ("TDTPA"), (2) Unjust Enrichment and (3) Injunctive Relief.  Defendant repeatedly misrepresented that various products that GNC sold in Texas and throughout the United States were lawful dietary supplements when in fact these products were adulterated and unlawful because they contained either Picamilon[1] or BMPEA,[2]

---

[1] Picamilon is also known as nicotinoyl-GABA, pycamilon, picamilone, pikatropin, and pikamilon.

[2] BMPEA is also known as, βMePEA, R-beta-methylphenethylamine, R-beta-methylphenethylamine HCl, Beta-methylphenethylamine, β-methylphenethylamine, 1-amino-2-phenylpropane, 2-phenylpropan-1-amine, 2-phenylpropylamine, alpha-benzylethylamine, 1-phenyl-1methyl-2-aminoethane, Beta-methylbenzeneethanamine, Beta-phenylpropylamine, 2-phenyl-1-propanamine.

potentially dangerous ingredients that do not meet the legal definition of a dietary ingredient and may not be lawfully used in dietary supplements. Picamilon is a synthetic chemical designed to cross the blood brain barrier and is a prescription drug used in some countries but not the United States to treat various neurological conditions. BMPEA is a synthetic chemical similar to amphetamine that is banned by the World Anti-Doping Organization. In addition to selling products containing Picamilon and BMPEA, Defendant sold products that it knew or should have known had been spiked with BMPEA, without disclosing on the product's label that the product contained these unlawful ingredients.

2.      As a result of its repeated breaches of contract and violations of the TDPTA, GNC is liable for damages, injunctive relief, restitution, disgorgement, and other appropriate relief, as set forth below.

## PARTIES

3.      Plaintiff Daniel Hubert is a resident of Mesquite, Texas.  On January 23, 2015; February 8, 2015; March 8, 2015; April 5, 2015; and May 18, 2015, Daniel Hubert purchased a product known as Mr. Hyde from GNC in Rockwall, Texas.  In connection with the purchases, Mr. Hubert talked to sales representatives and reviewed the information available to him.  At no time did GNC or its representatives make known to him that Mr. Hyde contained ingredients that may not be lawfully used in dietary supplements, specifically Picamilon and BMPEA.

4.      If Mr. Hubert had known that the Products were unsafe and unlawful, he would not have purchased the Products or would have spent significantly less to purchase it. He did not receive the benefit of his bargain. Further, at no time did GNC or its representatives advise him of any health or safety risks associated with the unlawful and unsafe dietary supplements sold to him by GNC, and which contain Picamilon and/or BMPEA.

5.      GENERAL NUTRITION CORPORATION is incorporated under the laws of Pennsylvania with its principal place of business located at 300 Sixth Avenue, Pittsburgh, Pennsylvania. GNC describes itself as a leading global retailer of health and wellness products, including vitamins, minerals, dietary supplement products, sports nutrition products and diet products. Its products are sold under GNC proprietary names and under third-party names in company owned retail stores and in franchise stores located across the United States, including in Pennsylvania.

## JURISDICTION AND VENUE

6.      The claims described in this Complaint arise from sale in Pennsylvania and throughout the United States by GNC of putative dietary supplements.

7.      This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act ("CAFA").  CAFA applies to class action where three conditions are met (1) there must be diversity, which occurs when any  member of the class is a citizen of a state different from any defendant; (2) there must be 100 or m ore class members; and (3) the amount in controversy exceeds $5 million.  28 U.S.C. § 1.332(d)(2), (d)(2)(A), and (d)(5)(B).  Each of those requirements is satisfied here.

8.      Plaintiff is a putative class representative and class member who is a citizen of a state different than the Defendant.  28 U.S.C. § 1332(d)(2)(A).

9.      The class is comprised of thousands of members geographically dispersed throughout the Commonwealth of Pennsylvania and the United States.

10.      The aggregated claims of the individual class members exceed $5 million.

11.      This Court also has original jurisdiction because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

3

12.    The aggregated claims of the individual class members exceed $5 million.

13.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

14.    Upon information and belief, GNC regularly conducts business in this District and Class members and a substantial part of the events or omissions giving rise to the claim occurred within this district.

15.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTS COMMON TO ALL CLAIMS

### GNC Controls and is Responsible for Third-Party Products Sold in GNC Stores

16.    GNC reviews and pre-approves all labels, packaging, advertising and marketing materials for third-party products sold in its stores. Third-party vendors may not make changes to a product's formula, label, or store advertising without GNC's express permission. On occasion, GNC approves changes in a third-party vendor's product ingredients. For example, on one occasion, GNC approved a third-party vendor's proposal to reformulate a product by substituting acacia rigidula for ephedra.

17.    GNC works closely with third-party vendors to ensure that labeling and marketing materials comply with GNC's requirements and expectations. Suppliers are expected to make labeling changes - such as adding GNC-approved warnings-as necessary.

18.    GNC reviews the scientific literature on many of the ingredients used in third-party products. For example, on December 8, 2014, an e-mail exchange between Jennifer Jakel, GNC's Senior Project Manager for Technical Research, and Christina Middleton, Associate Project Manager, discussed the scientific literature "regarding the ingredients from 3rd party

products." Based on Ms. Middleton's review of the literature, Ms. Jakel decided which ingredients "looked promising" for possible development by Nutra Manufacturing ("Nutra"), GNC's manufacturing arm. Nutra manufactures and supplies vitamins and supplements to General Nutrition Centers and to other third-party companies.

19.     GNC's third-party vendor agreement provides that the "Vendor Warrants that the Goods covered by this purchase order have been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (21 U.S.C. §301 ET SEQ, hereinafter "the Act") and requirements of all applicable federal, state and local laws, rules and regulations." Based on this language, GNC maintains that it is not liable for unlawful third-party vendor products sold at GNC stores or sold by GNC over the Internet. However, at least for products that contain Picamilon or BMPEA, although GNC received guarantees from third-party vendors that products containing these ingredients complied with legal requirements, GNC did not rely on these guarantees in good faith, because GNC knew or should have known that these ingredients were unlawful, and that products containing these ingredients are deemed to be adulterated.

20.     GNC represents on its website that "GNC sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the cutting-edge of nutritional science," and that "GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet our high standards of quality." Unfortunately, GNC's representations are untrue. As described below, GNC sells products obtained from third-party vendors that GNC knows or should know contain unlawful and potentially unsafe ingredients and GNC sells third-party products that GNC knows, or should know, have labels that are deceptive.

**Picamilon**

21.     Picamilon was developed by researchers in the former Soviet Union and is currently a prescription drug in Russia used to treat a variety of neurological conditions. It has never been approved as a prescription or over-the-counter drug in the United States.

22.     Picamilon is a neurotransmitter (gamma-aminobutyric acid or GABA) that has been synthetically modified in order to facilitate its translocation across the blood-brain barrier. Picamilon is formed by synthetically combining nicotinic acid (niacin) with GABA. There is no indication in the literature that this compound is found in nature.

23.     A "dietary ingredient" under section 201(ff)(1) of the Act is "(A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E)." 21 U.S.C. §321(ff)(1).

24.     Picamilon does not fit any of the dietary ingredient categories in section 201(ff)(A)-(F) of the Act. (Ex.1, Decl. of FDA Acting Deputy Director, Division of Dietary Supplement Programs, Dr. Cara Welch.) Thus Picamilon is not a lawful dietary ingredient and products that contain Picamilon are not lawful dietary supplements and may not be lawfully sold in the United States. Under the Act, products that contain Picamilon are deemed to be adulterated.

25.     GNC's manufacturing arm Nutra does not manufacture products that contain Picamilon, presumably because GNC knows that Picamilon is not a lawful dietary ingredient. GNC obtains products that contain Picamilon for sale in GNC stores through third-party vendors.

26.     As early as May 22, 2007, GNC knew that Picamilon is not a lawful dietary ingredient. On that date, GNC's Senior Project Manager for Technical Research Jennifer Jakel, whose responsibilities include ensuring that labeling and scientific claims are accurate, reviewed the available literature regarding Picamilon.

27.     All the documents reviewed by Ms. Jakel had been translated from Russian. Among the documents reviewed by Ms. Jakel was a review of Picamilon, which among other things describes Picamilon as one of "a new class of medicinal preparations called nootropics which are finding increasingly wider applications in various areas of medicine. Nootropic medications are adopted successfully for breakdowns of memory, attention, learning, and for treatment of loss of brain blood circulation, brain trauma, chronic alcoholism and other disorders." (Ex. 2.)

28.     Ms. Jakel also learned from this same document that Picamilon was "synthesized in 1969 by the All-Union Scientific Research Institute and studied in the NII pharmacological RAN. By chemical structure Picamilon is a derivative of the gamma-amino-butyric acid and nicotinic acid." (Underlined by Ms. Jakel). Thus, as early as early as May 22, 2007, GNC knew that Picamilon was a synthetic drug created by Soviet investigators and was not a lawful dietary ingredient in the United States.

29.     GNC also knew that Picamilon is not a lawful dietary ingredient because as part of her May 2007 review, Ms. Jakel documented in the GNC library file on Picamilon: "No NDI that I could find."

30.     An NDI or new dietary ingredient notification is required by federal law before a dietary ingredient not used in the United States before 1994, may be used in a dietary supplement. The NDI must be submitted 75 days before the ingredient is sold and must include

information that supports the manufacturer or distributors belief that the product is safe. Only if FDA takes no action during the 75-day period may the new dietary ingredient be used in dietary supplements sold in the United States.

31.     In April 2014, Ms. Jakel again looked for an NDI for Picamilon and documented in her file "still no NDI found." (Ex. 3.)

32.     Even if GNC did not actually know that Picamilon is not a lawful dietary ingredient (and it did), had GNC conducted a reasonable due diligence review, GNC would have known that Picamilon did not fulfill dietary ingredient categories in section 201(ff)(A)-(F) of the Act.

33.     When GNC sells products that contain Picamilon in Pennsylvania and throughout the United States, GNC represents that the product is a lawful dietary supplement that contains lawful dietary ingredients.

34.     Despite the fact that GNC knew, or should have known, that Picamilon was a prescription drug used in Russia and not a lawful dietary ingredient in the United States, and that products that contain Picamilon are not lawful dietary supplements, GNC sold thousands of units of products in Pennsylvania and throughout the United States that contained Picamilon. These products were falsely labeled and sold as if they were lawful dietary supplements when in fact, they were not. Between January 2013 and June 2015, GNC sales of products that contain Picamilon were as follows:

**Picamilon**

| Description | Vendor |
|---|---|
| Charge Extreme Energy Booster | Labrada Bodybuilding Nutrition |
| Lean Body for Her Fat Burner | Labrada Bodybuilding Nutrition |
| Lean Body Hi Energy Fat Burn | Labrada Bodybuilding |

|  | Nutrition |
| --- | --- |
| Testek | QNT International, Inc. |
| Riptek V2 | QNT International, Inc. |
| Tru Mangodrin | Truderma, LLC |
| Turbo Shred | Swole Sports Nutrition |
| Jacked Pack | BD Health Partners |
| Mr. Hyde – Fruit Punch | Prosupps USA LLC |
| Mr. Hyde – Watermelon | Prosupps USA LLC |
| Dr. Jekyll – Power Punch | Prosupps USA LLC |
| Dr. Jekyll – Watermelon | Prosupps USA LLC |
| Mr. Hyde – Orange Guava | Prosupps USA LLC |
| Vanish Bonus | Prosupps USA LLC |
| Mr. Hyde – Red Razz | Prosupps USA LLC |
| Mr. Hyde RTD Blue Razz | Prosupps USA LLC |
| Mr. Hyde – Blue Razz | Prosupps USA LLC |
| Blue Razz RTD Fruit Punch | Prosupps USA LLC |
| Nirvana | Sensatus Group LLC |
| ENGN Fruit Punch | Evlution Nutrition |
| ENGN Blue Raz | Evlution Nutrition |
| ENGN Green Apple | Evlution Nutrition |

35.     On June 16, 2015, pursuant to ORS 646.618, the Attorney General for the State of Oregon issued an Investigative Demand to GNC Holdings, Inc., (Defendant's parent company) which demanded production of documents and information relating to Defendant's sale of Picamilon. The Investigative Demand clearly discussed the likelihood that Picamilon was not a lawful dietary ingredient. Defendant was aware that GNC Holdings, Inc., was in receipt of the demand, and Defendant produced documents and information in response to the demand. Despite this additional notice to GNC that Picamilon is an unlawful ingredient and that products which contain Picamilon are adulterated, GNC continued to sell products that contain Picamilon nationally and in Pennsylvania. GNC did not cease selling such products until after Oregon Attorney General issued a document entitled "Notice of Unlawful Trade Practices and Proposed Resolution" on September 21, 2015. It was only after this document was served on Defendant, that GNC stopped selling products that contain Picamilon.

36.    In addition to the sales listed above, between May 22, 2007 (when GNC knew that Picamilon was not a lawful dietary ingredient) and January 1, 2013, and between June 2015 and the September 21, 2015, GNC sold a yet to be determined number of products that contained Picamilon in Pennsylvania and nationally.

## BMPEA

37.    BMPEA is a chemical similar to amphetamine. It was first synthesized in the 1930s as a replacement for amphetamine, but for unknown reasons it was never studied in humans. There are anecdotal reports that BMPEA is associated with hemorrhagic stroke.[3] Because of its amphetamine-like qualities, BMPEA is banned for use by athletes by the World Anti-Doping Agency.

38.    BMPEA is not a lawful dietary ingredient because it does not fit any of the dietary ingredient categories in Section 201(ff)(A)-(F) of the Act. Under federal law, any dietary supplement that contains BMPEA is deemed to be adulterated and may not be lawfully sold in the United States.

39.    GNC's manufacturing arm Nutra does not manufacture products that contain BMPEA, presumably because GNC knows that BMPEA is not a lawful dietary ingredient. However, GNC obtains products that contain BMPEA for sale in GNC stores through third-party vendors.

40.    BMPEA is synthetically produced and not found naturally. Although there is one published report[4] that BMPEA is found naturally in the acacia rigidula ("AR") plant, this report

---

[3] P. Cohen et al, Hemorrhagic Stroke Probably Caused by Exercise Combined with a Sports Supplement Containing β-Methylphenylethymaline (BMPEA): A Case Report; Ann Intern Med Published online 12 May 2015 doi; 10.7326L15-0106

[4] BA. Clement et al, *Toxic amines and alkaloids from* Acacia Rigidula, Phytochemistry  1377-1380

provides little information regarding how the identification was made, and in 2013, FDA conducted a more credible analysis using a verified and well-accepted testing methodology that found AR does not, in fact, contain BMPEA. The FDA study also found that 43% of the dietary supplements tested that were labeled as containing AR had been "spiked" with BMPEA.[5] Among other things, the 2013 study reported that BMPEA is a synthetic substance similar to amphetamine. Thus, anyone aware of the 2013 FDA study would know that BMPEA is not a lawful dietary ingredient and that products labeled as containing acacia rigidula were at significant risk of being spiked with BMPEA.

41.     Even before the 2013 FDA study, GNC should have known that BMPEA is not a lawful dietary ingredient because BMPEA does not fit any of the dietary ingredient categories in Section 201(ff)(A)-(F) of the Act.

42.     GNC knew of the FDA study as early as November 2, 2013, when GNC's Senior Project Manager for Technical Research Jennifer Jakel was notified by a PubMed service that the study was available on line.

43.     On November 18, 2013, USA Today published an article about the FDA study.[6]

44.     The FDA study became widely known throughout GNC on November 19, 2013, when Ms. Jakel circulated the USA Today article to approximately 100 recipients at GNC headquarters. Among those recipients was GNC's Senior Vice President and Chief Innovation Officer Guru Ramanathan. GNC Vice President General Counsel, Regulator Affairs David J Sullivan was another recipient of the *USA Today* article.

---

[5] Pawar et al, *determination of selected biogenic amines in acasia rigidula plant materials and dietary supplements us lc-MS/MS methods;* Journal of Pharmaceutical and Biomedical Analysis 88(2014)

[6] http://www.usatoday.com/story/news/nation/2013/11/18/fda-scientists-find-amphetamine-like-compund-in-dietary-supplements/3627963/ .

45.     The *USA Today* article stimulated significant concern and discussion within GNC. For example, within minutes of receiving the email from Ms. Jakel, Merchandising Manager Carter Gray wrote to GNC Director of Merchandising John Telencho, "Please tell me we won't have to get rid of acacia now." (Ex. 4.)

46.     Shortly after receiving the *USA Today* article, GNC Director of e-Commerce Nathaniel Kennedy learned of six products sold by GNC with acacia rigidula. Later that day, Brian Cavanough, GNC's Senior Vice President of Merchandising wrote to Steve Cherry, the Vice President of Purchasing, and David J. Sullivan, GNC's Vice President and General Counsel, and offered to do a "database search to find all SKUs" associated with effected products.

47.     Despite widespread knowledge that the AR products sold by GNC were at high risk of having been spiked with BMPEA, including knowledge by David J. Sullivan, GNC's Vice President & General Counsel, Regulatory Affairs, GNC continued to sell products that contained AR without testing these products to determine whether the product was adulterated with BMPEA or informing consumers of the risk that these products were adulterated.

48.     GNC also continued to sell products that were labeled as containing BMPEA even though it knew or should have known from the 2013 FDA study that BMPEA is a synthetic substance similar to amphetamine and was not a lawful dietary ingredient.

49.     Also after the 2013 FDA study, GNC approved inclusion of AR in products supplied to GNC by a third-party vendor. On February 21, 2014, supplier Riley Judd wrote to GNC employee Russell Barba that "Rhino Rush is currently reformulating the current ephedra version shot. To replace the ephedra, they would like to use Acacia Rigidula (leaves)-is this

ingredient acceptable." Barba then checked with GNC's Beth Curtin who approved Rhino Rush's use of AR.

50.     On March 12, 2014, the Food Standards Agency of the European Union (EU) contacted GNC and other sellers of AR products to inform them that AR was a "novel food product" and could not be sold in the EU because, among other things, its safety had not been demonstrated.

51.     In November 2014, the newsletter *NutraIngredients-USA*, reported that Danish and Swedish regulatory agencies had issued warnings that a dietary supplement labeled as containing AR that was spiked with BMPEA may have caused a hemorrhagic stroke. This newsletter was widely distributed throughout GNC headquarters.

52.     In December 2014, Health Canada, (the Canadian equivalent to FDA) announced a recall of the AR labeled dietary supplement "Jet Fuel Superburn" because it was spiked with undisclosed BMPEA. At the time of the Health Canada recall, GNC sold Jet Fuel Superburn and other dietary supplements labeled as containing AR and at risk of containing BMPEA, and continued to sell those products in Oregon and the United States even after the Health Canada recall.

53.     In April 2015, researchers reported the results of yet another study ("the Cohen study") that found more than 50% of tested dietary supplements labeled as containing AR were spiked with BMPEA.[7] The list of products tested in the Cohen study that were found to contain undisclosed BMPEA included products sold by GNC in the United States and Pennsylvania.

---

[7] Cohen et al, *An amphetamine isomer whose efficacy and safety in humans has never been studied β-methylphenethylamine (BMPEA), is found in multiple dietary supplements*, Drug Test analysis DOI.1002/dta.1793

54.     The Cohen study received significant national media attention. On April 23, 2015, after the results of the Cohen study became widely known, FDA formally announced that BMPEA does not meet the statutory definition of a dietary ingredient and sent warning letters to manufacturers whose products contain BMPEA.

55.     It was only after FDA made its formal announcement that GNC stopped selling products which contain BMPEA, including products labeled as containing AR that were spiked with BMPEA.

56.     The Oregon Department of Justice (ODOJ) conducted its own testing of three dietary supplements sold by GNC in Oregon. Jetfuel Superburn, MX-LS7 and Phenyl Core Weight management. These products were labeled as containing AR but were not labeled as containing BMPEA. ODOJ's expert tested these products using a state-of-the-art methodology: rapid resolution liquid chromatography-accurate mass-quadrupole-time of flight-tandem mass spectrometry. All three products tested positive for BMPEA.

57.     When GNC sold products in Pennsylvania and nationally that contained BMPEA, GNC misrepresented that the product was a lawful dietary supplement that only contained lawful dietary ingredients.

58.     From January 1, 2013, until May 2015, GNC sold in Oregon 340 units of seven different products that were labeled as containing AR. All but one of these products tested (Green Coffee Bean+Energy) tested positive for the presence of BMPEA.

59.     Whether Green Coffee Bean+Energy was adulterated with BMPEA is unknown because before it could be independently tested, the product was reformulated. On November 19, 2013, in an email that included a *USA Today* news article following up on the November 18th report about the FDA study, Charlie Chiaverini, the National Brand Manager for Rightway

Nutrition (manufacturer of Green Coffee Bean+Energy), wrote to GNC employee Bob Emilian asking, "[O]bviously you would like us to reformulate as fast as possible and replace the inventory in the stores in warehouse with new inventory yes." Mr. Emilian replied, "Yes for starters."

60.     After November 2013, when GNC knew that AR products were at significant risk of having been adulterated with BMPEA, GNC sold at least 27 AR products that were in fact adulterated with BMPEA.

61.     In addition, GNC sold at least 105 AR products after November 2013 without disclosing that these products were at significant risk of having been adulterated with BMPEA.

62.     The AP products sold between January 2013 and May 2015 are as follows:

**Acacia Rigidula**

| Description | Vendor |
|---|---|
| Hit Fastin XR | Hi Tech Pharmaceuticals |
| Lipodrene XR | Hi Tech Pharmaceuticals |
| Fastin XR DMAA Free | Hi Tech Pharmaceuticals |
| Jetfuel Superburn | World Health Products LLC |
| Green Coffee Bean + Energy | Rightway Nutrition |
| MX-LS7 | Isatori Global Technologies |
| Phenyl Core | |

63.     In addition to the AR products sold by GNC that contained undisclosed BMPEA, GNC also sold products that were labeled as containing BMPEA. These products were falsely labeled as if they were a lawful dietary supplement when, in fact, they were not dietary supplements because BMPEA is not a lawful dietary ingredient. Between January 1, 2013, and May 2015, GNC sold the following products that were labeled as contained BMPEA:

**BMPEA**

| Description | Vendor |
|---|---|
| Fastin | Hi Tech Pharmaceuticals |
| Fastin DMAA Free | Hi Tech Pharmaceuticals |
| Meltdown Watermelon | VPX Sports, Inc. |
| Meltdown Peach Mango | VPX Sports, Inc. |
| Meltdown Exotic Fruit | VPX Sports, Inc. |
| Lipo 6 Black | Nutrex Research |
| Meltdown | VPX Sports, Inc. |
| Redline Ultra Hardcore Twinpk | VPX Sports, Inc. |
| Redline Ultra Hardcore Bonus | VPX Sports, Inc. |
| Redline Ultra Hardcore | VPX Sports, Inc. |
| Redline Hardcore blister Pak | VPX Sports, Inc. |
| Fruit N.O. Shotgun | VPX Sports, Inc. |
| Grp Bgum Shotgun V3 | VPX Sports, Inc. |
| Craze – Candy Grape | Driven Sports |
| Vanish Bonus | Prosupps USA LLC |
| Shredz Burner | Shredz Supplements |
| Iso Lean 2 | Advanced Nutrition Systems |
| Iso Lean3 | Advanced Nutrition Systems |
| Methyl Drive 2.0 | Advanced Nutrition Systems |

64.     Prior to January 1, 2013, GNC sold a yet to be determined number of products in Oregon that contained BMPEA.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action on behalf of himself and the members of the following two classes:

a.  **Nationwide Class**: All persons in the United States who purchased from GNC any of the following products: Charge Extreme Energy Booster, Lean Body for Her Fat Burner, Lean Body Hi Energy Fat Burn, Testek, Riptek V2, Tru Mangodrin, Turbo Shred, Jacked Pack, Mr. Hyde – Fruit Punch, Mr. Hyde – Watermelon, Dr. Jekyll – Power Punch, Dr. Jekyll – Watermelon, Mr. Hyde – Orange Guava, Vanish

16

Bonus, Mr. Hyde – Red Razz, Mr. Hyde RTD Blue Razz, Mr. Hyde –
Blue Razz, Blue Razz RTD Fruit Punch, Nirvana, ENGN Fruit Punch,
ENGN Blue Raz, ENGN Green Apple, Hit Fastin XR, Lipodrene XR,
Fastin XR DMAA Free, Jetfuel Superburn, Green Coffee Bean +
Energy, MX-LS7, Phenyl Core, Fastin, Fastin DMAA Free, Meltdown
Watermelon, Meltdown Peach Mango, Meltdown Exotic Fruit, Lipo 6
Black, Meltdown, Redline Ultra Hardcore Twinpk, Redline Ultra
Hardcore Bonus, Redline Ultra Hardcore, Redline Hardcore blister
Pak, Fruit N.O. Shotgun, Grp Bgum Shotgun V3, Craze – Candy
Grape, Vanish Bonus, Shredz Burner, Iso Lean 2, Iso Lean3 or Methyl
Drive 2.0 (the "Products").

b. **Texas Class**: All persons in Texas who purchased from GNC any of
the following products: Charge Extreme Energy Booster, Lean Body
for Her Fat Burner, Lean Body Hi Energy Fat Burn, Testek, Riptek
V2, Tru Mangodrin, Turbo Shred, Jacked Pack, Mr. Hyde – Fruit
Punch, Mr. Hyde – Watermelon, Dr. Jekyll – Power Punch, Dr. Jekyll
– Watermelon, Mr. Hyde – Orange Guava, Vanish Bonus, Mr. Hyde –
Red Razz, Mr. Hyde RTD Blue Razz, Mr. Hyde – Blue Razz, Blue
Razz RTD Fruit Punch, Nirvana, ENGN Fruit Punch, ENGN Blue
Raz, ENGN Green Apple, Hit Fastin XR, Lipodrene XR, Fastin XR
DMAA Free, Jetfuel Superburn, Green Coffee Bean + Energy, MX-
LS7, Phenyl Core, Fastin, Fastin DMAA Free, Meltdown Watermelon,
Meltdown Peach Mango, Meltdown Exotic Fruit, Lipo 6 Black,

Meltdown, Redline Ultra Hardcore Twinpk, Redline Ultra Hardcore

Bonus, Redline Ultra Hardcore, Redline Hardcore blister Pak, Fruit

N.O. Shotgun, Grp Bgum Shotgun V3, Craze – Candy Grape, Vanish

Bonus, Shredz Burner, Iso Lean 2, Iso Lean3 or Methyl Drive 2.0 (the

"Products").

66.    Subject to additional information obtained through further investigation and

discovery, the foregoing Classes may be expanded or narrowed by amendment or amended

complaint.   Specifically excluded from the Class is any entity in which Defendant had a

controlling interest or which has a controlling interest in Defendant, and Defendant's legal

representatives, assigns, and successors.

67.    Members of the Classes are so numerous that joinder is impracticable.  While the

exact number of class members is unknown to Plaintiff, it is believed that the Class is comprised

of at least thousands of members geographically dispersed throughout the Commonwealth of

Pennsylvania and nationally.  The Class, however, is readily ascertainable from information and

records in the possession of GNC.

68.    Common questions of law and fact exist as to all members of the Class.  These

questions predominate over questions that may affect only individual class members because

GNC has acted on grounds generally applicable to the Classes.  Such common legal or factual

questions include:

a.    Whether the Products are adulterated;

b.    Whether GNC knew or reasonably should have known that
the Products were adulterated;

c.    Whether GNC concealed from and/or failed to disclose to
the Class the Product's ingredients;

d.     Whether GNC breached express warranties relating to the Products;

e.     Whether GNC breached the implied warranty of merchantability relating to the Products;

f.     Whether GNC was unjustly enriched by the sale of the Products;

g.     Whether GNC engaged in unfair, false, misleading, or deceptive trade practices by selling and/or marketing the Products;

h.     Whether GNC should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the Products; and,

i.     Whether Plaintiff and the Class are entitled to damages, including compensatory, exemplary, and statutory damages.

69.     GNC's defenses to Plaintiff's claims are typical of its defenses to claims of the members of the Class.

70.     Plaintiff's claims are typical of the members of the Class as all members of the Classes are similarly affected by GNC's actionable conduct.  Plaintiff and all members of the Class purchased one or more of the Products.  In addition, GNC's conduct that gave rise to the claims of plaintiff and members of the Class is the same for all members of the Classes.

71.     Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.  Furthermore, Plaintiff has retained counsel experienced and competent in the prosecution of complex class action litigation.  Plaintiff has or can acquire adequate financial resources to assure that the interests of the class will not be harmed.

72.     Class action treatment is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of

similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

73.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

74.     Plaintiff has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

**COUNT I**
**By Plaintiff Hubert on Behalf of the Texas Class**
**Violation of Texas Deceptive Trade Practices-Consumer Protection Act,**
**Tex. Bus. & Com. Code §§ 17.41, *et seq*.**

75.     Plaintiff Hubert, on behalf of himself and the Texas class, hereby re-allege the preceding paragraphs.

76.     The purposes of the Texas Deceptive Trade Practices and Consumer Protection Act (TDTPA) is to "protect consumers against false, misleading, and deceptive practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection," and it is liberally construed to effect those purposes. Tex. Bus. & Com. Code § 17.44.

77.     Plaintiff and Texas class members are "consumers," The Products are "goods,"

and GNC was engaged in "trade or commerce" as those terms are defined by § 17.45 of the DTPA.

78.     GNC has violated section 17.50(a)(1) and 17.46(b)(24) of the TDTPA by failing to disclose to Plaintiff and Texas class members that the dietary supplements containing Picamilon are unlawful dietary supplements, misrepresenting that products containing BMPEA are lawful dietary supplements, misrepresenting that Picamilon is a lawful dietary ingredient, failing to disclose that the Products contained BMPEA, and failing to disclose that Acacia Rigdula Products were at significant risk of adulteration with BMPEA.

79.     GNC's omissions were intended to induce Plaintiff and Texas class members to purchase dietary supplements that they otherwise would not have purchased at a price they otherwise would not have paid. Plaintiff and Texas class members relied upon GNC's omissions to their detriment, purchasing dietary supplements they otherwise would not have purchased at a price they otherwise would not have paid.

80.     GNC has also violated section 17.50(a)(3) of the DTPA by selling dietary supplements containing Picamilon and BMPEA. In addition, by selling products with unlawful and unsafe ingredients and not advising Plaintiff and class members, GNC's conduct constitutes an unconscionable course of action, as GNC took advantage of Plaintiff and the Texas class member's lack of knowledge to a grossly unfair degree.

81.     As a direct and proximate result of GNC's conduct, Plaintiff and other members of the Texas class have been harmed in that they purchased dietary supplements they otherwise would not have,  and/or paid more for dietary supplements than they otherwise would have. Meanwhile, GNC has sold more dietary supplements than it otherwise could have and charged inflated prices for dietary supplements, unjustly enriching itself thereby.

82.     GNC is liable to Plaintiff and Texas class members for damages in amounts to be proven at trial, including attorneys' fees recoverable pursuant to § 17.50(d) of the TDTPA, costs, and treble damages.

83.     Pursuant to §17.50 of the TDTPA, Plaintiff and the Texas Class seek damages, a declaration that GNCs conduct is unlawful, and an order requiring GNC to adequately disclose the extent and nature of their unlawful acts with respect to the products outlined herein.

## COUNT II-NATIONWIDE CLASS
### Unjust Enrichment

84.     Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

85.     Plaintiff and members of the Nationwide Class conferred a benefit upon GNC. Plaintiff and members of the Classes paid money to acquire the Products.  Accordingly, plaintiff and members of the Class conferred an economic benefit upon GNC because GNC profited as a result from Plaintiff and members of the Classes paying money to purchase the Products.

86.     GNC retained and appreciated the benefit conferred upon it by Plaintiff and members of the Classes.

87.     GNC, however, retained that benefit under circumstances that make it inequitable for GNC to retain it without paying the value thereof.  Specifically, GNC retained that benefit despite the fact that the Products were adulterated and unlawful and GNC knew or reasonably should have known that the Products were adulterated and unlawful but failed to disclose the Products' ingredients to Plaintiff and members of the Class.

## COUNT III-NATIONWIDE CLASS
### Injunctive Relief

88.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as

though fully set forth herein.

89.    GNC designed, manufactured, produced, tested, inspected, marketed, distributed, and sold Products that contain ingredients that are unlawful and unsafe as described above.

90.    GNC continues to market, distribute, and sell Products that contain unlawful and unsafe ingredients and has done nothing to remove them from the market and from the possession of consumers.  The unlawful and unsafe ingredients in the Products constitutes a continuing source of harm and damages to the Plaintiffs and the Nationwide Class.

91.    The  Products outlined herein pose an imminent risk of failure to consumers and the public.

92.    GNC has not issued any warnings or notices concerning the Products, and has not replaced the Products, or implemented a product recall.

93.    Plaintiffs and the Class have suffered actual damage or injury or are in immediate risk of suffering losses due to the unlawful and unsafe ingredients in the Products.

94.    In the event the fact finder determines that monetary relief is an insufficient remedy for the conduct described above, in the alternative, GNC should be required to take corrective action to avoid the serious and immediate risks its Products pose, including but not limited to: issuing a nationwide recall of the Products; issuing warnings and/or notices to consumers concerning the Products and the risks they pose; and, if GNC has not already done so, immediately discontinuing the manufacture, production, marketing, distribution, and sale of the unlawful and unsafe Products.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully request that this Court:

A. Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Award damages, including compensatory and exemplary damages, to Plaintiff and the Class in an amount to be determined at trial;

C. Grant restitution to Plaintiff and the Class and require GNC to disgorge its ill-gotten gains;

D. Award Plaintiff and the Class their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

F. Award plaintiff and the Class pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

G. Award such further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**


Dated:  October 27, 2015          By:     */s/ D. Aaron Rihn*
                                          D. Aaron Rihn, Esquire
                                          Pa. I.D. 85752
                                          **Robert Peirce & Associates, P.C.**
                                          707 Grant Street
                                          Suite 2500
                                          Pittsburgh, PA 15219-1918
                                          Telephone: (412) 281-7229
                                          arihn@peircelaw.com

                                          Shanon J. Carson, Esquire
                                          **Berger & Montague, P.C.**
                                          1622 Locust Street
                                          Philadelphia, PA 19103
                                          Telephone: (215)875-4656
                                          scarson@bm.net

                                          Gregory F. Coleman, Esquire
                                          Mark E. Silvey, Esquire
                                          Lisa A. White, Esquire

**Greg Coleman Law, P.C.**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0090

Gary E. Mason, Esquire
Esfand Y. Nafisi, Esquire
Benjamin Branda, Esquire
**Whitefield Bryson & Mason, LLP**
1625 Massachusetts Avenue, NW, Ste. 605
Washington, DC 20036
Telephone: (202) 429-2290

John Yanchunis, Esquire
Marcio Valladares, Esquire
Patrick A. Barthle Ii, Esquire
**Morgan & Morgan Complex Litigation Group**
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
Telephone: (813) 223-5505

Edward A. Wallace, Esquire
Mark R. Miller, Esquire
Amy E. Keller, Esquire
**Wexler Wallace, LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222

*Attorneys for Plaintiff*