| | |
|---|---|
| DANIEL HUBERT, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>GENERAL NUTRITION CORPORATION,<br>       Defendant.<br><br>(In re: GNC Picamilon/BMPEA Litigation) | Civil Action No. 2:15-cv-01391-MRH<br><br>This document relates to: ALL CASES<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.     Defendant General Nutrition Corporation ("GNC") is the world's largest specialty retailer of dietary supplements. It promises consumers on its website that it "sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency[.]"

2.     GNC, however, has broken that promise and repeatedly violated federal and state law by selling supplements with mislabeled dietary ingredients which are not even legally available in prescription drug form in the United States, let alone as a supplement to the diet.

3.     Specifically, GNC marketed and sold supplements (manufactured by third parties) that contain the picamilon, BMPEA, or *acacia rigidula*. Several supplements containing *acacia rigidula* are also spiked with BMPEA.

4.     GNC has long known, however, that picamilon, BMPEA, and *acacia rigidula* are not "dietary" ingredients. Picamilon is a synthetic chemical used as a prescription drug in Russia for a variety of neurological conditions; it is not approved as a drug in the United States.

BMPEA is an amphetamine-like synthetic chemical that is not found in nature and has no history of safe usage. *Acacia rigidula* is an herb or other botanical which also has no history of safe usage. In fact, no manufacturer or distributor has submitted to the Food and Drug Administration ("FDA") FDA any premarket notification establishing that a dietary supplement containing *acacia rigidula* is safe. The FDA has independently confirmed these facts in a series of warning letters issued to manufacturers of supplements containing picamilon, BMPEA, or *acacia rigidula*.

5.     Nevertheless, GNC sold products with false and misleading labeling, and it otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA, and *acacia rigidula*. It took these actions at the expense of consumer safety, in order to profit from product sales, and in violation of state and federal law.

6.     Plaintiffs are consumers who were hoodwinked into purchasing these supplements with mislabeled and dangerous ingredients. Plaintiffs would not have purchased these supplements had GNC disclosed that they contained mislabeled ingredients which pose serious health risks and are not marketable as dietary supplements.

7.     Plaintiffs bring this suit on behalf of themselves and a class of similarly situated consumers. They assert that GNC has violated established state consumer protection laws, breached product warranties, engaged in negligent misrepresentation, and unjustly enriched itself to the detriment of consumers.  Plaintiffs seek damages and equitable relief on behalf of themselves and the proposed classes.

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims

of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which Defendant GNC and members of the proposed plaintiff class, including named Plaintiffs, are citizens of different states.

9.      This Court may exercise jurisdiction over GNC because GNC maintains its headquarters in Pennsylvania; is registered to conduct business in Pennsylvania; has sufficient minimum contacts in Pennsylvania; and intentionally avails itself of the markets within Pennsylvania through the promotion, sale, marketing, and distribution of its products, such that the exercise of jurisdiction by this Court is both proper and necessary.

10.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## **PLAINTIFFS**

11.      Plaintiff Daniel Hubert resides in Mesquite, Texas. He purchased Mr. Hyde at GNC stores located in Rockwall and Greenville, Texas, on five occasions from January to May 2015.

12.      Plaintiff Kyle Eager resides in Lompoc, California. He purchased Mr. Hyde Fruit Punch and Mr. Hyde Blue Razz at the GNC store located at the Post Exchange on Vandenberg Air Force Base in California on two occasions in 2015.

13.      Plaintiff Robert Brooks resides in Escondido, California. He purchased Meltdown Watermelon, Lipo 6 Black, Meltdown, Redline Ultra Hardcore, and Shredz Burner at GNC stores located in Escondido and Vista, California, on multiple occasions between approximately June 2013 and September 2014.

14.      Plaintiff Matthew Shane Smith resides in Bryant, Arkansas. He purchased Mr. Hyde Fruit Punch in January 2015 at a GNC store located in Bryant, Arkansas.

15.     Plaintiff Mary Jo Cesario resides in Port Saint Lucie, Florida. She purchased Charge Extreme Energy Booster, Lean Body for Her Fat Burner, Nirvana, ENGN Blue Razz, Fastin, Redline Hardcore Blister Pak, Iso Lean 2, and Green Coffee Bean + Energy at GNC stores located in Florida on multiple occasions between 2011 and 2015.

16.     Plaintiff Chris Lynch resides in Urbandale, Iowa. He purchased Redline Ultra Hardcore at a GNC store in the Jordan Creek Mall located in West Des Moines, Iowa, in approximately May 2015.

17.     Plaintiff Jeff Johnston resides in Brighton, Michigan. He purchased Mr. Hyde, Fastin, and Redline Ultra Hardcore at GNC stores located in Michigan on multiple occasions between 2011 and 2015.

18.     Plaintiff Martine Landuit Vartanian resides in Westland, Michigan. She purchased Lean Body for Her Fat Burner, Turbo Shred, ISO Lean 2, Lipodrene XR, and Green Coffee Bean + Energy at GNC stores located in Michigan on multiple occasions between 2013 and 2015.

19.     Plaintiff Dan Malecha resides in Burnsville, Minnesota. He purchased Lean Body Hi Energy Fat Burn, Tru Mangodrin, Jacked Pack, Nirvana, Meltdown Watermelon, Meltdown Peach Mango, Lipo 6 Black, Shredz Burner, Methlyl Drive 2.0, Lipodrene XR, and Green Coffee Bean + Energy at GNC stores located in the Burnsville Center and Southport Centre in Minnesota on multiple occasions between 2012 and 2015.

20.     Plaintiff Joseph Lambert resides in Nashua, New Hampshire. He purchased Mr. Hyde Watermelon at a GNC store located in the Pheasant Lane Mall in Nashua, New Hampshire, on two occasions in 2015.

21.     Plaintiff Cory Toth resides in New York. He purchased Riptek V2, Meltdown, Redline Ultra Hardcore, Hit Fastin XR, Charge Extreme Energy Booster, Testek, and Jetfuel

Superburn at GNC stores located in New York and online at GNC.com on multiple occasions between 2011 and 2015.

22.     Plaintiff Nate Picone resides in Bethlehem, Pennsylvania. He purchased Dr. Jekyll (watermelon) at a GNC store in Bethlehem in or around July 2015.

23.     Plaintiffs reasonably relied on labeling, marketing, or advertising in purchasing these supplements. At the point of sale, Plaintiffs reasonably believed that the supplements they purchased did not include mislabeled ingredients and were otherwise legal dietary supplements.

24.     Had Plaintiffs known that the supplements they purchased contained mislabeled dietary ingredients or were unlawful dietary supplements, they would not have purchased them.

## DEFENDANT

25.     Defendant General Nutrition Corporation is a Pennsylvania corporation with its headquarters and principal place of business in Pittsburgh, Pennsylvania.

## FACTUAL ALLEGATIONS

### Dietary Supplements

26.     Over half of the United States population uses dietary supplements, according to the Centers for Disease Control and Prevention. Consumers ingest these products to supplement their total dietary intake of substances such as vitamins, minerals, herbs, or botanicals. These products are often found in the form of tablets, capsules, softgels, gelcaps, liquids, or powders.

27.     Dietary supplements are marketed for a variety of reasons, including for weight loss and energy enhancement. The supplements at issue here are primarily weight-loss and sports-nutrition supplements available as powders and liquids.

<u>Federal and State Law Requirements for Dietary Supplements</u>

28.     Federal and state law place primary responsibility for the safety of dietary supplements, and for truthful and non-misleading labeling and advertising, on the shoulders of supplement manufacturers and distributors such as GNC. State law provides an additional, and critical, layer of consumer protection against false or misleading labeling, marketing, and advertising. As such, state law complements federal law. It also serves a distinct compensatory function.

29.     The federal Food, Drug, and Cosmetic Act ("FDCA") defines a "dietary supplement" as a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients: a vitamin; a mineral; an herb or other botanical; an amino acid; a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or a combination of any ingredient mentioned above. *See* 21 U.S.C. § 321(ff). Dietary supplements are products which are intended for ingestion, which are not represented for use as a conventional food or as a sole item of a meal or diet, and which are labeled as dietary supplements. *See id.*

30.     A dietary ingredient that falls into the federal definition, but was not previously marketed in the United States before October 14, 1994, is a "new dietary ingredient" ("NDI") 21 U.S.C. § 350b(d).

31.     A manufacturer or distributor is required to notify the FDA if it intends to market a dietary supplement in the U.S. that contains a "new dietary ingredient" that was not previously present in the food supply.  The manufacturer or distributor must submit the new dietary ingredient notification at least 75 days before the ingredient is sold and must include information

that supports the safety of the product. If the FDA does not take action during this 75-day period, the ingredient may be used in dietary supplements sold in the United States.

32.     Manufacturers and distributors are responsible for determining whether a particular dietary ingredient was marketed before October 15, 1994, and for documenting that belief.

33.     The sale of a dietary supplement with a "new dietary ingredient" without required premarket notification is illegal. *See* 21 U.S.C. §§ 331(a), 350(b).

34.     Because dietary supplements are under the "umbrella" of foods, the federal prohibition against 'misbranded' food applies to dietary supplements. *See* 21 U.S.C. § 343(a)(1). The federal misbranding law provides that "food shall be deemed to be misbranded" "[i]f (1) its labeling is false or misleading in any particular, . . ." *Id*. The federal prohibition against adulterated foods also applies to dietary supplements. *See* 21 U.S.C. §§ 342(f), 350b. A dietary supplement which contains a new dietary ingredient is adulterated if it does not satisfy the conditions applicable to such ingredients, including premarket notification. *See id*.

35.     States have expressly adopted or incorporated a general prohibition against food labeling that is false or misleading in any particular, or against the sale of food which is adulterated, in their state Food, Drug, and Cosmetic Acts. These state statutes incorporate by reference relevant portions of the FDCA. *See, e.g.*, Arkansas's Food, Drug, and Cosmetic Act, Ark. Code. Ann. § 20-56-201, *et seq.*; California's Sherman Food, Drug, and Cosmetics Act, Cal. Health & Safety Code § 109875, *et seq.*; Florida's Food Safety Act, Fla. Stat. Ann. § 500.01, *et seq.*; Michigan's Food Law, Mich. Comp. Laws Ann. 289.1101, *et seq.*; Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq.*; New York's Agriculture and Markets law, N.Y. Agric. & Mkts. Law § 1, *et seq.*; New Hampshire's Purity and Branding of Foods and Drugs law,

N.H. Rev. Stat. Ann. § 146:1, *et seq*.; Pennsylvania's Food Safety Act, 3 Pa. C.S.A. § 5721, *et seq*.; and Texas's Food, Drug, and Cosmetic Act, Tex. Health & Safety Code Ann. § 431.001, *et seq*.

General Nutrition Corporation (GNC)

36.     GNC is the largest global specialty retailer of nutritional supplements, including vitamin, mineral, herbal, and other specialty supplements, as well as sports nutrition and dietary supplements. The company has over 4,800 retail locations in the United States, and sells products through its website, www.gnc.com.

37.     In 2014, GNC had over $2.6 billion in revenue with 44% of its retail revenue coming from sports supplements and 11% coming from diet supplements. Its products are sold under GNC proprietary names and under third-party names in company owned retail stores and in franchise stores located across the United States, as well as on its website.

38.     Many of GNC's sports and diet supplements contain the chemicals and ingredients picamilon, BMPEA, or *acacia rigidula*. As GNC has long known, these are substances which pose unique health dangers—not dietary ingredients (vitamins, minerals, botanicals, herbs, or certain other substances) used to supplement the diet that were previously present in the food supply.

Picamilon

39.     Picamilon (also known as pikamilon or pikatropin) is a chemical developed by researchers in the former Soviet Union and is currently sold as a prescription drug in Russia to increase levels of gamma-aminobutyric acid (GABA) in the central nervous system. Drugs like picamilon that mimic or increase GABA activity in the brain allegedly provide anti-anxiety and

anti-convulsive effects. The FDA has never approved picamilon as either a prescription drug or for over-the-counter use in the United States.

40.     On September 28, 2015, Dr. Cara Welch, the Acting Deputy Director of the Division of Dietary Supplement Programs at the FDA, issued a declaration stating that picamilon does not qualify as a dietary ingredient under the FDCA.

41.     Dr. Welch's declaration stated that picamilon is neither a vitamin, mineral, herb or other botanical, amino acid, dietary substance used to increase the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any of these items.

42.     According to Dr. Welch, picamilon is a neurotransmitter that is formed by synthetically combining niacin with GABA. While both of these chemicals are individually found in nature, the compound has only been produced synthetically and has no known natural source.

43.     GNC has been aware since 2007 that picamilon is not a lawful dietary ingredient and that it is a synthetic drug. In May 2007, Jennifer Jakel, GNC's Senior Project Manager for Technical Research whose responsibilities include ensuring that labeling and scientific claims are accurate, reviewed literature on picamilon translated from Russian. The literature described picamilon as a "medicinal preparation" and as a "derivative of gamma-amino-butryic acid and nicotinic acid" that was first synthesized in 1969 by the All-Union Scientific Research Institute and studied in the NII pharmacological RAN. Documents reviewed by Ms. Jakel also described picamilon as "a new class of medicinal preparations called nootropics which are finding increasingly wider applications in various areas of medicine. Nootropic medications are adopted successfully for breakdowns of memory, attention, learning, and for treatment of loss of brain blood circulation, brain trauma, chronic alcoholism and other disorders."

44.     GNC was also aware that picamilon was not a dietary ingredient because Ms. Jakel noted in her 2007 analysis that she could not find a new dietary ingredient notification: "No NDI that I could find." In April 2014, Ms. Jakel again looked for a new dietary ingredient notification and documented: "still no NDI found."

45.     Concerned that picamilon was listed as a dietary ingredient on dietary supplement labeling for products available in the United States, researchers independent of GNC conducted a study to determine the accuracy of supplement labels listing picamilon. B. Avula, et al., *Identification and Quantification of Vinpocetine and Picamilon in Dietary Supplements Sold in the United States*, Drug Testing and Analysis (July 15, 2015). The researchers found that the actual amount of picamilon in the supplements varied from 99.6% to 157.9% of the labeled claim. Moreover, while maximum daily prescription dosages abroad range from 50 to 200 mg, an American consumer following the recommended maximum daily serving on supplement labels might consume up to 721.5 mg per day.

46.     On June 16, 2015, the Attorney General for the State of Oregon issued an Investigative Demand to GNC Holdings, Inc. (GNC's parent company) that demanded production of documents and information relating to the sale of picamilon.  The demand discussed the likelihood that picamilon was not a lawful dietary ingredient. GNC was aware of this demand and produced documents and information in response to it, but continued to sell dietary supplements containing picamilon. GNC did not cease selling supplements containing picamilon until after the Oregon Attorney General issued a Notice of Unlawful Trade Practices and Proposed Resolution to GNC on September 21, 2015.

47.     Picamilon was openly found on the labels of a variety of supplements available for sale at GNC, including the products that Plaintiffs purchased. Through this labeling, GNC

misrepresented to Plaintiffs and consumers that picamilon was a dietary ingredient. GNC otherwise failed to inform consumers that picamilon is a dangerous, synthetic stimulant.

BMPEA

48.    BMPEA, also known as beta-methylphenethylamine, was first synthesized in the 1930s as a potential replacement for amphetamine. Animal trials completed around this time demonstrated that BMPEA increased blood pressure and heart rate. For unknown reasons, however, studies of efficacy and safety in humans were never performed. As a result, BMPEA was never introduced as a pharmaceutical drug and its effects on humans are unknown. BMPEA was identified only as a research chemical until recently.

49.    In 2013, FDA researchers discovered that many dietary supplements labeled as containing *acacia rigidula*, a shrub native to Texas, contained BMPEA. The subsequently published study revealed that nearly half of 21 tested dietary supplements labeled as containing *acacia rigidula* actually contained BMPEA. Pawar et al., *Determination of selected biogenic amines in* Acacia rigidula *plant materials and dietary supplements using LC-MS/MS methods* (January 2014). Researchers were unable to find BMPEA in tested samples of *acacia rigidula*, suggesting that the plant does not naturally contain BMPEA. The FDA researchers also confirmed that BMPEA had never been tested for safety on humans.

50.    Plaintiffs' counsel also commissioned analyses of *acacia rigidula* extract, which is listed as a dietary ingredient in certain dietary supplements sold by GNC, for the existence of BMPEA. The testing facility conducted the analysis using LC/MS (Liquid Chromatography coupled to Mass Spectrometry) and GC/MS (Gas Chromatography coupled to Mass Spectrometry) tests. These tests found no BMPEA in *acacia rigidula* extract, providing an additional indication that the source of BMPEA in the supplements was synthetic, not natural.

51.     According to the Center for Responsible Nutrition, companies effectively "spiked" products labeled with *acacia rigidula* with BMPEA, where none would naturally be present. Testing by the Oregon Department of Justice on three dietary supplements sold at GNC stores labeled as containing *acacia rigidula* showed that they contained BMPEA instead.

52.     GNC has been aware that since at least early November 2013 some dietary supplements labeled as containing the plant *acacia rigidula* actually contained the amphetamine-like BMPEA. At that time, Ms. Jakel was notified by the PubMed service of the FDA study. A few weeks later, Ms. Jakel also circulated a *USA Today* article about the study to approximately 100 recipients at GNC, including Senior Vice President Guru Ramanathan and Vice President & General Counsel of Regulatory Affairs David J. Sullivan. Within minutes of receiving the email, GNC Merchandising Manager Carter Gray wrote to the Director of Merchandising, "Please tell me we won't have to get rid of acacia now."

53.      Initially, GNC employees made an effort to identify products with *acacia rigidula*. GNC's Senior Vice President of Marketing, Brian Cavanough offered to perform a database search to identify all affected products. Director of e-Commerce Nathanial Kennedy also learned of at least six products sold by GNC with *acacia rigidula*.

54.     In an e-mail that included the *USA Today* article, Charlie Chiaverini, the National Branch Manager for Rightway Nutrition (manufacturer of Green Coffee Bean+Energy), wrote to GNC employee Bob Emilian, asking, "[O]bviously you would like us to reformulate as fast as possible and replace the inventory in the stores in warehouse with new inventory yes." Bob Emilian replied, "Yes for starters."

55.     By February 2014, however, GNC employees approved of the use of *acacia rigidula* by a third-party vendor seeking permission to reformulate a product. GNC also

continued to sell dietary supplements that contained *acacia rigidula* without testing these supplements to determine whether they were adulterated with BMPEA or informing consumers of the risk that these products were adulterated.

56.     The Food Standards Agency of the European Union (EU) contacted GNC and other sellers of *acacia rigidula* products in March 2014 to inform them that *acacia rigidula* was a "novel food product" and could not be sold in the EU because, among other things, its safety had not been demonstrated.

57.     In November 2014, an article by *NutraIngredients-USA* reporting on European regulatory warnings regarding *acacia rigidula* and BMPEA was widely distributed throughout GNC. The article warned that dietary supplements labeled with *acacia rigidula* and containing BMPEA had been linked to hemorrhagic stroke.

58.     An April 2015 study which received significant national media attention found that more than 50% of tested dietary supplements labeled as containing *acacia rigidula* in fact contained BMPEA, including products sold by GNC in the United States. *See* P. Cohen, et al., *An amphetamine isomer whose efficacy and safety in humans has never been studied, β-*, Drug Test Analysis (April 2015). Researchers determined that "[t]he dosages of BMPEA in supplements strongly suggest that the amphetamine isomer is synthetically produced and placed in the supplement to lead to physiologic effects."

59.     After the results of the Cohen study were released, another supplement retailer, Vitamin Shoppe, announced that it was pulling these products and all others that list *acacia rigidula* on their labels: "Because the health and safety of our customers is our number one priority, and out of an abundance of caution, we are immediately removing all *acacia rigidula*

containing products, due to the concern that some of them may contain BMPEA, from our stores and website."

60.     In April 2015, the FDA formally announced that BMPEA did not meet the statutory definition of a dietary ingredient and sent warning letters to manufacturers whose products included BMPEA. Only after this announcement did GNC stop selling certain products identified as containing BMPEA.

61.     Because BMPEA is not an extract of *acacia rigidula*, dietary supplement products that state that BMPEA is an *acacia rigidula* extract are also false and misleading and unlawful.

62.     A report published in *Annals of Internal Medicine* linked undisclosed BMPEA in a dietary supplement to the occurrence of a hemorrhagic stroke. An otherwise healthy 53-year-old woman reported the sudden onset of stroke symptoms 45 minutes after beginning a vigorous exercise routine that she had repeated several times weekly for years. She had consumed the recommended dose of a sports supplement called Jacked Power approximately 30 minutes before beginning exercise. Researchers tested the patient's Jacked Power supplement and discovered that it contained 290 mg of undisclosed BMPEA per dose. The study's authors concluded that "[e]xercise combined with BMPEA . . . probably caused this patient's stroke."

63.     Consumption of BMPEA could also have significant consequences for athletes and other consumers who are subjected to drug testing because BMPEA is banned by the World Anti-Doping Agency. Several athletes have tested positive for BMPEA in urine toxicology studies, including an Olympic canoeist who claimed he had inadvertently consumed BMPEA in a dietary supplement.

64.     Foreign agencies, including Health Canada and the European Food Standards Agency, have recalled products on the market containing BMPEA, calling the ingredient a

"serious health risk." Health Canada, the Canadian equivalent of the FDA, announced a recall of the *acacia rigidula*-labeled dietary supplement "Jet Fuel Superburn" sold by GNC because it was spiked with undisclosed BMPEA. The European Food Standards Agency contacted GNC and other sellers of *acacia rigidula* products to inform them that *acacia rigidula* was a "novel food product" and could not be sold in the European Union because, among other reasons, its safety had not been demonstrated.

65.     BMPEA was openly found on the labels of a variety of supplements available for sale at GNC, including the products that Plaintiffs purchased. Through this labeling, GNC misrepresented to Plaintiffs and consumers that supplements with BMPEA were safe, could be legally sold in the United States, and contained their listed dietary ingredients.

<u>Acacia Rigidula</u>

66.     *Acacia rigidula*—also called, among other names, *Vachellia rigidula*, chaparro prieto, and blackbrush—is an herb or other botanical offered for sale as a dietary ingredient in dietary supplements.

67.     On March 7, 2016, the FDA issued letters warning six manufacturers of dietary supplements containing the dietary ingredient *acacia rigidula* that this is a "new dietary ingredient" which lacks evidence of safe use, and therefore cannot lawfully be sold in the United States.

68.     As the warning letters explain, a new dietary ingredient is adulterated under the FDCA, 21 U.S.C. § 342(f), unless it was lawfully marketed as a dietary ingredient in the United States before October 15, 1994, or there is information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has not been chemically altered. If neither circumstance applies, there must be "a history of use or

other evidence of safety establishing that the dietary ingredient when used under the conditions recommended or suggested in the labeling of the dietary supplement will reasonably be expected to be safe." 21 U.S.C. § 342(f). In addition, "at least 75 days before being introduced or delivered for introduction into interstate commerce, the manufacturer or distributor of the dietary ingredient or dietary supplement [must] provide[] FDA with information, including any citation to published articles, which is the basis on which the manufacturer or distributor has concluded that a dietary supplement containing such dietary ingredient will reasonably be expected to be safe." *Id*. The failure to comply with these requirements renders a new dietary ingredient adulterated.

69.     According to the FDA warning letters, *acacia rigidula* is adulterated because it is a new dietary ingredient which was not lawfully marketed before October 14, 1994; it was not present in the food supply as an article of food; and the FDA never received any premarket notification demonstrating an acceptable safety profile, let alone 75 days before *acacia rigidula* was delivered in interstate commerce.

70.     GNC has not provided the FDA with the required 75-day premarket notification showing a history of *acacia rigidula's* safe use in food products or supplements or any other evidence of safety, even though it knew or had reason to know that *acacia rigidula* was not lawfully marketed as a dietary ingredient in the United States before October 15, 1994.

71.     The sale of adulterated or misbranded dietary supplements violates federal and state law, including state Food, Drug, and Cosmetic Acts. These requirements, moreover, apply to manufacturers and distributors alike.

72.     *Acacia rigidula* was openly found on the labels of a variety of supplements available for sale at GNC, including the products that Plaintiffs purchased. Through this labeling,

GNC misrepresented to Plaintiffs and consumers that supplements with *acacia rigidula* were safe, could be legally sold in the United States, and contained their listed dietary ingredients.

<div align="center">GNC's Control Over Vendors' Labeling and Misleading Conduct</div>

73. Along with selling supplements under its proprietary brands, GNC also sells many products from third-party brands. GNC maintains that its large number of third-party offerings is one of the key distinctions between it and its competitors. Because GNC has significant market power as the largest supplement retailer, it exercises a great deal of control over the products these third parties sell.

74. Before it sells third-party products in its stores, GNC reviews and pre-approves all third-party product labels, warnings, packaging, and advertising sold in its stores. Third-party vendors cannot alter approved formulas, labels, or advertising without express permission from GNC. GNC also reviews proposals to reformulate third-party products and grants approval on occasion.

75. GNC has stated publicly that it received guarantees from third-party vendors that products containing picamilon, BMPEA, and *acacia rigidula* complied with legal requirements. GNC's third-party vendor agreement provides that the "Vendor Warrants that the Goods covered by this purchase order have been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (21 U.S.C. §301, *et seq.*, hereinafter "the Act") and requirements of all applicable federal, state and local laws, rules and regulations."

76. Based on this language, GNC informed the Oregon Attorney General that it is not liable for unlawful third-party vendor products sold at GNC stores or sold by GNC over the Internet. GNC, however, did not rely on third-party vendor guarantees concerning picamilon,

BMPEA, and *acacia rigidula* in good faith, because GNC knew or should have known that these substances were not safe and could not be lawfully sold.

77.     GNC also reviews scientific literature on the ingredients used in its third-party products to independently verify claims made by third-parties. For example, an email exchange on December 8, 2014, between Ms. Jackel and Christina Middleton, a GNC Associate Project Manager, discussed the literature regarding ingredients in third-party products. Based on Ms. Middleton's review of the literature, Ms. Jakel decided which ingredients "looked promising" for possible development by Nutra Manufacturing, GNC's manufacturing arm.

78.     Nutra Manufacturing manufactures and supplies vitamins and supplements to GNC and other third-party companies. Nutra Manufacturing does not produce supplements that contain picamilon, indicating that GNC knew that picamilon was not safe and was unlawful to sell. GNC obtains products containing picamilon that are sold in GNC stores through third-party vendors. Despite its control over the formulas, advertising, and packaging of third-party supplements and its own review of scientific literature, GNC sold products in its stores that contained picamilon, BMPEA, or *acacia rigidula*, which the FDA has stated are not lawful dietary ingredients, and are therefore illegal to sell in the United States.

79.     Through its control of its vendors' labels, GNC misrepresented that supplements with picamilon, BMPEA, or *acacia rigidula* contained ingredients that were safe for consumers and legal to sell.

80.     GNC's false representations are germane to customers' health and safety and are therefore material because reasonable consumers would find them important in making their purchase decision.

81. As a result of GNC's practices, Plaintiffs and proposed class members purchased supplements that GNC sold unlawfully. Plaintiffs and the proposed class members purchased supplements they would otherwise not have purchased, paid more for supplements than they would have otherwise paid, and have been subjected to unreasonable safety risks.

82. While GNC represents on its website that "GNC sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the cutting-edge of nutritional science," and that "GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet our high standards of quality," these representations are untrue. GNC sells products obtained from third-party vendors that GNC knows or should know contain unlawful and unsafe ingredients and GNC sells third-party products that GNC knows, or should know, have labels that are deceptive.

<u>Affected Dietary Supplements</u>

83. The following dietary supplements were sold by GNC with picamilon, BMPEA, or *acacia rigidula*:

| Products with Picamilon | |
|---|---|
| *Name* | *Manufacturer* |
| Charge Extreme Energy Booster | Labrada Bodybuilding Nutrition |
| Lean Body for Her Fat Burner | Labrada Bodybuilding Nutrition |
| Lean Body Hi Energy Fat Burn | Labrada Bodybuilding Nutrition |
| Testek | QNT International, Inc. |
| Riptek V2 | QNT International, Inc. |
| Tru Mangodrin | Truderma, LLC |
| Turbo Shred | Swole Sports Nutrition |

| | |
|---|---|
| Jacked Pack | BD Health Partners |
| Mr. Hyde - Fruit Punch | Prosupps USA LLC |
| Mr. Hyde - Watermelon | Prosupps USA LLC |
| Dr. Jekyll - Power Punch | Prosupps USA LLC |
| Dr. Jekyll - Watermelon | Prosupps USA LLC |
| Mr. Hyde - Orange Guava | Prosupps USA LLC |
| Vanish Bonus | Prosupps USA LLC |
| Mr. Hyde - Red Razz | Prosupps USA LLC |
| Mr. Hyde RTD Blue Razz | Prosupps USA LLC |
| Mr. Hyde - Blue Razz | Prosupps USA LLC |
| Mr. Hyde RTD Fruit Punch | Prosupps USA LLC |
| Nirvana | Sensatus Group LLC |
| ENGN Fruit Punch | Evlution Nutrition |
| ENGN Blue Razz | Evlution Nutrition |
| ENGN Green Apple | Evlution Nutrition |

| Products Labeled with BMPEA | |
|---|---|
| *Name* | *Manufacturer* |
| Fastin | High Tech Pharmaceuticals |
| Fastin DMAA Free | High Tech Pharmaceuticals |
| Meltdown Watermelon | VPX Sports, Inc. |
| Meltdown Peach Mango | VPX Sports, Inc. |

| | |
|---|---|
| Meltdown Exotic Fruit | VPX Sports, Inc. |
| Lipo 6 Black | Nutrex Research |
| Meltdown | VPX Sports, Inc. |
| Redline Ultra Hardcore Twinpk | VPX Sports, Inc. |
| Redline Ultra Hardcore Bonus | VPX Sports, Inc. |
| Redline Ultra Hardcore | VPX Sports, Inc. |
| Redline Hardcore Blister Pak | VPX Sports, Inc. |
| Fruit N.O. Shotgun | VPX Sports, Inc. |
| Grp Bgum Shotgun V3 | VPX Sports, Inc. |
| Craze — Candy Grape | Driven Sports |
| Vanish Bonus | Prosupps USA LLC |
| Shredz Burner | Shredz Supplements |
| Iso Lean 2 | VPX Sports, Inc. |
| Iso Lean 3 | VPX Sports, Inc. |
| Methyl Drive 2.0 | VPX Sports, Inc. |

| Products with *Acacia Rigidula* | |
|---|---|
| *Name* | *Manufacturer* |
| Hit Fastin XR | Hi Tech Pharmaceuticals |
| Lipodrene XR | Hi Tech Pharmaceuticals |
| Fastin XR DMAA Free | Hi Tech Pharmaceuticals |
| Jetfuel Superburn | World Health Products LLC |

| Green Coffee Bean + Energy | Rightway Nutrition |
| --- | --- |
| MX-LS7 | Isatori Global Technologies |
| Phenyl Core | Infinite Labs |

## **CLASS ACTION ALLEGATIONS**

84.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

action on behalf of themselves and proposed class and subclasses initially defined as:

Nationwide Class:

All persons in the United States who purchased a dietary supplement with

picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of

resale.

Arkansas Sub-Class:

All persons in Arkansas who purchased a dietary supplement with picamilon,

BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

California Sub-Class:

All persons in California who purchased a dietary supplement with picamilon,

BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

Florida Sub-Class:

All persons in Florida who purchased a dietary supplement with picamilon,

BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

Iowa Sub-Class:

All persons in Iowa who purchased a dietary supplement with picamilon,

BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Michigan Sub-Class:</u>

All persons in Michigan who purchased a dietary supplement with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Minnesota Sub-Class:</u>

All persons in Minnesota who purchased a dietary supplement with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>New Hampshire Sub-Class:</u>

All persons in New Hampshire who purchased a dietary supplement with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>New York Sub-Class:</u>

All persons in New York who purchased a dietary supplement with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Pennsylvania Sub-Class:</u>

All persons in Pennsylvania who purchased a dietary supplement with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Texas Sub-Class:</u>

All persons in Texas who purchased a dietary supplement with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

85.     Excluded from the proposed class and subclasses are Defendant, any parent, affiliate, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any of Defendant's officers or directors; any successor or assign of Defendant; anyone

employed by counsel for Plaintiffs; any Judge to whom this case is assigned, his or her spouse, and all persons within a third degree of relationship to either of them.

86.    <u>Numerosity of the Classes – Fed. R. Civ. P. 23(a)(1)</u>. The members of the class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiffs at the present time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of class members located throughout the United States and thousands in each of the sub-class states. It would be impracticable to join the class members individually. These members are readily ascertainable, including through sales receipts and GNC Gold Card membership files maintained by GNC.

87.    <u>Existence and Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. Common questions of law and fact exist as to all class members and predominate over questions affecting only individual class members. These common questions include whether:

a.    GNC sold dietary supplement products with picamilon, BMPEA, or *acacia rigidula*;

b.    GNC represented that picamilon, BMPEA, and *acacia rigidula* were dietary ingredients;

c.    GNC's representations regarding picamilon, BMPEA, and *acacia rigidula* were otherwise false or deceptive;

d.    GNC knew, or in the exercise of reasonable diligence should have known, that its representations regarding picamilon, BMPEA, and *acacia rigidula* in dietary supplements it sold were false or deceptive;

e.    GNC's representations regarding picamilon, BMPEA, and *acacia rigidula* in dietary supplements would deceive a reasonable consumer;

f.      GNC's representations regarding picamilon, BMPEA, and *acacia rigidula* constitute unfair, deceptive, untrue, or misleading advertising;

g.      GNC violated the consumer protection laws of Arkansas, California, Florida, Iowa, Michigan, Minnesota, New Hampshire, New York, Pennsylvania, and Texas.

h.      GNC violated Arkansas's Food, Drug, and Cosmetic Act, Ark. Code Ann. § 20-56-201, *et seq.*; California's Sherman Food, Drug, and Cosmetics Act, Cal. Health & Safety Code § 109875, *et seq.*; Florida's Food Safety Act, Fla. Stat. Ann. § 500.01, *et seq.*; Michigan's Food Law, Mich. Comp. Laws 289.1101, *et seq.*; Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq.*; New York's Agriculture and Markets law, N.Y. Agric. & Mkts. Law § 1, *et seq.*; New Hampshire's Purity and Branding of Foods and Drugs law, N.H. Rev. Stat. Ann.§ 146:1, *et seq.*; Pennsylvania's Food Safety Act, 3 Pa. C.S.A. § 5721, *et seq.*; and Texas's Food, Drug, and Cosmetic Act, Tex. Health & Safety Code Ann.§ 431.001, *et seq.* by selling dietary supplement products with false or misleading labeling in any particular or adulterated ingredients;

i.      GNC's conduct described above caused Plaintiffs and class members to suffer injury, and they therefore may recover damages, or other legal and equitable relief, and an award of attorneys' fees, costs, and expenses.

88.    <u>Typicality – Fed. R. Civ. P. 23(a)(3)</u>. Plaintiffs' claims are typical of the claims of the class because, among other things, they purchased one of the affected supplements due to GNC's representations and lost money as a result.

89.    Adequacy of Representation – Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives because their interests are aligned with those of the class members they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously on class members' behalf.

90.    Superiority – Fed. R. Civ. P. 23(b)(3). The action may be certified under Rule 23(b)(3) because common questions predominate as described above and because a class action is the best available method for the fair and efficient adjudication of this controversy. This litigation involves technical issues and targeted discovery of a sophisticated defendant, and could not practically be taken on by individual litigants. In addition, individual litigation of class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results. A class action presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

91.    In the alternative to class certification under Rule 23(b)(3), the proposed class may be certified under 23(b)(2) because GNC has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class.

**FIRST CAUSE OF ACTION**
**Violations of the Magnuson-Moss Warranty Act (MMWA),**
**15 U.S.C. § 2301, *et seq*., for Breach of Implied Warranties**
**(All Plaintiffs, Individually and on behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

92.    Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth, each and every allegation set forth above.

93. The GNC dietary supplements are consumer products as defined in 15 U.S.C. § 2301(1).

94. Plaintiffs and the Classes are "consumers" as defined in 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

95. GNC is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

96. Under 15 U.S.C. § 2310(d)(1), the MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

97. In connection with its sale of the dietary supplements, GNC gave an implied warranty of merchantability as defined in 15 U.S.C. § 2301(7). Specifically, GNC warranted that the dietary supplements were fit for their ordinary purpose, to supplement the diet with dietary ingredients, and would pass without objection in the trade.

98. GNC breached the implied warranty of merchantability and thereby violated the MMWA by selling dietary supplements containing picamilon, BMPEA, or *acacia rigidula* to its customers, including Plaintiffs and statewide class members, endangering their health thereby.

99. GNC's breach of warranty has deprived Plaintiffs and the Classes of the benefit of their bargain.

100. As a direct and proximate result of GNC's conduct, Plaintiffs and the Classes have suffered damages and continue to suffer damages and other losses in an amount to be determined at trial.

101. Plaintiffs and each of the Class members have had sufficient direct dealings with either GNC or its agents to establish privity of contract between GNC and Plaintiffs and each of the Class members. Nonetheless, privity is not required here because Plaintiffs and each of the

Class members are intended third-party beneficiaries of contracts between GNC and its third-party manufacturers, and specifically, of GNC's implied warranties. GNC's warranty agreements were designed for and intended to benefit the Class.

102.    Privity also is not required because the dietary supplements are dangerous instrumentalities due to the defect and nonconformities outlined herein.

103.    Plaintiff Kyle Eager afforded GNC with a reasonable opportunity to cure its class-wide breach pursuant to 15 U.S.C. § 2310.

104.    Plaintiffs and the Class members have been damaged by GNC's breach of the implied warranty of merchantability and therefore seek damages, or other legal and equitable relief, and an award of attorneys' fees, costs, and expenses.

<div align="center">

**SECOND CAUSE OF ACTION**
**Breach of Implied Warranties**
**(All Plaintiffs, Individually and on behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

</div>

105.    Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth, each and every allegation set forth above.

106.    Defendant GNC is in the business of selling dietary supplements to consumers such as Plaintiffs and members of the classes, including, but not limited to, dietary supplement products with picamilon, BMPEA, or *acacia rigidula* of the kind sold to Plaintiffs and members of the proposed statewide classes.

107.    Plaintiffs and members of the classes purchased one of more supplements labeled with picamilon, BMPEA, or *acacia rigidula*.

108.    At all times herein mentioned, GNC manufactured, tested, advertised, promoted, marketed, sold and/or distributed these dietary supplements.

109.     At the time GNC designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the dietary supplements for use by Plaintiffs and the Class members, GNC knew of the uses for which the dietary supplements were intended, and impliedly warranted the products to be of merchantable quality.

110.     GNC's representations and warranties were false, misleading, and inaccurate, in that the dietary supplements were not of merchantable quality because the products were defective, would not pass without objection in the trade, were not fit for ordinary purposes, and did not conform the promises on labeling.

111.     Plaintiffs and the classes did rely on said implied warranty of merchantability.

112.     Plaintiffs and the classes reasonably relied upon the skill and judgment of GNC as to whether the dietary supplements were of merchantable quality.

113.     The dietary supplements were injected into the stream of commerce by GNC despite the fact that the dietary supplements were expected to and did reach users, handlers, and persons coming into contact with the products without substantial change in the condition in which they were sold.

114.     GNC breached the implied warranties, because the products were defective, could not deliver on the advertised claims, would not pass without objection in the trade, and were not fit for ordinary purposes.

115.     As a direct and proximate result of the breach of implied warranties, Plaintiffs and the members of the proposed State Classes suffered and/or will continue to be harmed and suffer economic loss.

116.     GNC's conduct breached its implied warranties regarding its products under state implied warranty laws including:

<div style="margin-left: 2em;">

a.      Ark. Code Ann. § 4-2-314 and § 4-2-315;

b.      Cal. Com. Code § 2314 and § 2315;

c.      Fla. Stat. § 672.314 and § 672.315;

d.      Iowa Code § 554.2314 and § 554.2315;

e.      Mich. Comp. Laws § 440.2314 and § 440.2315;

f.      Minn. Stat. § 336.2-314 and §336.2-315;

g.      N.H. Rev. Stat. Ann. § 382-A:2-314 and § 382-A:2-315;

h.      N.Y. U.C.C. Law § 2-314 and § 2-315;

i.      13 Pa. C.S.A.§ 2314 and § 2315; and

j.      Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315.

</div>

117.    GNC received notice of these issues by the investigations of the FDA, the Oregon Attorney General, numerous complaints filed against it including the instant Complaint, and by individual letters and communications sent by Plaintiffs.

118.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiffs and the Class members have suffered damages, and are entitled to compensatory damages, costs and reasonable attorneys' fees.

<div style="text-align: center;">

**THIRD CAUSE OF ACTION**
**Unjust Enrichment or Quasi-Contract**
**(All Plaintiffs, Individually and on behalf of behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

</div>

119.    Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth, each and every allegation set forth above.

120.    GNC has unjustly retained a benefit to the detriment of Plaintiffs and the members of the proposed Nationwide Class and State Sub-Classes. GNC sold dietary supplements to Plaintiff and other class members that were illegal because they contained

picamilon, BMPEA, or *acacia rigidula*—chemicals which do not qualify as dietary ingredients under federal law. GNC continues to possess money paid by Plaintiffs and the Nationwide Class to which it was not entitled.

121.     GNC's retention of this benefit violates the fundamental principles of justice, equity, and good conscience. Through its control of its vendors' labels and its sale of affected dietary supplement products to consumers, GNC misrepresented that its dietary supplements and the ingredients contained within were lawful.

122.     As a direct and proximate result of GNC's conduct, Plaintiffs and the Class members have suffered damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(All Plaintiffs, Individually and on behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

123.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

124.     Plaintiffs bring this claim on behalf of themselves and the proposed Classes.

125.     GNC had a duty to disclose to Plaintiffs and Class members the product's actual quality and characteristics.

126.     GNC negligently and/or carelessly misrepresented, omitted and concealed from consumers material facts relating to the quality and characteristics of its products, including but not limited to that they contain picamilon, BMPEA, or *acacia rigidula*.

127.     These misrepresentations and omissions were material and concerned the specific characteristics and quality of its products that a reasonable consumer would consider in purchasing any dietary supplement.

128. GNC made such false and misleading statements and omissions on its website and product labeling, and in its advertisements and warranties, with the intention of inducing Plaintiffs and the Class members to purchase the products.

129. As a result of GNC's misstatements, it was under a duty to disclose facts necessary to correct those misstatements. Further, GNC was in a better position to discover the misrepresentations than Plaintiffs because GNC controlled the products' design, manufacturing, testing, and marketing processes.

130. At the time it made the representations, GNC knew, or by the exercise of reasonable care should have known, that the statements were false.

131. GNC advertised and marketed its products with the intent to induce Plaintiffs and Class members to purchase the products.

132. GNC knew or, should have known, that without the misrepresentations and/or omissions, Plaintiffs and the classes would not have purchased the unsafe products.

133. Plaintiffs and the classes justifiably relied upon GNC's misrepresentations about the Product's quality and characteristics.

134. Plaintiffs and the classes were unaware of the falsity of GNC's misrepresentations and omissions and, as a result, justifiably relied on them in deciding to purchase the GNC Products. Had Plaintiffs and Class members been aware of the true nature and quality of the Products, they would not have purchased it.

135. As a direct and proximate result of GNC's misrepresentations and omissions of material fact, Plaintiffs and Class members have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Violations of Arkansas's Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-101,** *et seq.*
**(Plaintiff Matthew Shane Smith, Individually**
**and on behalf of the proposed Arkansas Sub-Class)**

136.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

137.     The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.* (the "ADTPA"), makes unlawful any "deceptive" and "unconscionable" trade practices and any "deception," "fraud," or "false pretense" utilized in connection with the sale or advertisement of any goods. GNC has violated and continues to violate the ADTPA.

138.     GNC engaged in "deceptive trade practices," as defined by Ark. Code Ann. §§ 4-88-107 and 4-88-108, by:

a.       Representing that products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they do not have;

b.       Representing that products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

c.       Omitting that products contained the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula* ; and

d.       Advertising the products that contained picamilon, BMPEA or *acacia rigidula* without intending to sell them as advertised.

139.     GNC knew or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA and *acacia rigidula* were not a lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, and *acacia rigidula* as dietary

ingredients on products and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

140.    Reasonable consumers such as Plaintiff Smith and members of the Arkansas Sub-Class would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected products.

141.    GNC intended that Plaintiff Smith and members of the Arkansas Sub-Class would rely on the false and misleading representations and omissions.

142.    Plaintiff Smith and members of the Arkansas Sub-Class justifiably relied on GNC's representations and omissions regarding the composition of its products containing picamilon, BMPEA or *acacia rigidula*.

143.    GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in the Arkansas's Food, Drug, and Cosmetic Act, A.C.A. § 20-56-201, *et seq*.

144.    As a direct and proximate result of GNC's conduct, Plaintiff Smith and the Arkansas Sub-Class Members were harmed because they purchased products that they would not have bought or otherwise paid a premium price for the products.

145.    Plaintiff Smith and the Arkansas Sub-Class are entitled to actual damages, reasonable attorneys' fees, and costs.

### SIXTH CAUSE OF ACTION
**Violations of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(Plaintiffs Kyle Eager and Robert Brooks, Individually**
**and on behalf of the proposed California Sub-Class)**

146.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

147.     The Unfair Competition Law, California Bus. & Prof. Code § 17200, *et seq*. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business acts or practices and any false or misleading advertising. GNC has violated and continues to violate the UCL.

148.     GNC's acts or practices also constitutes unlawful business practices in that they violate the Sherman Food, Drug, and Cosmetic Law, Cal. Health 7 Safety Code § 109875, *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*, and applicable federal laws and regulations.

149.     Plaintiffs Eager and Brooks, individually and on behalf of the other members of the California Sub-Class, reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such violative conduct is ongoing and continues to this date.

150.     GNC's acts and practices constitute "unfair" business practices because, as alleged above, GNC engages in *inter alia* deceptive and false advertising, and misrepresents and omits material facts regarding its dietary supplements with picamilon, BMPEA, or *acacia rigidula*, and thereby violates established public policy, and engages in immoral, unethical, oppressive, or unscrupulous activities that are substantially injurious to consumers like Plaintiffs and other members of the California Sub-Class. This conduct constitutes violations of the "unfair" prong of the UCL.

151.     GNC's acts and practices also constitute fraudulent practices in that they are false, misleading, and likely to deceive reasonable consumers like Plaintiffs, and other members of the California Sub-Class. GNC falsely represented that its dietary supplement products contained legal dietary ingredients. A reasonable consumer would not have purchased the affected dietary supplements from GNC if they had been aware of this fact.

152. GNC's fraudulent acts and practices also constitute "unfair" business practices in that:

      a.      The legitimate utility of GNC's conduct is outweighed by the harm to Plaintiffs and other members of the California Sub-Class;

      b.      GNC's conduct is immoral, unethical, oppressive, or unscrupulous activities that are substantially injurious to consumers like Plaintiffs, and other members of the California Sub-Class;

      c.      GNC's conduct violates the policies underlying the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* – to protect consumers from unfair or deceptive business practices.

153. There were reasonably available alternatives to further GNC's legitimate business interests, other than the conduct described herein.

154. As a direct and proximate result of GNC's unlawful, unfair, and fraudulent business practices as alleged above, Plaintiffs and the California Sub-Class have suffered injury in fact and lost money or property, because they purchased and paid for dietary supplements from GNC that they otherwise would not have, or would not have paid as much for them as they did. Meanwhile, GNC has generated more revenue than it otherwise would have and charged inflated prices for its products, unjustly enriching itself.

155. Plaintiffs Eager and Brooks and the California Sub-Class are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to GNC because of its unlawful, unfair, fraudulent, and deceptive acts and practices; reasonable attorneys' fees and costs; declaratory relief; injunctive relief; and all other relief this Court deems appropriate, consistent with Cal. Bus. & Prof. Code § 17203.

## SEVENTH CAUSE OF ACTION
### Violations of California's Consumers Legal Remedies Act,
### Cal. Civ. Code § 1750, *et seq.*
### (Plaintiffs Kyle Eager and Robert Brooks, Individually
### and on behalf of the proposed California Sub-Class)

156.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

157.    Plaintiffs Eager and Brooks and members of the California Sub-Class are "consumers" within the meaning of Cal. Civ. Code §§ 1761(d) and 1770, and each has engaged in a "transaction" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

158.    GNC is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770, and provided "goods" within the meaning of Cal. Civ. Code §§ 1761(a) and 1770.

159.    GNC's acts and practices, as alleged in this Consolidated Amended Complaint, violate California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1770(a)(5), (7), (9), (14), and (16), by engaging in unfair methods of completion and unfair and deceptive acts and practices in connection with transactions, namely, the sale of dietary supplements with picamilon, BMPEA, or *acacia rigidula* to Plaintiffs and members of the California Sub-Class. This conduct was intended to result and did result in the sale of these goods to consumers. Specifically, GNC:

        a.    Represented that dietary supplements with picamilon, BMPEA or *acacia rigidula* had approval or characteristics that they did not have;

        b.    Represented that dietary supplements with picamilon, BMPEA or *acacia rigidula* were of a particular standard, quality or grade when they were actually of another;

c. Advertising the dietary supplements with picamilon, BMPEA, or *acacia rigidula* without intent to sell them as advertised;

d. Represented that consumers' purchases of dietary supplements with picamilon, BMPEA, or *acacia rigidula* conferred or involved rights that the transactions did not have or involve; and

e. Represented that dietary supplements with picamilon, BMPEA, or *acacia rigidula* were supplied in accordance with GNC's representations, when the dietary supplements were not supplied that way.

160. GNC was in a position to know, both from its own product knowledge and the available scientific literature on Picamilon, BMPEA, and *acacia rigidula* referenced above, while consumers were not reasonably in a position to be aware of GNC's internal product information or such studies.

161. GNC intended that Plaintiffs and the California Sub-Class members would rely on the false and misleading representations, and any reasonable consumer would deem the false and misleading representations material to the purchase of the affected dietary supplements.

162. As a direct and proximate result of GNC's conduct, Plaintiffs and the California Sub-Class members have been harmed, in that they purchased products that they otherwise would not have. Meanwhile, GNC has generated more revenue than it otherwise would have, unjustly enriching itself.

163. Plaintiffs and the California Sub-Class is entitled to equitable relief, reasonable attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining GNC from its unlawful, fraudulent, and deceitful activity.

164.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Eager sent GNC a letter on behalf of himself and a proposed nationwide class of consumers on January 12, 2016, demanding that GNC rectify the problems listed herein. GNC has failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within the proscribed 30-day time period for written notice pursuant to Cal. Civ. Code § 1782.

165.    Due to GNC failing to rectify or otherwise agreeing to rectify the problems associated with the actions detailed above, Plaintiff seeks to further recover actual or statutory compensatory/monetary damages as authorized by Cal. Civ. Code § 1780(a)(1), restitution as applicable and authorized under Cal. Civ. Code § 1780(a)(3), and punitive damages as authorized by Cal. Civ. Code § 1780(a)(4), which are appropriate in this case in light of GNC's knowing, intentional, fraudulent, and unconscionable conduct, as well as GNC's reckless disregard of its legal obligations to Plaintiff and the California Sub-Class members, and as otherwise recoverable under Cal. Civ. Code § 1780(a)(4).

**EIGHTH CAUSE OF ACTION**
**Violations of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500,** *et seq.*
**(Plaintiffs Kyle Eager and Robert Brooks, Individually**
**and on behalf of the proposed California Sub-Class)**

166.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

167.    California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"), makes it unlawful for any person or corporation "to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any . . . advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement,

concerning . . . personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

168.    The advertisements at issue in this case were made or caused to be made before the public in California, either in terms of statements on GNC's website, or the product packaging of the dietary supplements with picamilon or BMPEA.

169.    GNC committed acts of false or misleading advertising when it:

   a.    Represented that dietary supplements with picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

   b.    Represented that dietary supplements with picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality or grade when they were actually of another; and

   c.    Represented that dietary supplements with picamilon, BMPEA, or *acacia rigidula* were supplied in accordance with GNC's representations, when the dietary supplements were not supplied that way.

170.    GNC was either aware, or should have known through the exercise of reasonable care, that their representations and omissions of material facts concerning ingredients of the dietary supplement with picamilon, BMPEA, or *acacia rigidula* were untrue or misleading.

171.    GNC's actions were untrue or misleading in that the general public targeted by GNC to act upon such advertisements were likely to be deceived.

172.    Plaintiffs Eager and Brooks and members of the California Sub-Class were injured in fact and lost money or property as a result of GNC's FAL violations because they

would not have purchased the dietary supplements with picamilon, BMPEA, or *acacia rigidula*, or would not have paid the price that they did if the true facts about the dietary supplements with picamilon, BMPEA, or *acacia rigidula* had been fully and timely disclosed, and the dietary supplements with picamilon, BMPEA, or *acacia rigidula* they received were worth substantially less than what they were promised by GNC and expected. Plaintiffs and members of the California Sub-Class are therefore entitled to equitable monetary relief and injunctive relief.

<p align="center">**NINTH CAUSE OF ACTION**<br>
**Violations of Florida's Deceptive and Unfair Trade Practices Act,**<br>
**Fla. Stat. § 501.201, *et seq*.**<br>
**(Plaintiff Mary Jo Cesario, Individually and on behalf of the**<br>
**proposed Florida Sub-Class)**</p>

173. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

174. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. (the "FDUTPA"), makes unlawful any "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." GNC has violated and continues to violate the FDUTPA.

175. GNC engaged in "deceptive" trade practices, as identified in Fla. Stat. §§ 501.203, and 501.204 by:

    a.    Representing that products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

    b.    Representing that products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

c. Omitting that products contained the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula*; and

d. Advertising the products that contained picamilon, BMPEA, or *acacia rigidula* without intending to sell them as advertised.

176. GNC knew or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed, or sold products that GNC knew falsely listed, picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various products and/or misrepresented BMPEA, as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

177. Reasonable consumers such as Plaintiff Cesario and members of the Florida Sub-Class, would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected products.

178. Plaintiff and members of the Florida Sub-Class justifiably relied on GNC's representations and omissions regarding the composition of its products containing picamilon, BMPEA, or *acacia rigidula* .

179. GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in the Florida's Food Safety Act, Fla. Stat. § 500.01, *et seq.*, and the Fla. Admin. Code. r. 5K4.002.

180. As a direct and proximate result of GNC's conduct, Plaintiff and members of the Florida Sub-Class were harmed because they purchased products that they would not have bought, or otherwise paid a premium price for the products.

181.     Plaintiff and the Florida Sub-Class are entitled to actual damages, costs, reasonable attorneys' fees and costs, a declaratory judgment that GNC's aforementioned conduct violates the FDUPTA, and an injunction precluding GNC from engaging in conduct that continues to violate the FDUTPA.

### TENTH CAUSE OF ACTION
**Violations of Iowa's Private Right of Action for Consumer Frauds Act,**
**Iowa Code Chapter 714H**
**(Plaintiff Chris Lynch, Individually and on behalf of the**
**proposed Iowa Sub-Class)**

182.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

183.     GNC has engaged in unfair, deceptive, untrue and misleading business practices in violation of Iowa law.

184.     GNC has violated this statutory prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts with the "intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission" in connection with the sale of its garments. Iowa Code Ann. § 714H.3.

185.     Pursuant to Iowa law, GNC had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the Products to Plaintiff Lynch and the Class members.

186.     In connection with the sale of its consumer merchandise, GNC engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

    a.     Unfairly and deceptively misrepresenting the benefits and quality of its Products to its customers;

      b.      Unfairly and deceptively advertising the actual ingredients of the Products; and

      c.      Unfairly and deceptively omitting that the Products contain the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula* .

187.    As a result of the unfair and deceptive conduct of GNC, Plaintiff Lynch sustained damages including but not limited to the damages detailed above, incorporated herein.

188.    Pursuant to the Iowa law, GNC had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the dietary supplements to Plaintiff Lynch and the Class members.

189.    GNC intended that Plaintiff Lynch and the Class members rely on its materially deceptive advertisements and misrepresentations and purchase its Products as a consequence of the deceptive practices.

190.    GNC's deceptive representations and material omissions to Plaintiff Lynch and the Class members constitute unfair and deceptive acts and practices under Iowa Law.

191.    GNC engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the Class members.

192.    Plaintiff Lynch and the Class members were actually deceived by CNG's misrepresentations.

193.    As a proximate result of GNC's misrepresentations, Plaintiff Lynch and the Class members have suffered ascertainable losses, in an amount to be determined at trial.

194.    Prior to filing this suit, counsel for Plaintiff Lynch received approval from the Attorney General of Iowa pursuant to Iowa Code Ann. § 714H.7.

## ELEVENTH CAUSE OF ACTION
### Violations of Michigan's Consumer Protection Act,
### Mich. Comp. Laws Ann. §445.901, *et seq.*
### (Plaintiffs Jeff Johnston and Martine Landuit Vartanian, Individually
### and on behalf of the proposed Michigan Sub-Class)

195.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

196.    Plaintiffs Johnston and Vartanian brings this claim on their own behalf and on behalf of each member of the Class described above.

197.    GNC, by the actions complained of herein has violated the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §445.901, *et seq.* ("MCPA") entitling Plaintiff and the members of the Class to damages and relief under the MCPA.

198.    In connection with the sale of its consumer products, Defendant engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

    a.    Unfairly and deceptively misrepresenting the benefits and quality of its Products to its customers;

    b.    Unfairly and deceptively advertising the actual ingredients  of the Products; and

    c.    Unfairly and deceptively omitting that the Products contain the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula*.

199.    GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in Michigan's Food Law, Mich. Comp. Laws Ann. 289.1101, et seq.

200.    GNC's conduct as set forth herein occurred in the course of trade or commerce.

201. GNC's conduct as set forth herein affects the public interest because it was part of a generalized course of conduct affecting numerous customers throughout the country.

202. Plaintiffs Johnston and Vartanian and Michigan Sub-Class members inherently relied on the materially deceptive advertisements and misrepresentations GNC made to Plaintiffs and the class regarding its Products.

203. As a proximate result of Defendant's misrepresentations, Plaintiffs Johnston and Vartanian and the Michigan Sub-Class members have suffered ascertainable losses, in an amount to be determined at trial.

204. GNC is liable to Plaintiffs and Class members for damages in an amount to be determined at trial, including attorneys' fees, costs and statutory damages, and should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable and unlawful practices as alleged herein.

**TWELFTH CAUSE OF ACTION**
**Violations of Minnesota's Unlawful Trade Practices Act,**
**Minn. Stat. Ann. § 325D.09, *et seq.***
**(Plaintiff Dan Malecha, Individually and on behalf of the**
**proposed Minnesota Sub-Class)**

205. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

206. The Minnesota Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09, *et seq.* (the "MUTPA"), makes unlawful the knowing "misrepresentation, directly or indirectly," of the "true quality" or "ingredients" of merchandise. GNC has violated and continues to violate the MUTPA.

207. GNC knowingly misrepresented the "quality" and "ingredients" of its products, as prohibited by Minn. Stat. Ann. § 325D.13, by:

a.  Representing that products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b.  Representing that products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another; and

c.  Omitting that the products contained the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula*.

208.    GNC knew or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, and *acacia rigidula* were not a lawful dietary ingredients, yet GNC falsely listed, or sold products that GNC knew falsely listed, picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various products and/or misrepresented BMPEA, as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

209.    Reasonable consumers such as Plaintiff Malecha and members of the Minnesota Sub-Class, and particularly health-conscious individuals who shop at GNC, would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected products.

210.    GNC intended that Plaintiff Malecha and members of the Minnesota Sub-Class would rely on GNC's false and misleading representations and omissions.

211.    Plaintiff Malecha and members of the Minnesota Sub-Class justifiably relied on GNC's representations and omissions regarding the composition of its products containing picamilon, BMPEA, or *acacia rigidula*.

212. GNC's conduct was also an unlawful trade practice in that it violated the prohibition against false or misleading labeling in Minnesota's Food Law, M.S.A. § 34A.01, *et seq*.

213. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and members of the Minnesota Sub-Class were harmed because they purchased products that they would not have bought or otherwise paid a premium price for the products.

214. Plaintiff Malecha and the Minnesota Sub-Class are entitled to actual damages and an injunction precluding GNC from engaging in conduct that continues to violate the MUTPA.

**THIRTEENTH CAUSE OF ACTION**
**Violations of Minnesota's Uniform Deceptive Trade Practices Act,**
**Minn. Stat. Ann. § 325D.43, *et seq.***
**(Plaintiff Dan Malecha, Individually and on behalf of the**
**proposed Minnesota Sub-Class)**

215. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

216. The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43, *et seq.* (the "MUDTPA"), makes unlawful any "deceptive" trade practices utilized in connection with the sale or advertisement of any goods. GNC has violated and continues to violate the MUDTPA.

217. GNC engaged in "deceptive trade practices," as defined by Minn. Stat. Ann. § 325D.44, by:

      a. Representing that products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b.      Representing that products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

c.      Omitting that products contained the unsafe compounds or ingredients of picamilon, BMPEA, or acacia rigidula; and

d.      Advertising the products containing picamilon, BMPEA, or *acacia rigidula* without intending to sell them as advertised.

218.    GNC knew, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, and *acacia rigidula* were not a lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various products and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

219.    Reasonable consumers such as Plaintiff Malecha and members of the Minnesota Class, would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected products.

220.    GNC intended that Plaintiff Malecha and members of the Minnesota Class would rely on the false and misleading representations and omissions.

221.    Plaintiff Malecha and the Minnesota Sub-Class members justifiably relied on GNC's representations and omissions regarding the composition of its products containing Picamilon and BMPEA.

222.    GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq*.

223.     As a direct and proximate result of GNC's conduct, Plaintiff Malecha and the

Minnesota Sub-Class members were harmed because they purchased products that they would

not have bought or otherwise paid a premium price for the products.

224.     Plaintiff Malecha and the Minnesota Class are entitled to costs, reasonable

attorneys' fees, an injunction precluding GNC from engaging in conduct that continues to violate

the MUDTPA, and any additional relief awarded to redress Plaintiffs' common law claims.

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**Violations of Minnesota's Consumer Fraud Act,**
**Minn. Stat. Ann. § 325F.68, *et seq.***
**(Plaintiff Dan Malecha, Individually and on behalf of the**
**proposed Minnesota Sub-Class)**

</div>

225.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as

if fully set forth herein.

226.     The Minnesota Consumer Fraud Act, Minn. Stat. Ann. § 325F.68, *et seq.* (the

"MCFA"), makes unlawful any "fraud, false pretense, false promise, misrepresentation,

misleading statement or deceptive practice, with the intent that others rely thereon in connection

with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or

damaged…" GNC has violated and continues to violate the MCFA.

227.     GNC engaged in "misleading" and "deceptive" practices, as defined by Minn.

Stat. Ann. § 325F.69, by:

> a.      Representing that products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

> b.      Representing that products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

c. Omitting that products contained the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula*; and

d. Advertising the products containing picamilon, BMPEA, or acacia rigidula without intending to sell them as advertised.

228. GNC knew or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, and *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, and *acacia rigidula* as dietary ingredients on various products and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

229. Reasonable consumers like Plaintiff Malecha and members of the Minnesota Sub-Class would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected products.

230. GNC intended that Plaintiff Malecha and the members of the Minnesota Sub-Class would rely on the false and misleading representations and omissions.

231. Plaintiff Malecha and the members of the Minnesota Sub-Class justifiably relied on GNC's representations and omissions regarding the composition of its products containing picamilon, BMPEA, or *acacia rigidula*.

232. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and members of the Minnesota Class were harmed because they purchased products that they would not have bought or otherwise paid a premium price for the products.

233. Plaintiff Malecha and the Minnesota Class are entitled to actual damages, costs, reasonable attorneys' fees, a declaratory judgment that GNC's aforementioned conduct violates

Minnesota's Consumer Fraud Act, and an injunction precluding GNC from engaging in conduct that continues to violate the MCPA.

**FIFTEENTH CAUSE OF ACTION**
**Violations of Minnesota's False Statement in Advertising Act,**
**Minn. Stat. Ann. § 325F.67**
**(Plaintiff Dan Malecha, Individually and on behalf of the**
**proposed Minnesota Sub-Class)**

234.  Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

235.  The Minnesota False Statement in Advertising Act, Minn. Stat. Ann. § 325F.67 (the "MFSAA"), precludes corporations from placing before the public a "label" or "advertisement of any sort regarding merchandise" for sale that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading . . . " GNC has violated and continues to violate the MFSAA.

236.  GNC "placed before the public" labels or other advertisements that contained untrue, deceptive, or misleading assertions, representations, and facts, as defined by Minn. Stat. Ann. § 325F.67, by:

      a.      Representing that products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

      b.      Representing that products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

      c.      Omitting that products contained the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula*; and

d. Advertising the products containing picamilon, BMPEA, or *acacia rigidula* without intending to sell them as advertised.

237. GNC knew or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various products and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

238. Reasonable consumers such as Plaintiff Malecha and members of the Minnesota Sub-Class, would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected products.

239. GNC intended that Plaintiff Malecha and members of the Minnesota Sub-Class would rely on the false and misleading representations and omissions.

240. Plaintiff Malecha and members of the Minnesota Sub-Class justifiably relied on GNC's representations and omissions regarding the composition of its products containing Picamilon and BMPEA.

241. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and members of the Minnesota Sub-Class were harmed because they purchased products that they would not have bought or otherwise paid a premium price for the products.

242. Plaintiff Malecha and the Minnesota Sub-Class are entitled to actual damages, costs, reasonable attorneys' fees, a declaratory judgment that GNC's aforementioned conduct violates Minnesota's False Statement in Advertising Act, and an injunction precluding GNC from engaging in conduct that continues to violate the MFSAA.

## SIXTEENTH CAUSE OF ACTION
### Minnesota's Private Attorney General Statute
### Minn. Stat. Ann. § 8.31, *et seq.*
### (Plaintiff Dan Malecha, Individually and on behalf of the
### proposed Minnesota Sub-Class)

243.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

244.    Plaintiff Malecha and the Minnesota Sub-Class members are consumers.

245.    Plaintiff and the Minnesota Sub-Class members were injured by GNC's sale of merchandise.

246.    Plaintiff Malecha and the Minnesota Sub-Class members were injured by GNC's violation of the MUTPA, MUDTPA, MCFA, MFSAA, and Minnesota's Food Law,Minn. Stat. Ann. § 34A.01, et seq..

247.    Plaintiff Malecha and the Minnesota Sub-Class members have suffered damages with a causal nexus to Defendant's above-alleged misrepresentations and deceptive practices.

248.    This action will benefit the public interest and, therefore, meets the requirements of Minnesota's Private Attorney General Statute, Minn. Stat. Ann. § 8.31, *et seq.*

## SEVENTEENTH CAUSE OF ACTION
### Violations of New York's General Business Law,
### N.Y. Gen. Bus. Law § 349
### (Plaintiff Cory Toth, Individually and on behalf of the
### proposed New York Sub-Class)

249.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

250.    GNC's business acts and practices alleged herein constitute deceptive acts or practices under the New York General Business Law, Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 ("NYGBL").

251. The practices of GNC, described throughout this Complaint, violate the NYGBL for, *inter alia*, one or more of the following reasons:

      a.    GNC unfairly and deceptively misrepresented the benefits and quality of its Products to its customers;

      b.    GNC unfairly and deceptively advertised the actual ingredients of the Products; and

      c.    GNC unfairly and deceptively omitted that the Products contain the unsafe compounds or ingredients of picamilon, BMPEA, or *acacia rigidula*.

252. GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in New York's Agriculture and Markets law, N.Y. Agric. & Mkts. Law § 1, *et seq*.

253. Under all of the circumstances, GNC's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant punitive damages.

254. GNC's actions impact the public interest because Plaintiff Toth and members of the New York Sub-Class were injured in exactly the same way as thousands of others purchasing the dietary supplements with picamilon, BMPEA, or *acacia rigidula* as a result of and pursuant to GNC's generalized course of deception.

255. The foregoing acts, omissions and practices proximately caused Plaintiff Toth and the other members of the New York Sub-Class to suffer ascertainable losses, in an amount to be determined at trial, and are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

## EIGHTEENTH CAUSE OF ACTION
### Violations of New Hampshire's Consumer Protection Act,
### N.H. Rev. Stat. Ann. §358-A, *et seq.*
### (Plaintiff Joseph Lambert, Individually and on behalf of the proposed New Hampshire Sub-Class)

256. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

257. GNC has represented to Plaintiff Lambert and members of the New Hampshire Sub-Class that its Products have characteristics, uses, and benefits that they do not have, in violation of RSA §358-A:2(V).

258. GNC has also represented to Plaintiff Lambert and members of the New Hampshire Sub-Class that its Products were of a particular standard, quality or grade which they were not, in violation of RSA §358- A:2(VII).

259. In addition, Plaintiff Lambert and the Class members have suffered injury in fact and lost money or property as a result of unfair competition and deceptive acts by GNC, as Plaintiff and the New Hampshire Sub-Class members paid the purchase price for a product which would not have been purchased if GNC had not made misrepresentations and concealed or omitted material information as to the safety of the product and its limitations.

260. Plaintiff Lambert and the New Hampshire Sub-Class members relied upon GNC to disclose all pertinent information about the dietary supplements with picamilon, BMPEA, or *acacia rigidula*.

261. The actions of GNC, as complained herein, constitute unfair and deceptive practices committed in violation of the New Hampshire Consumer Protection Act.

262.     Plaintiff Lambert and the New Hampshire Sub-Class members have suffered damages as a result of the conduct of GNC, because Plaintiff and the Class members were misled into purchasing products which were not what GNC advertised the Products to be.

263.     Plaintiff Lambert is informed of and believes that all of the conduct alleged herein occurs and continues to occur in GNC's business. The conduct of GNC is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

264.     GNC was aware, or by the exercise of reasonable case should have been aware, that the representations were untrue or misleading. GNC also was aware, or by the exercise of reasonable case should have been aware, that the concealments and omissions should have been disseminated in the advertising.

265.     GNC's conduct was also deceptive and unfair in that it violated the prohibition against false or misleading labeling in New Hampshire's Purity and Branding of Foods and Drugs law, N.H. Rev. Stat. Ann. § 146:1, *et seq*.

266.     Plaintiff Lambert and the members of the New Hampshire Sub-Class have each been directly and proximately injured by the conduct of the Defendants, and such injury includes payment for the dietary supplements with picamilon, BMPEA, or *acacia rigidula*.

267.     As a result of the conduct of GNC, as alleged herein, Plaintiff Lambert and the New Hampshire Sub-Class should be awarded actual damages, restitution, and punitive damages pursuant to N.H. Rev. Stat. Ann. §358-A:10(I), and any other relief the Court deems appropriate.

## NINETEENTH CAUSE OF ACTION
### Violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S § 201-1, *et seq.*
### (Plaintiff Nate Picone, Individually and on behalf the Pennsylvania Sub-Class, Against GNC)

268. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

269. Plaintiff Nate Picone and members of the proposed Pennsylvania Sub-Class purchased dietary supplements containing picamilon, BMPEA, or *acacia rigidula* for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

270. The Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits engaging in fraudulent or deceptive conduct (i) representing that goods have characteristics, benefits, or qualities that they do not have; (ii) representing that goods or services are of a particular standard, quality, or grade, if they are of another; (iii) advertising goods or services with intent not to sell them as advertised; and (iv) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4).

271. GNC's acts and practices, as alleged in this complaint, violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law by engaging in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions— namely, the sale of the dietary supplements with picamilon, BMPEA, or *acacia rigidula* to Plaintiffs and members of the Pennsylvania Sub-Class. This conduct was intended to result and did result in the sale of these goods to consumers. Specifically, GNC:

　　　　a.　　Represented that dietary supplements with picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b. Represented that dietary supplements with picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

c. Advertised goods or services with intent not to sell them as advertised; and

d. Engaged in other fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding; and

e. Represented that consumers' purchases of dietary supplements with picamilon, BMPEA, or *acacia rigidula* conferred or involved rights that the transactions did not have or involve.

272. GNC's conduct was also deceptive and unfair in that it violated the prohibition against false or misleading labeling in Pennsylvania's Food Safety Act, 3 Pa. C.S.A. § 5721, *et seq*.

273. As a direct and proximate result of GNC's conduct, Plaintiff Picone and members of the State Sub-Classes have been harmed and have suffered ascertainable loss, in that they purchased products that they otherwise would not have. Meanwhile, GNC has generated more revenue than it otherwise would have, unjustly enriching itself. GNC's violations also present a continuing risk to Plaintiff and members of the classes and affect the public interest.

274. Plaintiff Picone and members of the Pennsylvania Sub-Class are entitled to damages (including treble damages), equitable relief, reasonable attorney's fees and costs, declaratory relief, and a permanent injunction enjoining GNC from its unlawful, fraudulent, and deceitful activity.

## TWENTIETH CAUSE OF ACTION
**Violation of Texas Deceptive Trade Practices-Consumer Protection Act,**
**Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.***
**(Plaintiff Daniel Hubert, Individually and on behalf of the**
**proposed Texas Sub-Class)**

275.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

276.     The purposes of the Texas Deceptive Trade Practices and Consumer Protection Act (the "TDTPA") is to "protect consumers against false, misleading, and deceptive practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection," and it is liberally construed to effect those purposes. Tex. Bus. & Com. Code Ann. § 17.44.

277.     Plaintiff Hubert and members of the Texas Sub-Class are "consumers," the Products are "goods," and GNC was engaged in "trade or commerce" as those terms are defined by § 17.45 of the DTPA.

278.     GNC has violated section 17.50(a)(1) and 17.46(b)(24) of the TDTPA by failing to disclose to Plaintiff and members of the Texas Sub-Class that the dietary supplements containing picamilon, BMPEA, or *acacia rigidula* are unlawful dietary supplements, misrepresenting that picamilon, BMPEA, or *acacia rigidula* are lawful dietary ingredient, failing to disclose that the Products contained picamilon, BMPEA or *acacia rigidula* BMPEA.

279.     GNC's omissions were intended to induce Plaintiff Hubert and members of the Texas Sub-Class to purchase dietary supplements that they otherwise would not have purchased at a price they otherwise would not have paid. Plaintiff Hubert and members of the Texas Sub-Class relied upon GNC's omissions to their detriment, purchasing dietary supplements they

otherwise would not have purchased, or purchased dietary supplements at a price they otherwise would not have paid.

280.    GNC has also violated section 17.50(a)(3) of the TDTPA by selling dietary supplements containing picamilon, BMPEA, or *acacia rigidula*. In addition, by selling products with unlawful and unsafe ingredients and not advising Plaintiff Hubert and Texas Sub-Class members, GNC's conduct constitutes an unconscionable course of action, as GNC took advantage of Plaintiff and Texas Class members' lack of knowledge to a grossly unfair degree.

281.    GNC's conduct was also false, misleading, deceptive, and unfair in that it violated the prohibition against false or misleading labeling in Texas's Food, Drug, and Cosmetic Act, Tex. Health & Safety Code Ann.§ 431.001, *et seq*.

282.    As a direct and proximate result of GNC's conduct, Plaintiff Hubert and other members of the Texas Sub-Class have been harmed in that they purchased dietary supplements they otherwise would not have, and/or paid more for dietary supplements than they otherwise would have. Meanwhile, GNC has sold more dietary supplements than it otherwise could have and charged inflated prices for dietary supplements, unjustly enriching itself thereby.

283.    GNC is liable to Plaintiff and members of the Texas Sub-Class for damages in amounts to be proven at trial, including attorneys' fees recoverable pursuant to § 17.50(d) of the TDTPA, costs, and treble damages.

284.    Pursuant to §17.50 of the TDTPA, Plaintiff and the Texas Sub-Class seek damages, a declaration that GNCs conduct is unlawful, and an order requiring GNC to adequately disclose the extent and nature of their unlawful acts with respect to the products outlined herein.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Nationwide Class and State Sub-Classes, respectfully request that this Court:

a.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Classes as defined above;

b.    Appoint Plaintiffs as the representatives of the Classes;

c.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

d.    Award pre-judgment and post-judgment interest on such monetary relief;

e.    Grant appropriate injunctive and declaratory relief, including, without limitation, an order that requires GNC to recall dietary supplements containing picamilon, BMPEA, or *acacia rigidula* and to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the supplements' noncompliance with federal and state law and subsequent health hazards;

f.    Award reasonable attorneys' fees and costs; and

g.    Grant such further relief that this Court deems appropriate.

Dated:  April 26, 2016                         Respectfully submitted,


                                               /s/ Shanon J. Carson
                                               Shanon J. Carson, Esquire (Pa. ID No. 85957)
                                               Arthur Stock, Esquire (Pa. ID No. 64336)
                                               **Berger & Montague, P.C.**
                                               1622 Locust Street
                                               Philadelphia,  PA  19103
                                               Telephone: (215)875-4656
                                               Facsimile:  (215) 875-4604
                                               scarson@bm. net
                                               astock@bm.net

                                               Gary E. Mason, Esquire
                                               Benjamin Branda, Esquire
                                               **Whitfield Bryson & Mason, LLP**
                                               1625 Massachusetts Avenue, NW, Ste. 605
                                               Washington, DC 20036
                                               Telephone: (202) 429-2290
                                               Facsimile:  (202) 429-2294
                                               gmason@wbmllp.com
                                               bbranda@wbmllp.com

                                               *Co-Lead Counsel*

                                               D. Aaron Rihn, Esquire
                                               **Robert Peirce & Associates, P.C.**
                                               707 Grant Street
                                               Suite 2500
                                               Pittsburgh, PA  15219-1918
                                               Telephone:  (412) 281-7229
                                               Facsimile:  (412) 281-4229
                                               arihn@peircelaw.com

Gregory F. Coleman, Esquire
Mark E. Silvey, Esquire
Lisa A. White, Esquire
**Greg Coleman Law, P.C.**
First Tennessee Plaza
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0090
Facsimile: (865) 522-0049
greg@gregcoleman.law
mark@gregcolemanlaw.com
lisa@gregcolemanlaw.com

John Yanchunis, Esquire
Marcia Valladares, Esquire
Patrick A. Barthle II, Esquire
**Morgan & Morgan**
**Complex Litigation Group**
201 North Franklin Street
7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
jyanchunis@forthepeople.com
mvalladares@forthepeople.com
pbarthle@forthepeople.com

Edward A. Wallace, Esquire
Mark R. Miller, Esquire
Amy E. Keller, Esquire
**Wexler Wallace, LLP**
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
eaw@wexlerwallace.com
mrm@wexlerwallace.com
aek@wexlerwallace.com

Alfred G. Yates, Jr., Esquire
Gerald L. Rutledge, Esquire
**Law Office of Alfred G. Yates, Jr., P.C.**
429 Forbes Avenue
519 Allegheny Building
Pittsburgh, Pennsylvania 15234
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
yateslaw@aol.com

Janine Pollack, Esquire
**Wolf Haldenstein Adler Freeman & Herz LLP**
70 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
pollack@whafu.com

Theodore B. Bell, Esquire
Carl Malmstrom, Esquire
**Wolf Haldenstein Adler Freeman & Herz LLP**
One South Dearborn St.
Suite 2122
Chicago, IL 60603
Telephone: (312) 984-0000
Facsimile: (312) 212-4401
tbell@whafu.com
malmstrom@whafu.com

Charles E. Schaffer, Esquire
**Levin, Fishbein, Sedran & Berman**
510 Walnut Street
Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com

Robert K. Shelquist, Esquire
Craig S. Davis , Esquire
Rebecca A. Peterson, Esquire
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington  Avenue South
Suite 2200
Minneapolis,  MN  55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
rkshelquist@locklaw.com
cdavis@locklaw.com
rapeterson@locklaw.com

Charles J. LaDuca, Esquire
Brendan Thompson, Esquire
**Cuneo Gilbert & Laduca, LLP**
8120 Woodmont Avenue
Suite 810
Bethesda,  MD  20814
Telephone:  (240) 483-4292
Facsimile:  (202) 789-1 813
charles@cuneolaw.com
brendant@cuneolaw.com

J. Barton Goplerud, Esquire
Brian O. Marty, Esquire
**Hudson Mallaney Shindler & Anderson**
5015 Grand Ridge Drive
Suite 100
West Des Moines, Iowa 50265
Telephone:   (515) 223.4567
Facsimile:  (515) 223.8887
jbgoplerud@hudsonlaw.net
bommiy@hudsonlaw.net
Jonathan Shub, Esquire
**Kohn, Swift & Graf, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA  19107
Phone:  (215) 238-1700
Facsimile:  (215) 238-1700
jshub@kohnswift.com

Nick Suciu, III, Esquire
**Barbat Mansour & Suciu PLLC**
1644 Bracken Rd
Bloomfield Hills, MI 48302
Phone:  (313) 303-3472
Facsimile:  (313) 474-8585
nicksuciu@bmslawyers.com

Eric H. Gibbs, Esquire
Andre M. Mura, Esquire
Caroline Corbitt, Esquire
**Girard Gibbs LLP**
601 California Street, 14th Floor
San Francisco, CA  94108
Phone:  (415) 981-4800
Facsimile:  (415) 981-4846
ehg@girardgibbs.com
amm@girardgibbs.com
ccc@girardgibbs.com

Adam M. Moskowitz, Esquire
**Kozyak Tropin & Throckmorton, LLP**
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL  33134
Phone:  (305) 372-1800
Facsimile:  (305) 372-3508
amm@kttlaw.com

*Attorneys for Plaintiffs*