# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL HUBERT, individually and on behalf of all others similarly situated, ) ) ) | |
| ) | 2:15-cv-01391 |
| Plaintiff, ) ) | Judge Mark R. Hornak |
| v. ) ) | |
| GENERAL NUTRITION CORPORATION, ) ) | |
| Defendant. ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Presently before the Court is a motion by Defendant General Nutrition Corporation ("GNC" or "Defendant") to dismiss the First Amended Consolidated Class Action Complaint (the "Amended Complaint") filed by Plaintiff Daniel Hubert, individually and on behalf of similarly situated individuals (ECF No. 39) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion to Dismiss") (ECF No. 48). In this prospective class action litigation, Plaintiff Hubert alleges that he and other consumers ("Plaintiffs") purchased supplements sold by GNC with false and misleading labeling in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and the consumer fraud protection laws of numerous states.[1] Plaintiffs further assert that GNC

---

[1] Plaintiffs allege that GNC violated the following state laws: Arkansas's Deceptive Trade Practice Act, Ark. Code Ann. § 4-88-101, *et seq.*; California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*; Iowa's Private Right of Action for Consumer Frauds Act, Iowa Code Ch. 714H; Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*; Minnesota's Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09, *et seq.*; Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43, *et seq.*; Minnesota's Consumer Fraud Act, Minn. Stat. Ann. § 325F.68, *et seq.*; Minnesota's False Statement in Advertising Act, Minn. Stat. Ann. § 325F.67; Minnesota's Private Attorney General Statute, Minn. Stat. Ann. § 8.31, *et seq.*; New York's General Business Law, N.Y. Gen. Bus. Law § 349; New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, *et seq.*; Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*; and Texas' Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

breached implied warranties, engaged in negligent misrepresentation and unjustly enriched itself to the detriment of consumers. Defendant has moved to dismiss the Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim. For the reasons set forth below, Defendant's Motion to Dismiss for lack of subject matter jurisdiction will be granted, and the Amended Complaint will be dismissed, without prejudice.[2] Because the Court finds that Plaintiffs lack standing to bring this case, it need not address Defendant's other theories.

I. **BACKGROUND**

GNC, which is headquartered in Pittsburgh, Pennsylvania, is the largest global specialty retailer of nutritional supplements. Am. Compl. ¶¶ 25, 36. Plaintiffs allege that GNC marketed and sold supplements manufactured by third party vendors, which allegedly contained picamilon, BMPEA or acacia rigidula, despite having known that these substances are not dietary ingredients.[3] Id. ¶¶ 3, 4, 38. The supplements at issue here are primarily weight-loss and sports nutrition supplements available as powders and liquids. Id. ¶ 27.

Plaintiffs aver that federal and state law place primary responsibility for the safety of dietary supplements,[4] as well as truthful labeling and advertising, on supplement manufacturers and distributors such as GNC. Am. Compl. ¶ 28. According to Plaintiffs, GNC sold products with false

---

[2] In view of the Court's ruling granting the Motion to Dismiss for lack of subject matter jurisdiction, Defendant's Request for Judicial Notice (ECF No. 49-5) and Plaintiffs' Motion to Strike Declaration of Stephen Cherry (ECF No. 59) will be denied as moot.

[3] Picamilon is a synthetic chemical which is used as a prescription drug in Russia, but it is not approved as a drug in the United States, BMPEA is an amphetamine-like chemical that is not found in nature, acacia rigidula is an herb or other botanical, and both BMPEA and acacia rigidula allegedly have no history of safe use. Am. Compl. ¶¶ 4, 39, 48, 66.

[4] A dietary supplement is a product intended to supplement the diet that contains one or more of the following dietary ingredients: a vitamin; a mineral; an herb or other botanical; an amino acid; or a combination thereof. Am. Compl. ¶ 29. A dietary ingredient that was not previously marketed in the United States prior to October 14, 1994, is considered a "new dietary ingredient" ("NDI"). Id. ¶ 30. A manufacturer is required to notify the FDA if it intends to market a supplement that contains a NDI. Id. ¶ 31. If the FDA does not comment within 75 days after the NDI submission, the ingredient may be used in dietary supplements. Id.

and misleading labeling, and it failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. Id. ¶ 5. Plaintiffs claim that they were "hoodwinked" into purchasing supplements containing these substances and would not have done so if GNC had disclosed that they contained mislabeled ingredients which purportedly pose serious health risks and are not marketable as dietary supplements. Id. ¶¶ 6, 24.

Regarding picamilon, Plaintiffs allege that Jennifer Jakel ("Jakel"), who was GNC's Senior Project Manager for Technical Research, reviewed documents translated from Russian indicating that it is a "derivative of gamma-amino-butyric acid and nicotinic acid." Am. Compl. ¶ 43. In 2007, Jakel made a notation stating "[n]o NDI that I could find," suggesting that a NDI submission was not tendered to the Food and Drug Administration ("FDA") for picamilon. Id. ¶¶ 31, 44. Again in April 2014, Jakel wrote "still no NDI found." Id. ¶ 44.

Subsequently, on September 28, 2015, Dr. Cara Welch of the FDA issued a declaration stating that "picamilon does not qualify as a dietary ingredient" under the Food, Drug and Cosmetic Act (the "FDC Act"). Am. Compl. ¶ 40. Plaintiffs allege that GNC continued to sell dietary supplements containing picamilon until September 21, 2015, despite having known since 2007 that it was not a dietary ingredient. Id. ¶¶ 44, 46.

Plaintiffs additionally claim that GNC has been aware since the fall of 2013 that some dietary supplements labeled as containing acacia rigidula actually contained BMPEA. Am. Compl. ¶¶ 52. Ms. Jakel supposedly was notified in November 2013 of a study by FDA researchers which revealed that many dietary supplements purportedly containing acacia rigidula actually contained BMPEA, despite no testing to show that BMPEA was safe for humans (hereinafter, "the FDA Study"). Id. ¶¶ 49, 52. Subsequently, Jakel allegedly emailed a *USA Today* article about the FDA Study to approximately 100 recipients at GNC. Id. ¶ 52.

3

Plaintiffs allege that despite knowing of the FDA Study, GNC continued to sell supplements containing acacia rigidula, without testing them to determine whether they were adulterated with BMPEA. Am. Compl. ¶¶ 55. However, in April 2015, when the FDA formally announced that BMPEA did not meet the definition of a dietary ingredient, GNC stopped selling products containing BMPEA. Id. ¶ 60.

Concerning acacia rigidula, Plaintiffs allege that the FDA warned six manufacturers in March 2016, that it is a new dietary ingredient which lacks evidence of safe use and therefore could not be lawfully sold in the United States. Am. Compl. ¶ 67. Plaintiffs allege that GNC did not provide the FDA with the required pre-market notification showing a history of acacia rigidula's safe use, yet it was openly found on labels of supplements offered for sale at GNC. Id. ¶¶ 70, 72.

Plaintiffs aver that despite GNC's alleged knowledge regarding picamilon, BMPEA and acacia rigidula, GNC sold products containing those substances which were supplied by third-party vendors. Am. Compl. ¶ 78. Plaintiffs claim that GNC exercised significant control over the third-party products it sold by reviewing and pre-approving labels, warnings, packaging and advertising. Id. ¶¶ 73, 74. In addition, third-party vendors could not alter approved formulas, labels or advertising without GNC's permission. Id. ¶ 74. By controlling the product labels of third party vendors, Plaintiffs allege that GNC misrepresented that supplements containing picamilon, BMPEA and acacia rigidula were safe for consumers and legal to sell. Id. ¶ 79. According to Plaintiffs, it is irrelevant that GNC received guarantees from third-party vendors that products containing those substances complied with legal requirements because GNC knew or should have known that they were not safe and could not be lawfully sold. Id. ¶¶ 75, 76.

In sum, Plaintiffs allege that picamilon, BMPEA and acacia rigidula were listed on the labels of a variety of supplements available for sale at GNC, including products that they purchased. Am.

Compl. ¶¶ 47, 65, 72. Plaintiffs claim that through this labeling, GNC misrepresented that those substances were safe and could be legally sold in the United States. Id. As a result, Plaintiffs assert that they purchased supplements they otherwise would not have purchased, paid more for supplements than they otherwise would have paid and have been subjected to unreasonable safety risks. Id. ¶¶ 6, 24, 81.

## II. STANDARD OF REVIEW

Under Fed.R.Civ.P. 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim." In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).

In evaluating a challenge to subject matter jurisdiction under Rule 12(b)(1), a court first must determine whether the movant presents a facial or a factual attack. See Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). The distinction is important because it determines how the complaint must be reviewed. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). A facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.'" Davis, 824 F.3d at 346 (citation omitted). A factual challenge "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.'" Id. (citation omitted). Here, GNC makes a facial challenge because it has not disputed the validity of Plaintiffs' factual claims in its Motion to Dismiss. In essence, GNC contends that the allegations of the Amended Complaint, even accepted as true, are insufficient to establish Plaintiffs' Article III standing.

5

In considering a facial challenge to standing, courts are to apply the same standard as on review of a Rule 12(b)(6) motion for failure to state a claim. See Petruska v. Gannon Univ., 462 F.3d 294, 299 n.1 (3d Cir. 2006) (explaining "that the standard is the same when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)") (citation omitted)). Consequently, the court is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff [has standing]." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Nonetheless, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, "[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter" that would establish standing if accepted as true. Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III. DISCUSSION

GNC argues that the Amended Complaint must be dismissed for lack of standing because Plaintiffs have not sufficiently pled the essential element of injury-in-fact. According to GNC, Plaintiffs simply allege that they purchased the supplements, but do not allege that they actually consumed them or suffered any adverse health consequences from them. GNC points out that any apprehension Plaintiffs may have about possible future injury is insufficient to establish injury-in-fact.

Plaintiffs respond that they have suffered an economic injury, which suffices to establish injury-in-fact for standing purposes. Plaintiffs contend that they incurred economic injury because they purchased products with false, misleading and inaccurate labeling, which omitted information material to their purchases.

6

GNC counters that the gravamen of the Amended Complaint involves picamilon, BMPEA and acacia rigidula purportedly endangering the health of consumers. GNC contends that despite the emphasis on the alleged health dangers posed by those substances, Plaintiffs attempt to shift the focus to economic injury in order to establish an injury-in-fact for standing purposes. Even so, GNC urges that Plaintiffs have not sufficiently pled the element of injury-in-fact because they do not allege they purchased the supplements after the FDA issued warning letters.

For reasons explained below, the Court agrees that an economic injury can qualify as an injury-in-fact for standing purposes, but concludes that Plaintiffs have not adequately alleged that they suffered an injury-in-fact in this case. Therefore, the Amended Complaint must be dismissed for lack of standing.

### A. Article III Standing

Article III of the Constitution limits the scope of federal judicial power to the adjudication of "cases" or "controversies." U.S. Const., art. III, § 2. "The courts have developed several justiciability doctrines to enforce the case-or-controversy requirement, and perhaps the most important of these doctrines is the requirement that a litigant have standing to invoke the power of a federal court." In re Schering Plough, 678 F.3d at 244 (internal quotations and citation omitted). "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

It is well established that the "irreducible constitutional minimum" of standing consists of three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016) (citing Lujan, 504 U.S. at 560-61). The plaintiff, as the party invoking federal jurisdiction, bears the burden to establish standing. Lujan, 504 U.S. at 561. At the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element. Spokeo, 136 S.Ct. at 1547 (quoting Warth, 422 U.S. at 518).

Although there are three required elements of constitutional standing, the Third Circuit has emphasized that "the injury-in-fact element is often determinative." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 (3d Cir. 2009); see also Spokeo, 136 S.Ct. at 1547 (observing that injury-in-fact is the "[f]irst and foremost" of standing's three elements) (citation omitted). To establish injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. Although "[i]njury-in-fact is not Mount Everest," Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 294 (3d Cir. 2005), the complaint still must "clearly and specifically set forth facts sufficient to satisfy" Article III standing requirements. Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

The Third Circuit has explained that "[w]hile it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." Danvers Motor, 432 F.3d at 291. Indeed, "[m]onetary harm is a classic form of injury-in-fact." Id. at 293 (citation omitted). However, allegations of "possible future injury" are insufficient to satisfy the requirements of Article III. Whitmore, 495 U.S. at 158; Reilly v. Ceridian Corp., 664 F.3d 38, 42 (3d Cir. 2011).

**B. Plaintiffs Have Not Established That They Suffered an Injury-in-Fact, Thus They Lack Standing.**

Plaintiffs are correct that economic injury can suffice to establish injury-in-fact for standing purposes. However, the question here is whether Plaintiffs have suffered an economic injury. The

8

Court concludes that the Amended Complaint does not adequately plead facts that establish they have; consequently, Plaintiffs have not established that they suffered an injury-in-fact.

### 1. Analysis of Injury-In-Fact

The Court's standing analysis is informed by precedent from courts within this Circuit that have evaluated whether the plaintiff suffered an injury-in-fact in cases where, as here, it was alleged the product at issue contained a dangerous substance that was unknown to the consumer or the product label contained alleged misrepresentations.[5]

First, in Koronthaly v. L'Oreal USA, Inc., 374 F. App'x 257 (3d Cir. 2010), our Court of Appeals affirmed a district court's dismissal for lack of standing in a case where the plaintiff purchased lipstick that contained lead, which was not disclosed on the packaging or the product, and the plaintiff claimed she would not have purchased the lipstick had she known about the lead. In finding no standing, the Third Circuit deemed it significant that the plaintiff conceded she suffered no adverse health consequences from using the lipstick, and her subjective allegation that trace amounts of lead in the lipstick were unacceptable to her was not an injury-in-fact. Id. at 259. Further, to the extent the plaintiff claimed that the injury-in-fact was the loss of the "benefit of the bargain," the Third Circuit explained that she mistakenly relied on contract law. Id. Because the plaintiff's lipstick purchases were not made pursuant to a contract, she could not have been denied the benefit of any bargain. Id. The Third Circuit concluded that "[a]bsent any allegation that [the plaintiff] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [she] has not demonstrated a concrete injury-in-fact." Id.

---

[5] The Court is cognizant that Plaintiffs cite cases from other jurisdictions to support their position that they have suffered an economic injury. See Plaintiffs' Resp. in Opp'n (ECF No. 61 at 6, n.3). As stated, however, the Court relies on the precedent from the Third Circuit discussed herein to assess whether the Plaintiffs have sufficiently established an injury-in-fact for standing purposes.

9

In Young v. Johnson & Johnson, Civil Action No. 11-4580, 2012 WL 1372286 (D.N.J. Apr. 19, 2012), the district court determined that the plaintiff lacked standing in a case involving the alleged misrepresentation of the nutritional content and health benefits of Benecol, a butter/margarine substitute. The court found that the plaintiff did not sufficiently plead an injury-in-fact because he merely alleged that he purchased Benecol fairly regularly during a five-year period, but he did not allege that he actually consumed it or that he suffered any adverse health effects from it. Id. at *3. In addition, the court found unavailing the plaintiff's contention that he satisfied the injury-in-fact requirement based on allegations that he was deprived of the "benefit of the bargain," received an inferior product and paid a premium price because he believed Benecol was healthy, when in fact it was not. Id. at *4. In finding no economic injury, the court explained that the plaintiff's purchases of Benecol were not made pursuant to a contract and he did not allege how he paid a premium for it or received a product that did not deliver the advertised benefits. Id. (citing Koronthaly, 374 F. App'x 259).

In both James v. Johnson & Johnson Consumer Cos., Inc., Civil No. 10-cv-03049, 2011 WL 198026 (D.N.J. Jan. 20, 2011) and Medley v. Johnson & Johnson Consumer Cos., Inc., Civil No. 10-cv-02291, 2011 WL 159674 (D.N.J. Jan. 18, 2011), the district court accepted the plaintiffs' contention that economic injury suffices to confer standing, but found that they could not clear the threshold requirement for showing an economic injury. The cases involved ten plaintiffs who alleged Johnson & Johnson violated the FDA's ban on methyl chloride in cosmetic products because its baby shampoo contained that substance. The economic injury for which the plaintiffs sought redress was the price they paid for the shampoo, which the court noted they apparently used in bathing their children without adverse health reactions. Id. at *2. The court accepted as true the plaintiffs' allegation that had they known the true nature of the baby shampoo, they would not have

purchased it or allowed their children to be exposed to it, but determined that economic damages did not follow as a consequence. Id. The court concluded that once the shampoo had been used, there was no economic injury for the plaintiffs to complain of and the fear of future injury is insufficient to confer standing. Id. The court observed that the plaintiffs received the benefit of their bargain so long as there were no adverse health effects and the shampoo worked as intended, meaning that is cleansed the children's hair without producing irritation, and nothing in the complaint suggested otherwise. Id. As such, the court found that the plaintiffs did not demonstrate that they suffered an injury-in-fact.

Likewise, in Estrada v. Johnson & Johnson, Civil Action No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017), the court found that the plaintiff did not suffer an injury-in-fact and therefore lacked standing. In that case, the plaintiff asserted California state law consumer-fraud claims against Johnson & Johnson, claiming that it had been aware since at least 1982 of studies associating talcum powder with an elevated risk of ovarian cancer for women, yet failed to disclose that risk to consumers and continued to market baby powder as safe despite knowledge of the risk. As a result of Johnson & Johnson's misrepresentations and omissions, the plaintiff claimed to have suffered an economic injury based on three theories: (1) benefit of the bargain; (2) alternative product; and (3) premium price. Id. at * 6.

First, the plaintiff claimed that she did not receive the benefit of her bargain because she purchased baby powder under the belief that it was safe, but she would not have done so had she known that using baby powder in the genital area could lead to an increased risk of developing ovarian cancer. Estrada, 2017 WL 2999026, at *6. The court ultimately found that the plaintiff did not suffer an economic injury-in-fact based on a benefit of the bargain theory. Id. at *13. The court noted that the plaintiff's claim was similar to those alleged by the consumers in Koronthaly, James

11

and Medley: she alleged that she used baby powder; it was effective for its intended uses of eliminating friction and absorbing excess moisture; she was not physically injured; Johnson & Johnson failed to list enough warnings about an alleged increased risk of ovarian cancer associated with baby powder use; and she would like her money back. Id. at *9. However, the court found that absent a plausible allegation of adverse health consequences from using baby powder or that it failed to perform satisfactorily for its intended use, the plaintiff could not claim that she was denied the benefit of her bargain.[6] Id. (citing Koronthaly, 374 F. App'x at 259; James, 2011 WL 198026, at *2). The court held that the plaintiff's benefit of the bargain theory, based on Johnson & Johnson's alleged omissions, was an insufficient basis to find that she suffered an injury-in-fact. Id. at *9, 13. If the plaintiff wanted to file an amended complaint to reassert a benefit of the bargain theory, the court required that she point to an affirmative legal duty on Johnson & Johnson's part to disclose the facts that allegedly were omitted. Id. at *9.

Next, the Estrada court found that the plaintiff did not establish that she suffered an injury-in-fact under an alternative product theory of economic harm. Estrada, 2017 WL 2999026, at *14. The court recognized that injury-in-fact exists where a consumer alleges that, absent the defendant's omissions or misrepresentations, she would have purchased a cheaper alternative product. Id. at *13 (citations omitted). Although the plaintiff alleged she would have purchased an alternative cornstarch-based powder had she known of the increased cancer risk purportedly associated with baby powder, she did not allege that an alternative product would have been cheaper than baby powder. Id. at *14.

---

[6] The Estrada court distinguished cases cited by the plaintiff which recognized standing on a benefit of the bargain theory of economic harm, explaining that the plaintiffs in those cases did not receive the benefit of their bargain because either: (1) they received a defective product; or (2) they pled facts sufficient for the court to conclude that they were induced into purchasing the product at issue based on a specific misrepresentation made by the defendants. See Estrada, 2017 WL 2999026, at *9-*11 (citations omitted). Unlike the consumers in those cases, the plaintiff in Estrada did not sufficiently

12

Finally, the Estrada court found that the plaintiff's premium price theory of economic harm did not sufficiently establish that she suffered an injury-in-fact. Estrada, 2017 WL 2999026, at *15. In premium price cases, a plaintiff alleges that the defendant's omissions or misrepresentations caused her to overpay for a product. Id. (citations omitted). Under that theory, the plaintiff claimed that as a result of Johnson & Johnson's omissions and misrepresentations, it was able to sell baby powder for more than it otherwise would have if consumers had been properly informed about the safety risks. The court determined that the plaintiff's "threadbare" allegation that she purchased baby powder at a premium, without any supporting factual allegations, was insufficient to establish an injury-in-fact. Id. It was significant in the court's analysis that the plaintiff did not allege that Johnson & Johnson advertised baby powder as superior to other products, nor did she identify any comparable, cheaper products to show that baby powder was sold at a premium price. Id.

### 2. The Amended Complaint Fails to Adequately Plead That Plaintiffs Suffered an Economic Injury-In-Fact.

In view of the foregoing authority, Plaintiffs here do not sufficiently allege that they suffered an economic injury to satisfy the injury-in-fact element of standing. At the outset, Plaintiffs allege that GNC sold supplements with false and misleading labeling and otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. Am. Compl. ¶ 5. Plaintiffs then allege that they were hoodwinked into purchasing the supplements and would not have done so if GNC had disclosed that they contained mislabeled ingredients which supposedly pose serious health risks or were unlawful. Id. ¶¶ 6, 24. As a result of GNC's practices, Plaintiffs claim that they purchased supplements they otherwise would not have purchased, paid more for

---

allege that she was induced into purchasing baby powder based on specific misrepresentations made by Johnson & Johnson on its website, or on the product's label or advertisements. Id. at *11.

supplements than they otherwise would have paid[7] and have been subjected to unreasonable safety risks. Id. ¶ 81. Based on these allegations, Plaintiffs apparently attempt to assert two theories of economic injury: (1) they did not receive the benefit of their bargain; and (2) they paid a premium price for the supplements.[8]

First, Plaintiffs' premium price allegations do not sufficiently establish that they suffered an economic injury. Although Plaintiffs broadly aver that GNC's alleged omissions and misrepresentations caused them to pay more for supplements than they otherwise would have paid, that "threadbare" allegation, without any supporting factual allegations, is insufficient to establish an injury-in-fact. See Estrada, 2017 WL 2999026, at *15 ("threadbare" allegation that the plaintiff purchased a product at a premium, without factual support, was insufficient to establish injury-in-fact); Young, 2012 WL 1372286, at *4 (finding no injury-in-fact where, *inter alia*, the plaintiff did not set forth allegations as to how he paid a premium price for the product). As in Estrada, the Court finds it significant that Plaintiffs do not allege GNC advertised the supplements they purchased as superior to other products, nor do Plaintiffs identify any comparable, cheaper products to show that the supplements they purchased from GNC were sold at a premium price. See Estrada, 2017 WL 2999026, at *15.

Next, Plaintiffs' allegation that they did not receive the benefit of their bargain when they purchased the supplements does not suffice to establish that they suffered an economic injury-in-fact.

---

[7] In connection with Plaintiffs' various state law claims, Plaintiffs allege generally throughout the Amended Complaint that they purchased supplements from GNC that they otherwise would not have, or would not have paid as much for them as they did. See Am. Compl. ¶¶ 144, 154, 162, 172, 180, 213, 223, 232, 241, 259, 273, 279 and 282.

[8] We note that the Amended Complaint contains no allegations that Plaintiffs would have purchased a cheaper, alternative product absent GNC's alleged omissions or misrepresentations, thus injury-in-fact cannot be established under an alternative product theory of economic injury. Further, to the extent that Plaintiffs urge that they have standing based upon concerns of health problems that have yet to occur, see Am. Compl. ¶ 81 (alleging that "[a]s a result of GNC's practices, Plaintiffs . . . have been subjected to unreasonable safety risks"), apprehension concerning possible future injury is insufficient to establish injury-in-fact. Whitmore, 495 U.S. at 158; Reilly, 664 F.3d at 42.

14

As stated, Plaintiffs allege that they paid money for the supplements that, absent GNC's alleged omissions and misrepresentations, they otherwise would not have paid. See Am. Compl. ¶¶ 6, 24, 81; see supra n. 7. Although Plaintiffs do not allege that they consumed the supplements,[9] they certainly do not claim they suffered any adverse health consequences from them. Furthermore, Plaintiffs do not allege that the supplements at issue, which are "primarily weight-loss and sports-nutrition supplements," see Am. Compl. ¶ 27, failed to work for their intended purpose or did not deliver the advertised benefits.

The Amended Complaint presents some of the same concerns as in Koronthaly, Young, James, Medley and Estrada, which ultimately led the courts to find that the plaintiffs in those cases did not suffer an injury-in-fact. As observed in Koronthaly and Young, Plaintiffs' purchases of the supplements were not made pursuant to a contract, thus they could not have been denied the benefit of any bargain. Beyond that, as in Koronthaly, Young, James, Medley and Estrada, Plaintiffs have not alleged that the supplements failed to work for their intended purpose of weight loss and/or sports nutrition, and there is no allegation that Plaintiffs' health was adversely affected.

While we accept as true Plaintiffs' allegation that they would not have purchased the supplements had they known the supplements purportedly contained dangerous ingredients, economic damages do not necessarily follow as a consequence. To the extent Plaintiffs consumed the supplements, see supra, n. 9, once they were used, there would be no economic injury for Plaintiffs to complain of and apprehension concerning future health consequences is insufficient to establish an injury-in-fact. See James, 2011 WL 198026, at *2; Medley, 2011 WL 159674, at *2.

---

[9] Plaintiffs simply allege that they purchased the supplements on various occasions between 2011 and 2015. See Am. Compl. ¶¶ 11-22. However, in view of the fact that a number of Plaintiffs purchased supplements on multiple occasions over a period of months or years, see id. ¶¶ 11-13, 15, 17-21, it is logical to infer that they must have consumed the supplements. Indeed, it is highly unlikely that a consumer would make multiple purchases of items that he never used in the first place.

15

As in James and Medley, Plaintiffs would have received the benefit of their bargain so long as the supplements worked as intended, meaning they provided weight-loss and sports nutrition benefits, and they produced no adverse health effects. See id. Nothing in the Amended Complaint suggests this was not the case.

Plaintiffs appear to base their benefit of the bargain theory upon GNC's alleged omissions and misrepresentations, claiming that GNC sold products with false and misleading labeling, and it otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. See Am. Compl. ¶ 5. However, Plaintiffs do not allege what material facts GNC failed to disclose about the dangers of ingesting those substances or whether GNC had a duty to do so. Thus, the Court cannot conclude that Plaintiffs did not receive the benefit of their bargain based on alleged omissions by GNC. See Estrada, 2017 WL 2999026, at *6 (the plaintiff could not assert a benefit of the bargain theory of economic harm based on an omission where she failed to allege that the defendant was under a duty to disclose the omitted fact).

In addition, the Court finds that Plaintiffs were not deprived of the benefit of their bargain based on alleged misrepresentations by GNC. As observed in Estrada, courts have found that a plaintiff did not receive the benefit of the bargain in cases where sufficient facts were pled for the court to conclude that the plaintiff was induced into purchasing the product at issue by a *specific* misrepresentation made by the defendant. See Estrada, 2017 WL 2999026, at *9 - *11 (citations omitted). Unlike those cases, the plaintiff in Estrada did not sufficiently allege that she was induced into purchasing baby powder based on specific misrepresentations made by Johnson & Johnson on its website or on the product's label or advertisements. Id. at *11. Rather, the plaintiff simply alleged that she read the label prior to purchasing baby powder and in reliance on the label, she believed that baby powder was safe. Id. at *12.

16

Likewise, here, Plaintiffs fail to allege that they were induced into purchasing the supplements based on *specific* misrepresentations made by GNC. Plaintiffs allege that picamilon, BMPEA and acacia rigidula were "openly found" on the labels of various supplements available for sale at GNC; thus, through labeling, GNC misrepresented that the products were safe. See Am. Compl. ¶¶ 47, 65, 72, 79. Although Plaintiffs do not specifically allege it, they suggest that they read the labels on the supplements and believed they were safe. As in Estrada, that is insufficient, particularly in view of the fact that Plaintiffs do not otherwise allege they were induced into purchasing the supplements by any specific statements on the labels.

In sum, the Court is well-aware that "[i]njury in fact is not Mount Everest," Danvers Motor, 432 F.3d at 294, but, for the reasons explained herein, we conclude that Plaintiffs have not sufficiently alleged that they suffered an economic injury to satisfy the injury-in-fact element. Therefore, Plaintiffs have failed to establish that they have standing to bring the present action. Because Plaintiffs do not have standing, the Amended Complaint will be dismissed for lack of subject matter jurisdiction. Absent subject matter jurisdiction, the Court is without authority to rule on the remaining merit-based arguments.[10] ACLU-NJ v. Township of Wall, 246 F.3d 258, 261 (3d Cir. 2001) ("If plaintiffs do not possess Article III standing, . . . the District Court . . . lack[s] subject matter jurisdiction to address the merits of plaintiffs' case.").

---

[10] Although the Court is not empowered to address GNC's arguments for dismissal under Rule 12(b)(6), and expresses no opinion on the merits of that motion, we note the possibility that GNC's preemption claim could be premature. "[F]ederal preemption is an affirmative defense on which the defendant bears the burden of proof." In re Asbestos Prods. Liab. Litig., 822 F.3d 125, 133 n.6 (3d Cir. 2016). The Third Circuit has explained that "[t]his allocation of the burden of proof suggests that a motion under Rule 12(c) for judgment on the pleadings is a more appropriate procedural vehicle for dismissing cases on preemption grounds, instead of a motion under Rule 12(b)(6), except for cases in which preemption is manifest in the complaint itself." Id. (citations omitted). As stated, the Court expresses no opinion at this juncture as to whether this is a case in which preemption is manifest in the complaint itself, but simply raises the issue for the parties' consideration at the appropriate time.

## IV. CONCLUSION

Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2). Therefore, to the extent that Plaintiffs wish to file a second amended complaint to cure the deficiencies discussed herein, they will be granted leave do so within 30 days from the date of this decision.

Accordingly, the Motion to Dismiss filed by GNC as to Plaintiffs' lack of standing will be granted, and the Amended Complaint will be dismissed without prejudice at this time.

An appropriate order will be entered.

*/s/ Mark R. Hornak*
Mark R. Hornak
United States District Judge

Date: September 8, 2017

cc: All counsel of record