# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA
### Pittsburgh Division

| | |
|---|---|
| DANIEL HUBERT, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GENERAL NUTRITION CORPORATION,<br>        Defendant.<br><br>(In re: GNC Picamilon/BMPEA Litigation) | Civil Action No. 2:15-cv-01391-MRH<br><br>This document relates to: ALL CASES<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## <u>INTRODUCTION</u>

1.     A dietary supplement is a product intended to supplement the diet.  All products labeled as a dietary supplement also list dietary ingredients.  Plaintiffs purchased and ingested certain products sold by Defendant General Nutrition Corporation ("GNC") (the "Products"), a store specializing in nutritional supplements that (GNC says) promote healthful living.  The Products at issue were packaged or labeled as "dietary supplements" and identify either picamilon, BMPEA, or *acacia rigidula* as "dietary ingredients" in packaging or labeling.  The FDA has warned, however, that such labeling is false or misleading because picamilon, BMPEA, and *acacia rigidula* are not dietary ingredients — they are dangerous substances that have never been marketed in the United States as a supplement to the diet and have never been approved as such.

2.     GNC has removed these Products from its stores because the FDA has warned other manufacturers that such labeling is false and misleading.  GNC thus appears to understand that picamilon, BMPEA, and *acacia rigidula* are not intended to supplement the diet and should

1

not be included or represented as dietary ingredients in a dietary supplement. But GNC has not recompensed consumers who paid money for these falsely and misleadingly labeled Products. Instead, GNC has retained profits from the sales of these Products which should never have been marketed or sold as dietary supplements or as containing dietary ingredients.

3.      GNC has long known that picamilon, BMPEA, and *acacia rigidula* are not food, are not intended to supplement the diet, and cannot be truthfully or lawfully represented as a dietary supplement or ingredient in product packaging or labeling. In order for an ingredient in a dietary supplement to be deemed a legal "dietary ingredient," it must first be one of a handful of types of substances found in nature. It also must have been marketed in the United States before October 14, 1994, otherwise it is a "New Dietary Ingredient" ("NDI"). A manufacturer or distributor of a supplement containing an NDI is required, prior to selling the product, to submit a timely notification to the Food and Drug Administration ("FDA") that includes information that supports the safety of the supplement ("Premarket Notification"). None of these requirements were satisfied with respect to picamilon, BMPEA, or *acacia rigidula* prior to GNC's sale of the Products containing these ingredients and marketed as dietary supplements.

4.      Picamilon is a synthetic chemical used as a prescription drug in Russia for a variety of neurological conditions and is not approved as a drug in the United States. BMPEA is an amphetamine-like synthetic chemical that is not found in nature and has no history of safe usage. *Acacia rigidula* is an herb or other botanical which also has no history of safe usage. In fact, no manufacturer or distributor has submitted to the FDA any Premarket Notification establishing that a dietary supplement containing *acacia rigidula* is safe. The FDA has independently confirmed these facts in a series of warning letters issued to manufacturers of supplements containing picamilon, BMPEA, and *acacia rigidula*. Because picamilon, BMPEA,

and *acacia rigidula* are not "dietary ingredients," the Products cannot be sold as "dietary supplements."

5.      Nevertheless, GNC sold the Products with false and misleading labeling, and it otherwise failed to disclose material facts about the Products including the fact that they were not able to be lawfully sold in the United States as dietary supplements. GNC took these actions in order to profit from sales of the Products, and in violation of state and federal law.

6.      Plaintiffs are consumers who were hoodwinked into purchasing these mislabeled Products with mislabeled ingredients. Plaintiffs would not have purchased these Products, or paid more for the Products than they would have otherwise paid, had GNC disclosed that the Products are not in fact "dietary supplements," that picamilon, BMPEA, and *acacia rigidula* are not "dietary ingredients," and that the Products are not marketable as dietary supplements. Plaintiffs purchased Products that were worth objectively less than what they reasonably expected.

7.      Plaintiffs bring this suit on behalf of themselves and a class, and sub-classes, of similarly situated consumers. Plaintiffs assert that GNC has violated established state consumer protection laws, breached product warranties, engaged in negligent misrepresentation, and unjustly enriched itself to the detriment of consumers. Plaintiffs seek damages, restitution and other equitable relief on behalf of themselves and the proposed classes.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of

interest and costs, and this is a class action in which Defendant GNC and members of the proposed plaintiff class, including named Plaintiffs, are citizens of different states.

9.      This Court may exercise jurisdiction over GNC because GNC maintains its headquarters in Pennsylvania; is registered to conduct business in Pennsylvania; has sufficient minimum contacts in Pennsylvania; and intentionally avails itself of the markets within Pennsylvania through the promotion, sale, marketing, and distribution of its products, such that the exercise of jurisdiction by this Court is both proper and necessary.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## **PLAINTIFFS**

11.     Plaintiff Daniel Hubert resides in Mesquite, Texas.  He purchased (and later consumed) Mr. Hyde at GNC stores located in Rockwall and Greenville, Texas, on five occasions from January to May 2015.

12.     Plaintiff Kyle Eager resides in Lompoc, California.  He purchased (and later consumed) Mr. Hyde Fruit Punch and Mr. Hyde Blue Razz at the GNC store located at the Post Exchange on Vandenberg Air Force Base in California on two occasions in 2015.

13.     Plaintiff Robert Brooks resides in Escondido, California.  He purchased (and later consumed) Meltdown Watermelon, Lipo 6 Black, Meltdown, Redline Ultra Hardcore, and Shredz Burner at GNC stores located in Escondido and Vista, California, on multiple occasions between approximately June 2013 and September 2014.

14.     Plaintiff Matthew Shane Smith resides in Bryant, Arkansas.  He purchased (and later consumed) Mr. Hyde Fruit Punch in January 2015 at a GNC store located in Bryant, Arkansas.

15.     Plaintiff Mary Jo Cesario resides in Port Saint Lucie, Florida.  She purchased (and later consumed) Charge Extreme Energy Booster, Lean Body for Her Fat Burner, Nirvana, ENGN Blue Razz, Fastin, Redline Hardcore Blister Pak, Iso Lean 2, and Green Coffee Bean + Energy at GNC stores located in Florida on multiple occasions between 2011 and 2015.

16.     Plaintiff Chris Lynch resides in Urbandale, Iowa.  He purchased (and later consumed) Redline Ultra Hardcore at a GNC store in the Jordan Creek Mall located in West Des Moines, Iowa, in approximately May 2015.

17.     Plaintiff Jeff Johnston resides in Brighton, Michigan.  He purchased (and later consumed) Mr. Hyde, Fastin, and Redline Ultra Hardcore at GNC stores located in Michigan on multiple occasions between 2011 and 2015.

18.     Plaintiff Martine Landuit-Vartanian resides in Westland, Michigan.  She purchased (and later consumed) Lean Body for Her Fat Burner, Turbo Shred, ISO Lean 2, Lipodrene XR, and Green Coffee Bean + Energy at GNC stores located in Michigan on multiple occasions between 2013 and 2015.

19.     Plaintiff Dan Malecha resides in Burnsville, Minnesota.  He purchased (and later consumed) Lean Body Hi Energy Fat Burn, Tru Mangodrin, Jacked Pack, Nirvana, Meltdown Watermelon, Meltdown Peach Mango, Lipo 6 Black, Shredz Burner, Methlyl Drive 2.0, Lipodrene XR, and Green Coffee Bean + Energy at GNC stores located in the Burnsville Center and Southport Centre in Minnesota on multiple occasions between 2012 and 2015.

20.     Plaintiff Joseph Lambert resides in Nashua, New Hampshire.  He purchased (and later consumed) Mr. Hyde Watermelon at a GNC store located in the Pheasant Lane Mall in Nashua, New Hampshire, on two occasions in 2015.

21.     Plaintiff Cory Toth resides in New York.  He purchased (and later consumed) Riptek V2, Meltdown, Redline Ultra Hardcore, Hit Fastin XR, Charge Extreme Energy Booster, Testek, and Jetfuel Superburn at GNC stores located in New York and online at GNC.com on multiple occasions between 2011 and 2015.

22.     Plaintiff Nate Picone resides in Bethlehem, Pennsylvania.  He purchased (and later consumed) Dr. Jekyll (watermelon) at a GNC store in Bethlehem in or around July 2015.

23.     Each Plaintiff went to GNC to purchase dietary supplements with dietary ingredients.  Each of the Products they purchased stated in its labeling that the Product is a "dietary supplement," and listed picamilon, BMPEA, or *acacia rigidula* as "dietary ingredients." Plaintiffs reviewed and reasonably relied on the Products' labeling in purchasing the Products and (at the point of sale) reasonably believed them to be dietary supplements with legal dietary ingredients.

24.     Had Plaintiffs known that the Products they purchased contained ingredients that were never intended to supplement the diet and cannot be lawfully marketed or sold as such, they would not have purchased them at all or would not have paid as much for them as they did.

<u>**DEFENDANT**</u>

25.     Defendant General Nutrition Corporation is a Pennsylvania corporation with its headquarters and principal place of business in Pittsburgh, Pennsylvania.

26.     GNC is the world's largest specialty retailer of dietary supplements.

<u>**FACTUAL ALLEGATIONS**</u>

<u>Dietary Supplements</u>

27.     Over half of the United States population uses dietary supplements, according to the Centers for Disease Control and Prevention.  Consumers ingest these products to supplement

their total dietary intake of substances such as vitamins, minerals, herbs, or botanicals. These products are often found in the form of tablets, capsules, softgels, gelcaps, liquids, or powders.

28.     Dietary supplements are marketed for a variety of reasons, including for weight loss and energy enhancement. The Products at issue here are primarily weight-loss and sports-nutrition supplements available as powders and liquids.

<u>Federal and State Law Requirements for Dietary Supplements and Labels</u>

29.     Federal and state law place primary responsibility for the safety of dietary supplements, and for truthful and non-misleading labeling and advertising, on the shoulders of supplement manufacturers and distributors such as GNC. State law provides an additional, and critical, layer of consumer protection against false or misleading labeling, marketing, and advertising. As such, state law complements federal law. It also serves a distinct compensatory function.

30.     The federal Food, Drug, and Cosmetic Act ("FDCA") defines a "dietary supplement" as a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following "dietary ingredients": a vitamin; a mineral; an herb or other botanical; an amino acid; a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or a combination of any ingredient mentioned above. *See* 21 U.S.C. § 321(ff). Dietary supplements are products which are intended for ingestion, which are not represented for use as a conventional food or as a sole item of a meal or diet, and which are labeled as dietary supplements. *See id*.

31.     A "dietary ingredient" that falls into the federal definition, but was not previously marketed in the United States before October 14, 1994, is an NDI. 21 U.S.C. § 350b(d).

32.     A manufacturer or distributor is required to notify the FDA if it intends to market a dietary supplement in the U.S. that contains an NDI that was not previously present in the food supply. *See* 21 U.S.C. § 350b(a)(2). The manufacturer or distributor must submit the new dietary ingredient notification at least 75 days before the ingredient is sold and must include information that supports the safety of the product. *See id.* If the FDA does not take action during this 75-day period, the ingredient may be used in dietary supplements sold in the United States. *See id.*

33.     Manufacturers and distributors are responsible for determining whether a particular dietary ingredient was marketed before October 15, 1994, and for documenting that belief. *See id.*

34.     The sale of a dietary supplement with a "new dietary ingredient" without the required Premarket Notification is illegal, and the ingredient cannot be represented as a "dietary ingredient." *See* 21 U.S.C. §§ 331(a), 350(b).

35.     Because dietary supplements are under the "umbrella" of foods, the federal prohibition against 'misbranded' food applies to dietary supplements. *See* 21 U.S.C. § 343(a)(1). The federal misbranding law provides that "food shall be deemed to be misbranded" "[i]f (1) its labeling is false or misleading in any particular, . . ." *Id*. The federal prohibition against adulterated foods also applies to dietary supplements. *See* 21 U.S.C. §§ 342(f), 350b. A dietary supplement which contains a new dietary ingredient is adulterated if it does not satisfy the conditions applicable to such ingredients, including the submission of a Premarket Notification. *See id*.

36.     Section 403 of the FDCA, 21 U.S.C. § 343, and regulations of the FDA promulgated thereunder, *see* 21 C.F.R. § 101.36, require dietary supplements to be labeled with a

"nutrition label" that includes, among other things, a heading, "Supplement Facts," and then, between two heavy bars, a list of the "dietary ingredients," as defined by 21 U.S.C. § 321(ff), that are present in the dietary supplement. 21 U.S.C § 343(s)(2)(A); 21 C.F.R. § 101.36(b)(1)(i), (b)(2) and (3), and (c), (d), and (e)(1) and (6). Here are two of the sample labels provided by the FDA for the purpose of illustration (21 C.F.R. § 101.36(e)(11)):

(vi) Dietary supplement of an herb

# Supplement Facts

Serving Size 1 Capsule

**Amount Per Capsule**

| | |
|---|---|
| Oriental Ginseng, powdered (root) | 250 mcg• |

• Daily Value not established.

Other ingredients: Gelatin, water, and glycerin.

(vii) Dietary supplement of amino acids:

# Supplement Facts

Serving Size 1 Tablet

**Amount Per Tablet**

| | |
|---|---|
| Calories | 15 |
| Isoleucine (as L-isoleucine hydrochloride) | 450 mg• |
| Leucine (as L-leucine hydrochloride) | 620 mg• |
| Lysine (as L-lysine hydrochloride) | 500 mg• |
| Methionine (as L-methionine hydrochloride) | 350 mg• |
| Cystine (as L-cystine hydrochloride) | 200 mg• |
| Phenylalanine (as L-phenylalanine hydrochloride) | 220 mg• |
| Tyrosine (as L-tyrosine hydrochloride) | 900 mg• |
| Threonine (as L-threonine hydrochloride) | 300 mg• |
| Valine (as L-valine hydrochloride) | 650 mg• |

• Daily Value not established.

Other ingredients: Cellulose, lactose, and magnesium stearate.

37.     The FDA's regulations require dietary supplements to list immediately below the nutrition label any "Ingredients"/"Other ingredients" that are present in the dietary supplement, and include any ingredients that are not "dietary ingredients" or do not contain "dietary ingredients" "such as excipients, fillers, artificial colors, artificial sweeteners, flavors, or binders."  21 CFR § 101.4(g).

38.     The FDA's regulations also require the source ingredients that supply the dietary ingredients to be identified either within the nutrition label or as a part of the "Ingredients"/"Other ingredients" list immediately below the nutrition label.  If the source ingredient is a "botanical," the statutes and the regulations require the listing to specify the "part of the plant from which the ingredient is derived."  21 U.S.C. § 343(s)(2)(C), 21 CFR § 101.36.

39.     The effect of these statutes and regulations is that when a seller of a dietary supplement (among other persons) lists an ingredient on a nutrition label under Supplement Facts and between the two heavy bars, it constitutes a representation to consumers by the seller (among other persons) that the ingredient is a legal "dietary ingredient" as defined in FDCA § 201(ff), 21 U.S.C. § 321(ff).  This listing of dietary ingredients is particularly important because the presence of a "dietary ingredient" in a product otherwise intended to supplement the diet is what *makes the product a "dietary supplement"* under the FDCA -- the particular food product category that consumers who purchase dietary supplements are in the market for, and the chief market in which GNC participates.

40.     States have expressly adopted or incorporated a general prohibition against food labeling that is false or misleading in any particular, or against the sale of food which is adulterated, in their state Food, Drug, and Cosmetic Acts.  These state statutes incorporate by reference relevant portions of the FDCA.  *See, e.g.*, Arkansas's Food, Drug, and Cosmetic Act,

Ark. Code. Ann. § 20-56-201, *et seq.*; California's Sherman Food, Drug, and Cosmetics Act, Cal. Health & Safety Code § 109875, *et seq.*; Florida's Food Safety Act, Fla. Stat. Ann. § 500.01, *et seq.*; Michigan's Food Law, Mich. Comp. Laws Ann. 289.1101, *et seq.*; Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq.*; New York's Agriculture and Markets law, N.Y. Agric. & Mkts. Law § 1, *et seq.*; New Hampshire's Purity and Branding of Foods and Drugs law, N.H. Rev. Stat. Ann. § 146:1, *et seq.*; Pennsylvania's Food Safety Act, 3 Pa. C.S.A. § 5721, *et seq.*; and Texas's Food, Drug, and Cosmetic Act, Tex. Health & Safety Code Ann. § 431.001, *et seq.*

General Nutrition Corporation (GNC)

41.     GNC is the largest global specialty retailer of nutritional supplements, including vitamin, mineral, herbal, and other specialty supplements, as well as sports nutrition and dietary supplements.  The company has over 4,800 retail locations in the United States, and sells products through its website, www.gnc.com.

42.     In 2014, GNC had over $2.6 billion in revenue with 44% of its retail revenue coming from sports supplements and 11% coming from diet supplements.  Its products are sold under GNC proprietary names and under third-party names in company-owned retail stores and in franchise stores located across the United States, as well as on its website.

43.     Many of GNC's products contained the chemicals and ingredients picamilon, BMPEA, or *acacia rigidula*.  But as GNC has long known, these are not dietary ingredients (vitamins, minerals, botanicals, herbs, or certain other substances) used to supplement the diet that were previously present in the food supply, and therefore Products containing these ingredients cannot be marketed as dietary supplements in the United States.

<u>Picamilon</u>

44.     Picamilon (also known as, *inter alia*, pycamilon, pikamilon or pikatropin) is a chemical developed by researchers in the former Soviet Union and is currently sold as a prescription drug in Russia to increase levels of gamma-aminobutyric acid ("GABA") in the central nervous system.

45.     On September 28, 2015, Dr. Cara Welch, the Acting Deputy Director of the Division of Dietary Supplement Programs at the FDA, issued a declaration stating that picamilon does not qualify as a dietary ingredient under the FDCA.  According to Dr. Welch, picamilon is a neurotransmitter that is formed by synthetically combining niacin with GABA.  While both of these chemicals are individually found in nature, the compound has only been produced synthetically and has no known natural source.  Dr. Welch's declaration also stated that picamilon is neither a vitamin, mineral, herb or other botanical, amino acid, dietary substance used to increase the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any of these items.  Accordingly, Dr. Welch concluded that picamilon is not a legal dietary ingredient pursuant to 21 U.S.C. § 321(ff).

46.     On November 30, 2015, the FDA sent and published warning letters to five supplement makers stating the FDA's determination that the ingredient list on their product labeling declares picamilon as a dietary ingredient, that picamilon is not a dietary ingredient within the definition set forth in the FDCA, 21 U.S.C. § 321(ff)(1), and that declaring picamilon in their product labeling as a dietary ingredient causes their Products marketed as dietary supplements to be "misbranded" under the FDCA, 21 U.S.C. § 343(a)(1).

47.     GNC has been aware since 2007 that picamilon is not a lawful dietary ingredient and that it is a synthetic drug.  In May 2007, Jennifer Jakel, GNC's Senior Project Manager for

Technical Research whose responsibilities include ensuring that labeling and scientific claims are accurate, reviewed literature on picamilon translated from Russian. The literature described picamilon as a "medicinal preparation" and as a "derivative of gamma-amino-butryic acid and nicotinic acid" that was first synthesized in 1969 by the All-Union Scientific Research Institute and studied in the NII pharmacological RAN. Documents reviewed by Ms. Jakel also described picamilon as "a new class of medicinal preparations called nootropics which are finding increasingly wider applications in various areas of medicine. Nootropic medications are adopted successfully for breakdowns of memory, attention, learning, and for treatment of loss of brain blood circulation, brain trauma, chronic alcoholism and other disorders."

48.     GNC was also aware that picamilon was not a dietary ingredient because Ms. Jakel noted in her 2007 analysis that she could not find a new dietary ingredient notification: "No NDI that I could find." In April 2014, Ms. Jakel again looked for a new dietary ingredient notification and documented: "still no NDI found."

49.     On June 16, 2015, the Attorney General for the State of Oregon issued an Investigative Demand to GNC Holdings, Inc. (GNC's parent company) that demanded production of documents and information relating to the sale of picamilon. The demand discussed the likelihood that picamilon was not a lawful dietary ingredient. GNC was aware of this demand and produced documents and information in response to it, but continued to sell Products containing picamilon and labeled as "dietary supplements." GNC did not cease selling Products containing picamilon until after the Oregon Attorney General issued a Notice of Unlawful Trade Practices and Proposed Resolution to GNC on September 21, 2015.

50.     Picamilon was openly listed (in its various names) on the nutrition label of a variety of products available for sale at GNC, including the Products that Plaintiffs purchased,

under Supplement Facts and between the two heavy bars, and thereby constituted a representation to consumers by GNC that picamilon is a "dietary ingredient" as defined in 21 U.S.C. § 321(ff). For example:





51.     Through this labeling GNC misrepresented to Plaintiffs and consumers that picamilon was a lawful dietary ingredient.  But for the reasons discussed herein, picamilon is not a lawful "dietary ingredient," and therefore the Products containing picamilon are not "dietary supplements" and cannot be lawfully sold as such.

52.     Even if GNC had submitted an NDI to the FDA for approval of picamilon as a New Dietary Ingredient, such request would have been rejected because GNC would not have been able to submit information that supported the safety of the Products, as picamilon has no history of safe usage.  The FDA has never approved picamilon as either a prescription drug or for over-the-counter use in the United States.  *See* B. Avula, et al., Identification and Quantification

of Vinpocetine and Picamilon in Dietary Supplements Sold in the United States, Drug Testing and Analysis (July 15, 2015).

BMPEA

53.     BMPEA (also known as, *inter alia*, β-methylphenylethylamine and beta-methylphenethylamine) was first synthesized in the 1930s as a potential replacement for amphetamine.  Animal trials completed around this time demonstrated that BMPEA increased blood pressure and heart rate.  For unknown reasons, however, studies of efficacy and safety in humans were never performed.  As a result, BMPEA was never introduced as a pharmaceutical drug and its effects on humans are unknown.  BMPEA was identified only as a research chemical until recently.

54.     In April 2015, the FDA issued warning letters to five companies selling products listing BMPEA as a dietary ingredient.  As discussed further *infra*, two of the five companies also identified the botanical *Acacia rigidula* as the source of the BMPEA.  In publically announcing the warning letters, the FDA stated its position that:

> While BMPEA was listed as a dietary ingredient on the product labels, the substance does not meet the statutory definition of a dietary ingredient.  The Federal Food, Drug, and Cosmetic Act defines a dietary ingredient as a vitamin; mineral; herb or other botanical; amino acid; dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or combination of the preceding substances. BMPEA is none of these, rendering misbranded any products that declare BMPEA as a dietary supplement.  Additionally, relating to the two companies that identified the botanical *Acacia rigidula* as the source of the BMPEA, research conducted by the FDA in 2013 established that BMPEA is not a constituent or extract of *Acacia rigidula*.  FDA considers these specific products to be misbranded for this reason, as well.

55.     Only after the FDA formally announced that BMPEA did not meet the statutory definition of a dietary ingredient and sent warning letters to manufacturers whose products included BMPEA in April 2015 did GNC stop selling certain products identified as containing BMPEA.

56.     Because BMPEA is not an extract of *acacia rigidula*, dietary supplement products that state that BMPEA is an *acacia rigidula* extract are also false and misleading and unlawful.

57.     BMPEA was openly listed on the nutrition label of a variety of products available for sale at GNC as dietary supplements, including the Products that Plaintiffs purchased, under Supplement Facts and between the two heavy bars, and thereby constituted a representation to consumers by GNC that BMPEA is a "dietary ingredient" as defined in 21 U.S.C. § 321(ff).  For example:



## Supplement Facts

**Serving Size:** 1 Tablet     **Servings per Container:** 60

| | Amount Per Serving | % Daily Value |
|---|---|---|
| Proprietary blend with Thermo-Rx®: Phenylethylamine HCl, Methylsynephrine HCl, Theobromine Anhydrous, 1,3-Dimethylamine HCl, Synephrine HCl, N-Methyl-B-Phenylethylamine HCl, Yohimbine HCl | 245mg | * |
| Caffeine (anhydrous) | 100mg | * |

*Daily value not established

**Other Ingredients:** Dextrose, Microcrystalline Cellulose, Hydroxypropyl Methylcellulose, Stearic Acid, Magnesium Stearate, Sodium Starch Glycolate, Starch, Silica.

**Directions:** Take 1-2 tablets in the morning and 1 tablet after lunch. Do not exceed 4 tablets daily. Fastin® is heat and moisture sensitive, and the bottle should remain sealed after using. Keep desiccant in the bottle to avoid moisture. **Store at room temperature 59°- 86°F protected from moisture, heat, and light.** Failure to do so may cause pills to slightly turn brown. This will not affect the efficacy, potency or safety of the product, but will cause Fastin® to become brittle.

Manufactured by: Hi-Tech Pharmaceuticals, Inc.
**6015-B Unity Drive • Norcross GA 30071 • 1.888.855.7919**

†THESE STATEMENTS HAVE NOT BEEN EVALUATED BY THE FOOD AND DRUG ADMINISTRATION. THIS PRODUCT IS NOT INTENDED TO DIAGNOSE, TREAT, CURE OR PREVENT ANY DISEASE.





## Supplement Facts

Serving Size: 1 Scoop (5.3 grams)
Servings Per Container: 45

| Amount Per Serving | | % Daily Value |
|---|---|---|
| Vitamin C (as ascorbic acid) | 250mg | 417% † |
| Kilmista™ Proprietary Blend | 4,580mg | * |

Trimethylglycine (Betaine Anhydrous), Creatine Monohydrate, L-Citrulline, Dendrobex™ (Dendrobium Extract) (stem) (Concentrated for alkaloid content including Dendrobine, Dendroxine, Dendramine, B-Phenylethylamine, N,N-Dimethyl-B-phenylethylamine, and N,N-Diethyl-B-Phenylethylamine), B-Phenylethylamine HCl, Citramine™ (Citrus reticulata Extract) (fruit) (Concentrated for N-Methyltyramine Extract), Caffeine Anhydrous.

1204134 EXP : 04/15

† Percent Daily Values are based on a 2,000 calorie diet.
* Daily Value not established.

19

58.     Through this labeling, GNC misrepresented to Plaintiffs and consumers that BMPEA was a lawful dietary ingredient. But for the reasons discussed herein, BMPEA is not a lawful "dietary ingredient," and therefore the Products containing BMPEA were not lawful "dietary supplements" and cannot be lawfully sold as such.

59.     Even if GNC had submitted an NDI to the FDA for approval of BMPEA as a New Dietary Ingredient, such request would have been rejected because GNC would not have been able to submit information that supported the safety of the Products. BMPEA has no history of safe usage. Foreign agencies, including Health Canada and the European Food Standards Agency, have recalled products on the market containing BMPEA, calling the ingredient a "serious health risk." Health Canada, the Canadian equivalent of the FDA, announced a recall of the *acacia rigidula*-labeled Product "Jet Fuel Superburn" sold by GNC because it was spiked with undisclosed BMPEA.

### *Acacia Rigidula*

60.     *Acacia rigidula*—also called, among other names, *Vachellia rigidula*, chaparro prieto, and blackbrush—is a botanical improperly offered for sale as a dietary ingredient in GNC products.

61.     On March 7, 2016, the FDA issued letters warning six manufacturers of products containing the dietary ingredient *acacia rigidula* that the herb is a "new dietary ingredient" which lacks evidence of safe use, and therefore cannot lawfully be sold in the United States.

62.     As the warning letters explain, a new dietary ingredient is adulterated under the FDCA, 21 U.S.C. § 342(f), unless it was lawfully marketed as a dietary ingredient in the United States before October 15, 1994, or there is information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has

not been chemically altered. If neither circumstance applies, there must be "a history of use or other evidence of safety establishing that the dietary ingredient when used under the conditions recommended or suggested in the labeling of the dietary supplement will reasonably be expected to be safe." 21 U.S.C. § 342(f). In addition, "at least 75 days before being introduced or delivered for introduction into interstate commerce, the manufacturer or distributor of the dietary ingredient or dietary supplement [must] provide[] FDA with information, including any citation to published articles, which is the basis on which the manufacturer or distributor has concluded that a dietary supplement containing such dietary ingredient will reasonably be expected to be safe." *Id*. The failure to comply with these requirements renders a new dietary ingredient adulterated.

63. According to the FDA warning letters, *acacia rigidula* is adulterated because it is a new dietary ingredient which was not lawfully marketed before October 14, 1994; it was not present in the food supply as an article of food; and the FDA never received any Premarket Notification demonstrating an acceptable safety profile, let alone 75 days before *acacia rigidula* was delivered in interstate commerce.

64. GNC has not provided the FDA with the required 75-day Premarket Notification showing a history of *acacia rigidula's* safe use in food products or supplements or any other evidence of safety, even though it knew, or had reason to know, that *acacia rigidula* was not lawfully marketed as a dietary ingredient in the United States before October 15, 1994.

65. In 2013, FDA researchers discovered that many dietary supplements labeled as containing *acacia rigidula* contained BMPEA. The subsequently published study revealed that nearly half of 21 tested dietary supplements labeled as containing *acacia rigidula* actually contained BMPEA. *See* Pawar et al., *Determination of selected biogenic amines in* Acacia

rigidula *plant materials and dietary supplements using LC-MS/MS methods* (January 2014). Researchers were unable to find BMPEA in tested samples of *acacia rigidula*, suggesting that the plant does not naturally contain BMPEA. The FDA researchers also confirmed that BMPEA had never been tested for safety on humans.

66. Plaintiffs' counsel also commissioned analyses of *acacia rigidula* extract, which is listed as a dietary ingredient in certain Products sold by GNC as dietary supplements, for the existence of BMPEA. The testing facility conducted the analysis using LC/MS (Liquid Chromatography coupled to Mass Spectrometry) and GC/MS (Gas Chromatography coupled to Mass Spectrometry) tests. These tests found no BMPEA in *acacia rigidula* extract, providing an additional indication that the source of BMPEA in the Products was synthetic, not natural.

67. According to the Center for Responsible Nutrition, companies effectively "spiked" products labeled with *acacia rigidula* with BMPEA, where none would naturally be present. Testing by the Oregon Department of Justice on three Products sold at GNC stores labeled as containing *acacia rigidula* showed that they contained BMPEA instead.

68. GNC has been aware that since at least early November 2013 some dietary supplements labeled as containing the plant *acacia rigidula* actually contained the amphetamine-like BMPEA. At that time, Ms. Jakel was notified by the PubMed service of the FDA study. A few weeks later, Ms. Jakel also circulated a *USA Today* article about the study to approximately 100 recipients at GNC, including Senior Vice President Guru Ramanathan and Vice President & General Counsel of Regulatory Affairs David J. Sullivan. Within minutes of receiving the email, GNC Merchandising Manager Carter Gray wrote to GNC's Director of Merchandising, John Telencho, "Please tell me we won't have to get rid of acacia now."

69.     Initially, GNC employees made an effort to identify products with *acacia rigidula*. GNC's Senior Vice President of Marketing, Brian Cavanough, offered to perform a database search to identify all affected products. Director of e-Commerce Nathanial Kennedy also learned of at least six products sold by GNC with *acacia rigidula*.

70.     In an e-mail that included the *USA Today* article, Charlie Chiaverini, the National Branch Manager for Rightway Nutrition (manufacturer of Green Coffee Bean+Energy), wrote to GNC employee Bob Emilian, asking, "[O]bviously you would like us to reformulate as fast as possible and replace the inventory in the stores in warehouse with new inventory yes." Bob Emilian replied, "Yes for starters."

71.     By February 2014, however, GNC employees approved of the use of *acacia rigidula* by a third-party vendor seeking permission to reformulate a product. GNC also continued to sell products that contained *acacia rigidula* without testing these products to determine whether they were adulterated with BMPEA or informing consumers of the risk that these products were adulterated.

72.     The Food Standards Agency of the European Union (EU) contacted GNC and other sellers of *acacia rigidula* products in March 2014 to inform them that *acacia rigidula* was a "novel food product" and could not be sold in the EU because, among other things, its safety had not been demonstrated.

73.     In November 2014, an article by *NutraIngredients-USA* reporting on European regulatory warnings regarding *acacia rigidula* and BMPEA was widely distributed throughout GNC. The article warned that dietary supplements labeled with *acacia rigidula* and containing BMPEA had been linked to hemorrhagic stroke.

74.    An April 2015 study which received significant national media attention found that more than 50% of tested dietary supplements labeled as containing *acacia rigidula* in fact contained BMPEA, including products sold by GNC in the United States.  *See* P. Cohen, et al., *An amphetamine isomer whose efficacy and safety in humans has never been studied, β-*, Drug Test Analysis (April 2015).   Researchers determined that "[t]he dosages of BMPEA in supplements strongly suggest that the amphetamine isomer is synthetically produced and placed in the supplement to lead to physiologic effects."

75.    After the results of the Cohen study were released, another supplement retailer, Vitamin Shoppe, announced that it was pulling these products and all others that list *acacia rigidula* on their labels:  "Because the health and safety of our customers is our number one priority, and out of an abundance of caution, we are immediately removing all *acacia rigidula* containing products, due to the concern that some of them may contain BMPEA, from our stores and website."  The author of the Cohen study applauded this action by Vitamin Shoppe, stating "there is no legitimate role for *acacia rigidula* in supplements, and *acacia rigidula* has been used as code for synthetic stimulants."

76.    *Acacia rigidula* was openly listed on the nutrition labels of a variety of products available for sale at GNC as dietary supplements, including the Products that Plaintiffs purchased, under Supplement Facts and between the two heavy bars, and thereby constituted a representation to consumers by GNC that *acacia rigidula* is a "dietary ingredient" as defined in 21 U.S.C. § 321(ff).  For example:





**Supplement Facts**
SERVING SIZE: 3 CAPSULES    SERVINGS PER CONTAINER: 40

| | AMOUNT PER SERVING | %DV |
|---|---|---|
| Jetfuel Maximum Strength Thermogenic System* | 504 mg | ** |
| 1,3,7-Trimethyl-1H-purine-2,6(3H,7H)-dione | | |
| Olive leaf extract (15% 4-(2-hydroxyethyl)phenol) | | |
| Microparticulate sustained-release Acacia rigidula extract (leaf) | | |
| Capsicum frutescens extract (fruit) | | |
| Rauwolfia canescens extract (root) | | |
| Evodia rutaecarpa extract (fruit) | | |
| Jetfuel Lipolytic Support System* | 255 mg | ** |
| Camellia sinensis nigra extract (leaf) (60% polyphenols, 30% catechins, 7% caffeine) | | |
| Camellia sinensis veridis extract (leaf) (75% catechins, 45% EGCG, 5% caffeine) | | |
| Tetradecylthioacetic acid (TTA) | | |
| Camellia sinensis albus extract (leaf)(90% polyphenols, 45% catechins, 7% caffeine) | | |
| Jetfuel Psychotropic Support System* | 250 mg | ** |
| Withania somnifera extract (root)(2.5% withanolides) | | |
| Melissa officianalis extract (leaf) | | |
| 2-Amino-4-(ethylcarbamoyl)butyric acid | | |
| Jetfuel Oil-Infused Bio-Absorption System | 55 mg | ** |
| Medium-chain triacylglycerols (MCT) (from coconut oil) | | |
| ω-3 Fatty Acids (from fish oil) | | |
| Piper nigrum extract (seed) | | |

** Daily Value (DV) not established.    EACH SERVING CONTAINS APPROX. 286 MG OF CAFFEINE.

*JETFUEL SUPERBURN Maximum Strength*
**4-PART THERMOGENIC SYSTEM:**

1. **MAXIMIZE** calorie-burning intensity and energy!*
2. **BREAK DOWN** body fat!*
3. **ENHANCE** alertness!*
4. **OPTIMIZE** absorption!*

77.    Through this labeling, GNC misrepresented to Plaintiffs and consumers that *acacia rigidula* was a lawful dietary ingredient.  But for the reasons discussed herein, *acacia rigidula* is not a lawful "dietary ingredient," and therefore the Products containing *acacia rigidula* are not "dietary supplements" and cannot be lawfully sold as such.

78.    GNC also omitted to inform consumers that the FDA had determined that *acacia rigidula*-labeled Products were adulterated, and that no timely NDI notice had been provided to the FDA including information that supports the safety of the ingredient.

<u>GNC's Control Over Vendors' Labeling and Misleading Conduct</u>

79.    Along with selling supplements under its proprietary brands, GNC also sells many products from third-party brands.  GNC maintains that its large number of third-party offerings is one of the key distinctions between it and its competitors.  Because GNC has significant market

26

power as the largest supplement retailer, it exercises a great deal of control over the products these third parties sell.

80. Before it sells third-party products in its stores, GNC reviews and pre-approves all third-party product labels, warnings, packaging, and advertising sold in its stores. Third-party vendors cannot alter approved formulas, labels, or advertising without express permission from GNC. GNC also reviews proposals to reformulate third-party products and grants approval on occasion.

81. GNC has stated publicly that it received guarantees from third-party vendors that products containing picamilon, BMPEA, and *acacia rigidula* complied with legal requirements. GNC's third-party vendor agreement provides that the "Vendor Warrants that the Goods covered by this purchase order have been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (21 U.S.C. §301, *et seq.*, hereinafter "the Act") and requirements of all applicable federal, state and local laws, rules and regulations."

82. Based on this language, GNC informed the Oregon Attorney General that it is not liable for unlawful third-party vendor products sold at GNC stores or sold by GNC over the Internet. GNC, however, did not rely on third-party vendor guarantees concerning picamilon, BMPEA, and *acacia rigidula* in good faith, because GNC knew or should have known that these substances were not safe and could not be lawfully sold.

83. GNC also reviews scientific literature on the ingredients used in its third-party products to independently verify claims made by third-parties. For example, an email exchange on December 8, 2014, between Ms. Jackel and Christina Middleton, a GNC Associate Project Manager, discussed the literature regarding ingredients in third-party products. Based on Ms.

Middleton's review of the literature, Ms. Jakel decided which ingredients "looked promising" for possible development by Nutra Manufacturing, GNC's manufacturing arm.

84.     Nutra Manufacturing manufactures and supplies vitamins and supplements to GNC and other third-party companies. Nutra Manufacturing does not produce products that contain picamilon or BMPEA, indicating that GNC knew that these ingredients were unlawful to sell. GNC obtains products containing picamilon and BMPEA that are sold in GNC stores through third-party vendors. Despite its control over the formulas, advertising, and packaging of third-party supplements and its own review of scientific literature, GNC sold products in its stores that contained picamilon, BMPEA, or *acacia rigidula*, which the FDA has stated are not lawful dietary ingredients, and are therefore illegal to sell in the United States.

85.     Through its control of its vendors' labels, GNC misrepresented that Products containing picamilon, BMPEA, or *acacia rigidula* contained lawful dietary ingredients, and therefore were lawful dietary supplements that were legal to sell as such.

86.     GNC's false representations and omissions are germane to customers' health and safety and are therefore material because reasonable consumers would find them important in making their purchase decision.

87.     As a result of GNC's practices, Plaintiffs and proposed class members purchased Products that GNC sold unlawfully. Plaintiffs and the proposed class members purchased Products they would otherwise not have purchased, and paid more for Products than they would have otherwise paid. Plaintiffs purchased Products that were worth objectively less than what they reasonably expected.

<u>Affected Products</u>

88.     The following Products were sold by GNC as "dietary supplements" containing

the "dietary ingredients" picamilon, BMPEA, or *acacia rigidula*:

| Products with Picamilon | |
| --- | --- |
| *Name* | *Manufacturer* |
| Charge Extreme Energy Booster | Labrada Bodybuilding Nutrition |
| Lean Body for Her Fat Burner | Labrada Bodybuilding Nutrition |
| Lean Body Hi Energy Fat Burn | Labrada Bodybuilding Nutrition |
| Testek | QNT International, Inc. |
| Riptek V2 | QNT International, Inc. |
| Tru Mangodrin | Truderma, LLC |
| Turbo Shred | Swole Sports Nutrition |
| Jacked Pack | BD Health Partners |
| Mr. Hyde - Fruit Punch | Prosupps USA LLC |
| Mr. Hyde - Watermelon | Prosupps USA LLC |
| Dr. Jekyll - Power Punch | Prosupps USA LLC |
| Dr. Jekyll - Watermelon | Prosupps USA LLC |
| Mr. Hyde - Orange Guava | Prosupps USA LLC |
| Vanish Bonus | Prosupps USA LLC |
| Mr. Hyde - Red Razz | Prosupps USA LLC |
| Mr. Hyde RTD Blue Razz | Prosupps USA LLC |
| Mr. Hyde - Blue Razz | Prosupps USA LLC |

| | |
|---|---|
| Mr. Hyde RTD Fruit Punch | Prosupps USA LLC |
| Nirvana | Sensatus Group LLC |
| ENGN Fruit Punch | Evlution Nutrition |
| ENGN Blue Razz | Evlution Nutrition |
| ENGN Green Apple | Evlution Nutrition |

| Products Labeled with BMPEA | |
|---|---|
| *Name* | *Manufacturer* |
| Fastin | High Tech Pharmaceuticals |
| Fastin DMAA Free | High Tech Pharmaceuticals |
| Meltdown Watermelon | VPX Sports, Inc. |
| Meltdown Peach Mango | VPX Sports, Inc. |
| Meltdown Exotic Fruit | VPX Sports, Inc. |
| Lipo 6 Black | Nutrex Research |
| Meltdown | VPX Sports, Inc. |
| Redline Ultra Hardcore Twinpk | VPX Sports, Inc. |
| Redline Ultra Hardcore Bonus | VPX Sports, Inc. |
| Redline Ultra Hardcore | VPX Sports, Inc. |
| Redline Hardcore Blister Pak | VPX Sports, Inc. |
| Fruit N.O. Shotgun | VPX Sports, Inc. |
| Grp Bgum Shotgun V3 | VPX Sports, Inc. |
| Craze — Candy Grape | Driven Sports |

| Vanish Bonus | Prosupps USA LLC |
|---|---|
| Shredz Burner | Shredz Supplements |
| Iso Lean 2 | VPX Sports, Inc. |
| Iso Lean 3 | VPX Sports, Inc. |
| Methyl Drive 2.0 | VPX Sports, Inc. |

| Products with *Acacia Rigidula* | |
|---|---|
| *Name* | *Manufacturer* |
| Hit Fastin XR | Hi Tech Pharmaceuticals |
| Lipodrene XR | Hi Tech Pharmaceuticals |
| Fastin XR DMAA Free | Hi Tech Pharmaceuticals |
| Jetfuel Superburn | World Health Products LLC |
| Green Coffee Bean + Energy | Rightway Nutrition |
| MX-LS7 | Isatori Global Technologies |
| Phenyl Core | Infinite Labs |

## CLASS ACTION ALLEGATIONS

89.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and proposed class and subclasses initially defined as:

<u>Nationwide Class</u>:

All persons in the United States who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Arkansas Sub-Class</u>:

All persons in Arkansas who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>California Sub-Class</u>:

All persons in California who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Florida Sub-Class:</u>

All persons in Florida who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Iowa Sub-Class:</u>

All persons in Iowa who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Michigan Sub-Class:</u>

All persons in Michigan who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

<u>Minnesota Sub-Class:</u>

All persons in Minnesota who purchased Products with picamilon, BMPEA, or *acacia rigidula* from GNC, other than for purposes of resale.

New Hampshire Sub-Class:

    All persons in New Hampshire who purchased Products with picamilon, BMPEA,

    or *acacia rigidula* from GNC, other than for purposes of resale.

New York Sub-Class:

    All persons in New York who purchased Products with picamilon, BMPEA, or

    *acacia rigidula* from GNC, other than for purposes of resale.

Pennsylvania Sub-Class:

    All persons in Pennsylvania who purchased Products with picamilon, BMPEA, or

    *acacia rigidula* from GNC, other than for purposes of resale.

Texas Sub-Class:

    All persons in Texas who purchased Products with picamilon, BMPEA, or *acacia*

    *rigidula* from GNC, other than for purposes of resale.

    90.    Excluded from the proposed class and subclasses are Defendant, any parent,

affiliate, or subsidiary of Defendant; any entity in which Defendant has a controlling interest;

any of Defendant's officers or directors; any successor or assign of Defendant; anyone

employed by counsel for Plaintiffs; any Judge to whom this case is assigned, his or her spouse,

and all persons within a third degree of relationship to either of them.

    91.    <u>Numerosity of the Classes – Fed. R. Civ. P. 23(a)(1)</u>.  The members of the class

are so numerous that joinder of all members is impracticable.  While the exact number of class

members is unknown to Plaintiffs at the present time and can only be ascertained through

appropriate discovery, Plaintiffs believe that there are tens of thousands of class members

located throughout the United States and thousands in each of the sub-class states.  It would be

impracticable to join the class members individually. These members are readily ascertainable, including through sales receipts and GNC Gold Card membership files maintained by GNC.

92. <u>Existence and Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. Common questions of law and fact exist as to all class members and predominate over questions affecting only individual class members. These common questions include whether:

a. GNC sold Products with picamilon, BMPEA, or *acacia rigidula*;

b. GNC represented that the Products were lawful dietary supplements;

c. GNC represented that picamilon, BMPEA, and *acacia rigidula* were lawful dietary ingredients;

d. GNC's representations regarding picamilon, BMPEA, and *acacia rigidula* were otherwise false or deceptive;

e. GNC knew, or in the exercise of reasonable diligence should have known, that its representations regarding picamilon, BMPEA, and *acacia rigidula* in the Products it sold were false or deceptive;

f. GNC's representations and omissions regarding picamilon, BMPEA, and *acacia rigidula* in its Products would deceive a reasonable consumer;

g. GNC's representations and omissions regarding picamilon, BMPEA, and *acacia rigidula* constitute unfair, deceptive, untrue, or misleading advertising;

h. GNC violated the consumer protection laws of Arkansas, California, Florida, Iowa, Michigan, Minnesota, New Hampshire, New York, Pennsylvania, and Texas;

i. GNC violated Arkansas's Food, Drug, and Cosmetic Act, Ark. Code Ann. § 20-56-201, *et seq.*; California's Sherman Food, Drug, and Cosmetics Act, Cal. Health & Safety Code § 109875, *et seq.*; Florida's Food Safety Act, Fla. Stat. Ann. § 500.01, *et seq.*; Michigan's Food Law, Mich. Comp. Laws 289.1101, *et seq.*; Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq.*; New York's Agriculture and Markets law, N.Y. Agric. & Mkts. Law § 1, *et seq.*; New Hampshire's Purity and Branding of Foods and Drugs law, N.H. Rev. Stat. Ann.§ 146:1, *et seq.*; Pennsylvania's Food Safety Act, 3 Pa. C.S.A. § 5721, *et seq.*; and Texas's Food, Drug, and Cosmetic Act, Tex. Health & Safety Code Ann.§ 431.001, *et seq.* by selling Products with false or misleading labeling in any particular or adulterated ingredients; and

j. GNC's conduct described above caused Plaintiffs and class members to suffer injury, and they therefore may recover damages, or other legal and equitable relief, and an award of attorneys' fees, costs, and expenses.

93. <u>Typicality – Fed. R. Civ. P. 23(a)(3)</u>. Plaintiffs' claims are typical of the claims of the class because, among other things, they purchased one of the affected Products due to GNC's representations and lost money as a result.

94. <u>Adequacy of Representation – Fed. R. Civ. P. 23(a)(4)</u>. Plaintiffs are adequate representatives because their interests are aligned with those of the class members they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously on class members' behalf.

95.     Superiority – Fed. R. Civ. P. 23(b)(3).  The action may be certified under Rule 23(b)(3) because common questions predominate as described above and because a class action is the best available method for the fair and efficient adjudication of this controversy.  This litigation involves technical issues and targeted discovery of a sophisticated defendant, and could not practically be taken on by individual litigants.  In addition, individual litigation of class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results.  A class action presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

96.     In the alternative to class certification under Rule 23(b)(3), the proposed class may be certified under 23(b)(2) because GNC has acted or refused to act on grounds generally applicable to the class and subclasses, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class and subclasses.

**FIRST CAUSE OF ACTION**
**Violations of the Magnuson-Moss Warranty Act (MMWA),**
**15 U.S.C. § 2301, *et seq*., for Breach of Implied Warranties**
**(All Plaintiffs, Individually and on behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

97.     Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth each and every allegation set forth above.

98.     The GNC Products are consumer products as defined in 15 U.S.C. § 2301(1).

99.     Plaintiffs and the Classes are "consumers" as defined in 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

100.     GNC is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

101.    Under 15 U.S.C. § 2310(d)(1), the MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

102.    In connection with its sale of the Products, GNC gave an implied warranty of merchantability as defined in 15 U.S.C. § 2301(7).   Specifically, GNC warranted that the Products were fit for their ordinary purpose, to supplement the diet with dietary ingredients, and would pass without objection in the trade.

103.    GNC breached the implied warranty of merchantability and thereby violated the MMWA by selling Products containing picamilon, BMPEA, or *acacia rigidula* to its customers, including Plaintiffs and statewide class members.

104.    GNC's breach of warranty has deprived Plaintiffs and the Classes of the benefit of their bargain.

105.    As a direct and proximate result of GNC's conduct, Plaintiffs and the Classes have suffered damages and continue to suffer damages and other losses in an amount to be determined at trial.

106.    Plaintiffs and each of the Class members have had sufficient direct dealings with either GNC or its agents to establish privity of contract between GNC and Plaintiffs and each of the Class members.   Nonetheless, privity is not required here because Plaintiffs and each of the Class members are intended third-party beneficiaries of contracts between GNC and its third-party manufacturers, and specifically, of GNC's implied warranties.   GNC's warranty agreements were designed for and intended to benefit the Class.

107.    Privity also is not required because the Products are dangerous instrumentalities due to the defect and nonconformities outlined herein.

108. Plaintiff Kyle Eager afforded GNC with a reasonable opportunity to cure its class-wide breach pursuant to 15 U.S.C. § 2310.

109. Plaintiffs and the Class members have been damaged by GNC's breach of the implied warranty of merchantability and therefore seek damages, or other legal and equitable relief, and an award of attorneys' fees, costs, and expenses.

**SECOND CAUSE OF ACTION**
**Breach of Implied Warranties**
**(All Plaintiffs, Individually and on behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

110. Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth each and every allegation set forth above.

111. Defendant GNC is in the business of selling dietary supplements to consumers such as Plaintiffs and members of the classes, including, but not limited to, products with picamilon, BMPEA, or *acacia rigidula* of the kind sold to Plaintiffs and members of the proposed statewide classes.

112. Plaintiffs and members of the classes purchased one of more Products marketed as dietary supplements with labels identifying picamilon, BMPEA, or *acacia rigidula* as dietary ingredients.

113. At all times herein mentioned, GNC manufactured, tested, advertised, promoted, marketed, sold and/or distributed these Products.

114. At the time GNC designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Products for use by Plaintiffs and the Class members, GNC knew of the uses for which the Products were intended, and impliedly warranted the Products to be of merchantable quality.

115.     GNC's representations and warranties were false, misleading, and inaccurate, in that the Products were not of merchantable quality because the Products were defective, would not pass without objection in the trade, were not fit for ordinary purposes, and did not conform to the promises on labeling.

116.     Plaintiffs and the classes did rely on said implied warranty of merchantability.

117.     Plaintiffs and the classes reasonably relied upon the skill and judgment of GNC as to whether the Products were of merchantable quality.

118.     The Products were injected into the stream of commerce by GNC despite the fact that the Products were expected to and did reach users, handlers, and persons coming into contact with the Products without substantial change in the condition in which they were sold.

119.     GNC breached the implied warranties, because the Products were defective, could not deliver on the advertised claims, would not pass without objection in the trade, and were not fit for ordinary purposes.

120.     As a direct and proximate result of the breach of implied warranties, Plaintiffs and the members of the proposed State Classes suffered and/or will continue to be harmed and suffer economic loss.

121.     GNC's conduct breached its implied warranties regarding its Products under state implied warranty laws including:

      a.      Ark. Code Ann. § 4-2-314 and § 4-2-315;

      b.      Cal. Com. Code § 2314 and § 2315;

      c.      Fla. Stat. § 672.314 and § 672.315;

      d.      Iowa Code § 554.2314 and § 554.2315;

      e.      Mich. Comp. Laws § 440.2314 and § 440.2315;

f.      Minn. Stat. § 336.2-314 and §336.2-315;

g.      N.H. Rev. Stat. Ann. § 382-A:2-314 and § 382-A:2-315;

h.      N.Y. U.C.C. Law § 2-314 and § 2-315;

i.      13 Pa. C.S.A.§ 2314 and § 2315; and

j.      Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315.

122.    GNC received notice of these issues by the investigations of the FDA, the Oregon Attorney General, numerous complaints filed against it including the instant Complaint, and by individual letters and communications sent by Plaintiffs.

123.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiffs and the Class members have suffered damages, and are entitled to compensatory damages, costs and reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment or Quasi-Contract**
**(All Plaintiffs, Individually and on behalf of behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

124.    Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth each and every allegation set forth above.

125.    GNC has unjustly retained a benefit to the detriment of Plaintiffs and the members of the proposed Nationwide Class and State Sub-Classes.  GNC sold the Products to Plaintiffs with labeling that misrepresented that the Products and the ingredients contained within were lawful.  GNC continues to possess money paid by Plaintiffs and the Nationwide Class to which it was not entitled.

126.    GNC's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.  Through its control of its vendors' labels and its sale of the

affected Products to consumers, GNC misrepresented that the Products and the ingredients contained within were lawful.

127.     As a direct and proximate result of GNC's conduct, Plaintiffs and the Class members have suffered damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(All Plaintiffs, Individually and on behalf of the Nationwide Class**
**and State Sub-Classes, Against GNC)**

128.     Plaintiffs, on behalf of themselves and the proposed classes, reallege as if fully set forth each and every allegation set forth above.

129.     Plaintiffs bring this claim on behalf of themselves and the proposed Classes.

130.     GNC had a duty to disclose to Plaintiffs and Class members the Products' actual quality and characteristics.

131.     GNC negligently and/or carelessly misrepresented, omitted and concealed from consumers material facts relating to the quality and characteristics of the Products, including through its misrepresenting that the Products were lawful dietary supplements, that ingredients contained in the Products, picamilon, BMPEA, or *acacia rigidula*, were lawful dietary ingredients, and that the Products could be lawfully sold as dietary supplements.

132.     These misrepresentations and omissions were material and concerned the specific characteristics and quality of its Products that a reasonable consumer would consider in purchasing any dietary supplement.

133.     GNC made such false and misleading statements and omissions on its Products' labeling with the intention of inducing Plaintiffs and the Class members to purchase the Products.

134.    As a result of GNC's misstatements, it was under a duty to disclose facts necessary to correct those misstatements.  Further, GNC was in a better position to discover the misrepresentations than Plaintiffs because GNC controlled the Products' design, manufacturing, testing, and marketing processes.

135.    At the time it made the representations, GNC knew, or by the exercise of reasonable care should have known, that the statements were false.

136.    GNC advertised and marketed its Products with the intent to induce Plaintiffs and Class members to purchase the Products.

137.    GNC knew, or should have known, that without the misrepresentations and/or omissions, Plaintiffs and the classes would not have purchased the Products, or would have paid less for the Products than they did.

138.    Plaintiffs and the classes justifiably relied upon GNC's misrepresentations about the Products' quality and characteristics.

139.    Plaintiffs and the classes were unaware of the falsity of GNC's misrepresentations and omissions and, as a result, justifiably relied on them in deciding to purchase the GNC Products.  Had Plaintiffs and Class members been aware of the true nature and quality of the Products, they would not have purchased them, or would have paid less for the Products than they did.

140.    As a direct and proximate result of GNC's misrepresentations and omissions of material fact, Plaintiffs and Class members have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Violations of Arkansas's Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-101,** *et seq.*
**(Plaintiff Matthew Shane Smith, Individually**
**and on behalf of the proposed Arkansas Sub-Class)**

141.     Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

142.     The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.* (the "ADTPA"), makes unlawful any "deceptive" and "unconscionable" trade practices and any "deception," "fraud," or "false pretense" utilized in connection with the sale or advertisement of any goods.  GNC has violated and continues to violate the ADTPA.

143.     GNC engaged in "deceptive trade practices," as defined by Ark. Code Ann. §§ 4-88-107 and 4-88-108, by:

> a.     Representing that the Products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they do not have;
>
> b.     Representing that the Products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;
>
> c.     Omitting that the Products were not dietary supplements and contained unlawful ingredients picamilon, BMPEA, or *acacia rigidula*.

144.     GNC knew, or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA and *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, and *acacia rigidula* as dietary ingredients on the Products, marketed the Products as dietary supplements and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

145.    Reasonable consumers such as Plaintiff Smith and members of the Arkansas Sub-Class would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected Products.

146.    GNC intended that Plaintiff Smith and members of the Arkansas Sub-Class would rely on the false and misleading representations and omissions.

147.    Plaintiff Smith and members of the Arkansas Sub-Class justifiably relied on GNC's representations and omissions regarding the composition and legality of its Products containing picamilon, BMPEA or *acacia rigidula*.

148.    GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in the Arkansas's Food, Drug, and Cosmetic Act, A.C.A. § 20-56-201, *et seq*.

149.    As a direct and proximate result of GNC's conduct, Plaintiff Smith and the Arkansas Sub-Class Members were harmed because they purchased Products that they would not have bought, or paid more for the Products than they otherwise would have.

150.    Plaintiff Smith and the Arkansas Sub-Class are entitled to actual damages, reasonable attorneys' fees, and costs.

### SIXTH CAUSE OF ACTION
**Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq.*
(Plaintiffs Kyle Eager and Robert Brooks, Individually
and on behalf of the proposed California Sub-Class)**

151.    Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

152.    The Unfair Competition Law, California Bus. & Prof. Code § 17200, *et seq*. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business acts or practices and any false or misleading advertising.  GNC has violated and continues to violate the UCL.

153.    GNC's acts or practices also constitutes unlawful business practices in that they violate the Sherman Food, Drug, and Cosmetic Law, Cal. Health 7 Safety Code § 109875, *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*, and applicable federal laws and regulations.

154.    Plaintiffs Eager and Brooks, individually and on behalf of the other members of the California Sub-Class, reserve the right to allege other violations of law that constitute other unlawful business acts or practices.  Such violative conduct is ongoing and continues to this date.

155.    GNC's acts and practices constitute "unfair" business practices because, as alleged above, GNC engages in *inter alia* deceptive and false labelling, and misrepresents and omits material facts regarding its Products with picamilon, BMPEA, or *acacia rigidula*, and thereby violates established public policy, and engages in immoral, unethical, oppressive, or unscrupulous activities that are substantially injurious to consumers like Plaintiffs and other members of the California Sub-Class.  This conduct constitutes violations of the "unfair" prong of the UCL.

156.    GNC's acts and practices also constitute fraudulent practices in that they are false, misleading, and likely to deceive reasonable consumers like Plaintiffs, and other members of the California Sub-Class.   GNC falsely represented that the Products were lawful dietary supplements, and that they contained lawful dietary ingredients.  A reasonable consumer would

not have purchased the affected Products from GNC if they had been aware of this fact, or would have paid less than the price at which the Products were offered.

157.    GNC's fraudulent acts and practices also constitute "unfair" business practices in that:

a.    The legitimate utility of GNC's conduct is outweighed by the harm to Plaintiffs and other members of the California Sub-Class;

b.    GNC's conduct is immoral, unethical, oppressive, or unscrupulous activities that are substantially injurious to consumers like Plaintiffs, and other members of the California Sub-Class;

c.    GNC's conduct violates the policies underlying the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* – to protect consumers from unfair or deceptive business practices.

158.    There were reasonably available alternatives to further GNC's legitimate business interests, other than the conduct described herein.

159.    As a direct and proximate result of GNC's unlawful, unfair, and fraudulent business practices as alleged above, Plaintiffs and the California Sub-Class have suffered injury in fact and lost money or property, because they purchased and paid for the Products from GNC that they otherwise would not have, or would not have paid as much for them as they did. Meanwhile, GNC has generated more revenue than it otherwise would have and charged inflated prices for its Products, unjustly enriching itself.

160.    Plaintiffs Eager and Brooks and the California Sub-Class are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to GNC because of its unlawful, unfair, fraudulent, and deceptive acts and practices; reasonable attorneys' fees and

costs; declaratory relief; injunctive relief; and all other relief this Court deems appropriate, consistent with Cal. Bus. & Prof. Code § 17203.

**SEVENTH CAUSE OF ACTION**
**Violations of California's Consumers Legal Remedies Act,**
**Cal. Civ. Code § 1750, *et seq.***
**(Plaintiffs Kyle Eager and Robert Brooks, Individually**
**and on behalf of the proposed California Sub-Class)**

161. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

162. Plaintiffs Eager and Brooks and members of the California Sub-Class are "consumers" within the meaning of Cal. Civ. Code §§ 1761(d) and 1770, and each has engaged in a "transaction" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

163. GNC is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770, and provided "goods" within the meaning of Cal. Civ. Code §§ 1761(a) and 1770.

164. GNC's acts and practices, as alleged in this Complaint, violate California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1770(a)(5), (7), (9), (14), and (16), by engaging in unfair methods of completion and unfair and deceptive acts and practices in connection with transactions, namely, the sale of the Products with picamilon, BMPEA, or *acacia rigidula* to Plaintiffs and members of the California Sub-Class. This conduct was intended to result and did result in the sale of these goods to consumers. Specifically, GNC:

    a.    Represented that the Products with picamilon, BMPEA or *acacia rigidula* had approval or characteristics that they did not have;

    b.    Represented that the Products with picamilon, BMPEA or *acacia rigidula* were of a particular standard, quality or grade when they were actually of another;

c. Represented that consumers' purchases of the Products with picamilon, BMPEA, or *acacia rigidula* conferred or involved rights that the transactions did not have or involve; and

d. Represented that the Products were dietary supplements, and that picamilon, BMPEA, or *acacia rigidula* were lawful dietary ingredients, when they were not.

165. GNC was in a position to know, both from its own product knowledge and the available scientific literature on Picamilon, BMPEA, and *acacia rigidula* referenced above, that these were not lawful dietary ingredients, while consumers were not reasonably in a position to be aware of GNC's internal product information or such studies.

166. GNC intended that Plaintiffs and the California Sub-Class members would rely on the false and misleading representations, and any reasonable consumer would deem the false and misleading representations material to the purchase of the affected Products.

167. As a direct and proximate result of GNC's conduct, Plaintiffs and the California Sub-Class members have been harmed, in that they purchased Products that they otherwise would not have, or paid more for the Products than they otherwise would have. Meanwhile, GNC has generated more revenue than it otherwise would have, unjustly enriching itself.

168. Plaintiffs and the California Sub-Class is entitled to equitable relief, reasonable attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining GNC from its unlawful, fraudulent, and deceitful activity.

169. Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Eager sent GNC a letter on behalf of himself and a proposed nationwide class of consumers on January 12, 2016, demanding that GNC rectify the problems listed herein. GNC has failed to rectify or agree to rectify the

problems associated with the actions detailed above and give notice to all affected consumers within the proscribed 30-day time period for written notice pursuant to Cal. Civ. Code § 1782.

170.    Due to GNC failing to rectify or otherwise agreeing to rectify the problems associated with the actions detailed above, Plaintiff seeks to further recover actual or statutory compensatory/monetary damages as authorized by Cal. Civ. Code § 1780(a)(1), restitution as applicable and authorized under Cal. Civ. Code § 1780(a)(3), and punitive damages as authorized by Cal. Civ. Code § 1780(a)(4), which are appropriate in this case in light of GNC's knowing, intentional, fraudulent, and unconscionable conduct, as well as GNC's reckless disregard of its legal obligations to Plaintiff and the California Sub-Class members, and as otherwise recoverable under Cal. Civ. Code § 1780(a)(4).

**EIGHTH CAUSE OF ACTION**
**Violations of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500,** *et seq.*
**(Plaintiffs Kyle Eager and Robert Brooks, Individually**
**and on behalf of the proposed California Sub-Class)**

171.    Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

172.    California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"), makes it unlawful for any person or corporation "to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any . . . advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof,

which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

173.     The advertisements at issue in this case were made or caused to be made before the public in California through the product packaging of the Products with picamilon, BMPEA and *acacia rigidula*.

174.     GNC committed acts of false or misleading advertising when it:

   a.     Represented that the Products with picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

   b.     Represented that the Products with picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality or grade when they were actually of another; and

   c.     Represented that the Products with picamilon, BMPEA, or *acacia rigidula* were dietary supplements containing lawful dietary ingredients when they were not.

175.     GNC was either aware, or should have known through the exercise of reasonable care, that their representations and omissions of material facts concerning ingredients of the Products with picamilon, BMPEA, or *acacia rigidula* were untrue or misleading.

176.     GNC's actions were untrue or misleading in that the general public targeted by GNC to act upon such advertisements were likely to be deceived.

177.     Plaintiffs Eager and Brooks and members of the California Sub-Class were injured in fact and lost money or property as a result of GNC's FAL violations because they would not have purchased the Products with picamilon, BMPEA, or *acacia rigidula*, or would not have paid the price that they did if the true facts about the Products with picamilon, BMPEA,

or *acacia rigidula* had been fully and timely disclosed, and the Products with picamilon, BMPEA, or *acacia rigidula* they received were worth substantially less than what they were promised by GNC and expected. Plaintiffs and members of the California Sub-Class are therefore entitled to equitable monetary relief and injunctive relief.

<u>**NINTH CAUSE OF ACTION**</u>
**Violations of Florida's Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201,** *et seq.*
**(Plaintiff Mary Jo Cesario, Individually and on behalf of the**
**proposed Florida Sub-Class)**

178. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

179. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (the "FDUTPA"), makes unlawful any "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." GNC has violated and continues to violate the FDUTPA.

180. GNC engaged in "deceptive" trade practices, as identified in Fla. Stat. §§ 501.203, and 501.204 by:

    a.    Representing that the Products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

    b.    Representing that the Products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another; and

    c.    Omitting that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

181. GNC knew, or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed, or sold Products that GNC knew falsely listed, picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various Products, marketed the Products as dietary supplements and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

182. Reasonable consumers such as Plaintiff Cesario and members of the Florida Sub-Class would consider the misrepresentations and omissions as to the ingredients and quality of a product material to the purchase of the affected Products.

183. Plaintiff and members of the Florida Sub-Class justifiably relied on GNC's representations and omissions regarding the composition and legality of its Products containing picamilon, BMPEA, or *acacia rigidula*.

184. GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in the Florida's Food Safety Act, Fla. Stat. § 500.01, *et seq.*, and the Fla. Admin. Code. r. 5K4.002.

185. As a direct and proximate result of GNC's conduct, Plaintiff and members of the Florida Sub-Class were harmed because they purchased Products that they would not have bought, or otherwise would not have paid the price they paid for the Products.

186. Plaintiff and the Florida Sub-Class are entitled to actual damages, costs, reasonable attorneys' fees and costs, a declaratory judgment that GNC's aforementioned conduct violates the FDUPTA, and an injunction precluding GNC from engaging in conduct that continues to violate the FDUTPA.

**TENTH CAUSE OF ACTION**
**Violations of Iowa's Private Right of Action for Consumer Frauds Act,**
**Iowa Code Chapter 714H**
**(Plaintiff Chris Lynch, Individually and on behalf of the**
**proposed Iowa Sub-Class)**

187. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

188. GNC has engaged in unfair, deceptive, untrue and misleading business practices in violation of Iowa law.

189. GNC has violated this statutory prohibition against engaging in unlawful acts and practices by, *inter alia*, making the misrepresentations and omissions of material facts with the "intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission" in connection with the sale of its Products. Iowa Code Ann. § 714H.3.

190. Pursuant to Iowa law, GNC had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the Products to Plaintiff Lynch and the Iowa Sub-Class members.

191. In connection with the sale of its consumer merchandise, GNC engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

    a. Unfairly and deceptively misrepresenting the benefits and quality of its Products to its customers; and

    b. Unfairly and deceptively omitting that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

192.     As a result of the unfair and deceptive conduct of GNC, Plaintiff Lynch sustained damages including but not limited to the damages detailed above, incorporated herein.

193.     Pursuant to the Iowa law, GNC had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the Products to Plaintiff Lynch and the Iowa Sub-Class members.

194.     GNC intended that Plaintiff Lynch and the Iowa Sub-Class members rely on its materially deceptive misrepresentations and omissions, and purchase its Products as a consequence of the deceptive practices.

195.     GNC's deceptive representations and material omissions to Plaintiff Lynch and the Iowa Sub-Class members constitute unfair and deceptive acts and practices under Iowa Law.

196.     GNC engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the Iowa Sub-Class members.

197.     Plaintiff Lynch and the Iowa Sub-Class members were actually deceived by GNC's misrepresentations and omissions.

198.     As a proximate result of GNC's misrepresentations and omissions, Plaintiff Lynch and the Iowa Sub-Class members have suffered ascertainable losses, in an amount to be determined at trial.

199.     Prior to filing this suit, counsel for Plaintiff Lynch received approval from the Attorney General of Iowa pursuant to Iowa Code Ann. § 714H.7.

## ELEVENTH CAUSE OF ACTION
### Violations of Michigan's Consumer Protection Act,
### Mich. Comp. Laws Ann. §445.901, *et seq.*
### (Plaintiffs Jeff Johnston and Martine Landuit-Vartanian, Individually
### and on behalf of the proposed Michigan Sub-Class)

200.    Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

201.    Plaintiffs Johnston and Landuit-Vartanian brings this claim on their own behalf and on behalf of each member of the Michigan Sub-Class described above.

202.    GNC, by the actions complained of herein, has violated the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §445.901, *et seq.* ("MCPA") entitling Plaintiff and the members of the Michigan Sub-Class to damages and relief under the MCPA.

203.    In connection with the sale of its consumer products, Defendant engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

      a.    Unfairly and deceptively misrepresenting the benefits and quality of its Products to its customers; and

      b.    Unfairly and deceptively omitting that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

204.    GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in Michigan's Food Law, Mich. Comp. Laws Ann. 289.1101, *et seq.*

205.    GNC's conduct as set forth herein occurred in the course of trade or commerce.

206.    GNC's conduct as set forth herein affects the public interest because it was part of a generalized course of conduct affecting numerous customers throughout the country.

207. Plaintiffs Johnston and Landuit-Vartanian and Michigan Sub-Class members relied on the materially deceptive misrepresentations and omissions GNC made to Plaintiffs and the class regarding its Products.

208. As a proximate result of Defendant's misrepresentations, Plaintiffs Johnston and Landuit-Vartanian and the Michigan Sub-Class members have suffered ascertainable losses, in an amount to be determined at trial.

209. GNC is liable to Plaintiffs and Class members for damages in an amount to be determined at trial, including attorneys' fees, costs and statutory damages, and should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable and unlawful practices as alleged herein.

## TWELFTH CAUSE OF ACTION
### Violations of Minnesota's Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09, *et seq.* (Plaintiff Dan Malecha, Individually and on behalf of the proposed Minnesota Sub-Class)

210. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

211. The Minnesota Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09, *et seq.* (the "MUTPA"), makes unlawful the knowing "misrepresentation, directly or indirectly," of the "true quality" or "ingredients" of merchandise. GNC has violated and continues to violate the MUTPA.

212. GNC knowingly misrepresented the "quality" and "ingredients" of its products, as prohibited by Minn. Stat. Ann. § 325D.13, by:

a. Representing that the Products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b.  Representing that the Products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another; and

c.  Omitting that the Products the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

213.  GNC knew, or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, and *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed, or sold Products that GNC knew falsely listed, picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various Products, marketed the Products as dietary supplements, and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

214.  Reasonable consumers such as Plaintiff Malecha and members of the Minnesota Sub-Class would consider the misrepresentations and omissions as to the composition and legality of ingredients material to the purchase of the affected Products.

215.  GNC intended that Plaintiff Malecha and members of the Minnesota Sub-Class would rely on GNC's false and misleading representations and omissions.

216.  Plaintiff Malecha and members of the Minnesota Sub-Class justifiably relied on GNC's representations and omissions regarding the composition and legality of its Products containing picamilon, BMPEA, or *acacia rigidula*.

217.  GNC's conduct was also an unlawful trade practice in that it violated the prohibition against false or misleading labeling in Minnesota's Food Law, M.S.A. § 34A.01, *et seq.*

218. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and members of the Minnesota Sub-Class were harmed because they purchased Products that they would not have bought, or paid more than they otherwise would have for the Products.

219. Plaintiff Malecha and the Minnesota Sub-Class are entitled to actual damages and an injunction precluding GNC from engaging in conduct that continues to violate the MUTPA.

**THIRTEENTH CAUSE OF ACTION**
**Violations of Minnesota's Uniform Deceptive Trade Practices Act,**
**Minn. Stat. Ann. § 325D.43, *et seq.***
**(Plaintiff Dan Malecha, Individually and on behalf of the**
**proposed Minnesota Sub-Class)**

220. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

221. The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43, *et seq.* (the "MUDTPA"), makes unlawful any "deceptive" trade practices utilized in connection with the sale or advertisement of any goods. GNC has violated and continues to violate the MUDTPA.

222. GNC engaged in "deceptive trade practices," as defined by Minn. Stat. Ann. § 325D.44, by:

    a.    Representing that Products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

    b.    Representing that Products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another; and

c. Omitting that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

223. GNC knew, or should have known from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, and *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, or *acacia rigidula* as dietary ingredients on various Products, marketed the Products as dietary supplements, and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

224. Reasonable consumers such as Plaintiff Malecha and members of the Minnesota Sub-Class would consider the misrepresentations and omissions as to the composition and legality of the ingredients material to the purchase of the affected Products.

225. GNC intended that Plaintiff Malecha and members of the Minnesota Sub-Class would rely on the false and misleading representations and omissions.

226. Plaintiff Malecha and the Minnesota Sub-Class members justifiably relied on GNC's representations and omissions regarding the composition and legality of its Products containing Picamilon and BMPEA.

227. GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq*.

228. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and the Minnesota Sub-Class members were harmed because they purchased Products that they would not have bought, or paid more than they otherwise would have for the Products.

229.    Plaintiff Malecha and the Minnesota Sub-Class are entitled to costs, reasonable attorneys' fees, an injunction precluding GNC from engaging in conduct that continues to violate the MUDTPA, and any additional relief awarded to redress Plaintiffs' common law claims.

**FOURTEENTH CAUSE OF ACTION**
**Violations of Minnesota's Consumer Fraud Act,**
**Minn. Stat. Ann. § 325F.68, *et seq.***
**(Plaintiff Dan Malecha, Individually and on behalf of the**
**proposed Minnesota Sub-Class)**

230.    Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

231.    The Minnesota Consumer Fraud Act, Minn. Stat. Ann. § 325F.68, *et seq.* (the "MCFA"), makes unlawful any "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged…" GNC has violated and continues to violate the MCFA.

232.    GNC engaged in "misleading" and "deceptive" practices, as defined by Minn. Stat. Ann. § 325F.69, by:

a.    Representing that Products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b.    Representing that Products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another; and

c.    Omitting that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

233. GNC knew, or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, and *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, and *acacia rigidula* as dietary ingredients on various Products, marketed the Products as dietary supplements, and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

234. Reasonable consumers like Plaintiff Malecha and members of the Minnesota Sub-Class would consider the misrepresentations and omissions as to the composition and legality of ingredients material to the purchase of the affected Products.

235. GNC intended that Plaintiff Malecha and the members of the Minnesota Sub-Class would rely on the false and misleading representations and omissions.

236. Plaintiff Malecha and the members of the Minnesota Sub-Class justifiably relied on GNC's representations and omissions regarding the composition and legality of its Products containing picamilon, BMPEA, or *acacia rigidula*.

237. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and members of the Minnesota Sub-Class were harmed because they purchased Products that they would not have bought, or paid more than they otherwise would have for the Products.

238. Plaintiff Malecha and the Minnesota Sub-Class are entitled to actual damages, costs, reasonable attorneys' fees, a declaratory judgment that GNC's aforementioned conduct violates Minnesota's Consumer Fraud Act, and an injunction precluding GNC from engaging in conduct that continues to violate the MCPA.

## FIFTEENTH CAUSE OF ACTION
### Violations of Minnesota's False Statement in Advertising Act,
### Minn. Stat. Ann. § 325F.67
### (Plaintiff Dan Malecha, Individually and on behalf of the
### proposed Minnesota Sub-Class)

239. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

240. The Minnesota False Statement in Advertising Act, Minn. Stat. Ann. § 325F.67 (the "MFSAA"), precludes corporations from placing before the public a "label" or "advertisement of any sort regarding merchandise" for sale that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading . . . " GNC has violated and continues to violate the MFSAA.

241. GNC "placed before the public" labels that contained untrue, deceptive, or misleading assertions, representations, and facts, as defined by Minn. Stat. Ann. § 325F.67, by:

a. Representing that Products containing picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b. Representing that Products containing picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another; and

c. Omitting that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

242. GNC knew, or should have known, from its internal product knowledge, research, and available scientific literature, that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients, yet GNC falsely listed picamilon, BMPEA, or *acacia rigidula* as dietary

ingredients on various Products, marketed the Products as dietary supplements, and/or misrepresented BMPEA as an *acacia rigidula* extract and/or omitted BMPEA on the labels altogether.

243. Reasonable consumers such as Plaintiff Malecha and members of the Minnesota Sub-Class would consider the misrepresentations and omissions as to the composition and legality of the ingredients material to the purchase of the affected Products.

244. GNC intended that Plaintiff Malecha and members of the Minnesota Sub-Class would rely on the false and misleading representations and omissions.

245. Plaintiff Malecha and members of the Minnesota Sub-Class justifiably relied on GNC's representations and omissions regarding the composition and legality of its Products containing Picamilon and BMPEA.

246. As a direct and proximate result of GNC's conduct, Plaintiff Malecha and members of the Minnesota Sub-Class were harmed because they purchased Products that they would not have bought, or paid more than they otherwise would have for the Products.

247. Plaintiff Malecha and the Minnesota Sub-Class are entitled to actual damages, costs, reasonable attorneys' fees, a declaratory judgment that GNC's aforementioned conduct violates Minnesota's False Statement in Advertising Act, and an injunction precluding GNC from engaging in conduct that continues to violate the MFSAA.

## SIXTEENTH CAUSE OF ACTION
### Minnesota's Private Attorney General Statute
### Minn. Stat. Ann. § 8.31, *et seq.*
### (Plaintiff Dan Malecha, Individually and on behalf of the
### proposed Minnesota Sub-Class)

248. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

249. Plaintiff Malecha and the Minnesota Sub-Class members are consumers.

250. Plaintiff and the Minnesota Sub-Class members were injured by GNC's sale of merchandise.

251. Plaintiff Malecha and the Minnesota Sub-Class members were injured by GNC's violation of the MUTPA, MUDTPA, MCFA, MFSAA, and Minnesota's Food Law, Minn. Stat. Ann. § 34A.01, *et seq*.

252. Plaintiff Malecha and the Minnesota Sub-Class members have suffered damages with a causal nexus to Defendant's above-alleged misrepresentations and deceptive practices.

253. This action will benefit the public interest and, therefore, meets the requirements of Minnesota's Private Attorney General Statute, Minn. Stat. Ann. § 8.31, *et seq*.

## SEVENTEENTH CAUSE OF ACTION
### Violations of New York's General Business Law,
### N.Y. Gen. Bus. Law § 349
### (Plaintiff Cory Toth, Individually and on behalf of the
### proposed New York Sub-Class)

254. Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

255. GNC's business acts and practices alleged herein constitute deceptive acts or practices under the New York General Business Law, Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 ("NYGBL").

256.     The practices of GNC, described throughout this Complaint, violate the NYGBL for, *inter alia*, one or more of the following reasons:

>    a.     GNC unfairly and deceptively misrepresented the benefits and quality of its Products to its customers;

>    b.     GNC unfairly and deceptively labelled the actual ingredients of the Products; and

>    c.     GNC unfairly and deceptively omitted that the Products were not dietary supplements and that picamilon, BMPEA, or *acacia rigidula* were not lawful dietary ingredients.

257.     GNC's conduct was also deceptive in that it violated the prohibition against false or misleading labeling in New York's Agriculture and Markets law, N.Y. Agric. & Mkts. Law § 1, *et seq*.

258.     Under all of the circumstances, GNC's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant punitive damages.

259.     GNC's actions impact the public interest because Plaintiff Toth and members of the New York Sub-Class were injured in exactly the same way as thousands of others purchasing the Products with picamilon, BMPEA, or *acacia rigidula* as a result of, and pursuant to, GNC's generalized course of deception.  Because of GNC's deceptive conduct Plaintiff Toth and the New York Sub-Class did not receive the full value of their purchase of the Products, and paid more than they would have but for the deceptive conduct.

260.     The foregoing acts, omissions and practices proximately caused Plaintiff Toth and the other members of the New York Sub-Class to suffer ascertainable losses, in an amount

to be determined at trial, and are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

**EIGHTEENTH CAUSE OF ACTION**
**Violations of New Hampshire's Consumer Protection Act,**
**N.H. Rev. Stat. Ann. §358-A,** *et seq.*
**(Plaintiff Joseph Lambert, Individually and on behalf of the proposed New Hampshire Sub-Class)**

261.    Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

262.    GNC has represented to Plaintiff Lambert and members of the New Hampshire Sub-Class that its Products have characteristics, uses, and benefits that they do not have, in violation of RSA §358-A:2(V).

263.    GNC has also represented to Plaintiff Lambert and members of the New Hampshire Sub-Class that its Products were of a particular standard, quality or grade which they were not, in violation of RSA §358- A:2(VII).

264.    In addition, Plaintiff Lambert and the New Hampshire Sub-Class members have suffered injury in fact and lost money or property as a result of unfair competition and deceptive acts by GNC, as Plaintiff and the New Hampshire Sub-Class members purchased Products which they otherwise would not have been purchased, or paid more for the Products than they would have if GNC had not made misrepresentations and concealed or omitted material information about the composition and legality of the Product.

265.    Plaintiff Lambert and the New Hampshire Sub-Class members relied upon GNC to disclose all pertinent information about the Products with picamilon, BMPEA, or *acacia rigidula*.

266. The actions of GNC, as complained herein, constitute unfair and deceptive practices committed in violation of the New Hampshire Consumer Protection Act.

267. Plaintiff Lambert and the New Hampshire Sub-Class members have suffered damages as a result of the conduct of GNC, because Plaintiff and the New Hampshire Sub-Class members were misled into purchasing Products which were not what GNC represented the Products to be, or paying more for the Products that they otherwise would have.

268. Plaintiff Lambert is informed of and believes that all of the conduct alleged herein occurs and continues to occur in GNC's business. The conduct of GNC is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

269. GNC was aware, or by the exercise of reasonable case should have been aware, that the representations detailed herein were untrue or misleading. GNC also was aware, or by the exercise of reasonable case should have been aware, that the concealments and omissions detailed herein should have been disclosed in the Products' packaging.

270. GNC's conduct was also deceptive and unfair in that it violated the prohibition against false or misleading labeling in New Hampshire's Purity and Branding of Foods and Drugs law, N.H. Rev. Stat. Ann. § 146:1, *et seq*.

271. Plaintiff Lambert and the members of the New Hampshire Sub-Class have each been directly and proximately injured by the conduct of the Defendant, and such injury includes payment for the Products with picamilon, BMPEA, or *acacia rigidula*.

272. As a result of the conduct of GNC, as alleged herein, Plaintiff Lambert and the New Hampshire Sub-Class should be awarded actual damages, restitution, and punitive damages pursuant to N.H. Rev. Stat. Ann. §358-A:10(I), and any other relief the Court deems appropriate.

## NINETEENTH CAUSE OF ACTION
**Violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law,
73 P.S § 201-1, *et seq.*
(Plaintiff Nate Picone, Individually and on behalf the Pennsylvania Sub-Class, Against
GNC)**

273.    Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

274.    Plaintiff Nate Picone and members of the proposed Pennsylvania Sub-Class purchased Products containing picamilon, BMPEA, or *acacia rigidula* for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

275.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits engaging in fraudulent or deceptive conduct (i) representing that goods have characteristics, benefits, or qualities that they do not have; (ii) representing that goods or services are of a particular standard, quality, or grade, if they are of another; (iii) advertising goods or services with intent not to sell them as advertised; and (iv) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. *See* 73 P.S. § 201-2(4).

276.    GNC's acts and practices, as alleged in this complaint, violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law by engaging in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions— namely, the sale of the Products with picamilon, BMPEA, or *acacia rigidula* to Plaintiffs and members of the Pennsylvania Sub-Class.  This conduct was intended to result, and did result, in the sale of these goods to consumers.  Specifically, GNC:

      a.    Represented that the Products with picamilon, BMPEA, or *acacia rigidula* had approval or characteristics that they did not have;

b. Represented that the Products with picamilon, BMPEA, or *acacia rigidula* were of a particular standard, quality, or grade when they were actually of another;

c. Engaged in other fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding; and

d. Represented that consumers' purchases of the Products with picamilon, BMPEA, or *acacia rigidula* conferred or involved rights that the transactions did not have or involve.

277. GNC's conduct was also deceptive and unfair in that it violated the prohibition against false or misleading labeling in Pennsylvania's Food Safety Act, 3 Pa. C.S.A. § 5721, *et seq*.

278. As a direct and proximate result of GNC's conduct, Plaintiff Picone and members of the Pennsylvania Sub-Class have been harmed and have suffered ascertainable loss, in that they purchased Products that they otherwise would not have, or paid more than they otherwise would have for the Products. Meanwhile, GNC has generated more revenue than it otherwise would have, unjustly enriching itself. GNC's violations also present a continuing risk to Plaintiff and members of the Pennsylvania Sub-Class and affect the public interest.

279. Plaintiff Picone and members of the Pennsylvania Sub-Class are entitled to damages (including treble damages), equitable relief, reasonable attorney's fees and costs, declaratory relief, and a permanent injunction enjoining GNC from its unlawful, fraudulent, and deceitful activity.

**Violation of Texas Deceptive Trade Practices-Consumer Protection Act,**
**Tex. Bus. & Com. Code Ann. §§ 17.41,** *et seq.*
**(Plaintiff Daniel Hubert, Individually and on behalf of the**
**proposed Texas Sub-Class)**

280.     Plaintiffs, on behalf of themselves and the proposed sub-class, reallege as if fully set forth each and every allegation set forth above.

281.     The purposes of the Texas Deceptive Trade Practices and Consumer Protection Act (the "TDTPA") are to "protect consumers against false, misleading, and deceptive practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection," and the TDTPA is liberally construed to effect those purposes.  Tex. Bus. & Com. Code Ann. § 17.44.

282.     Plaintiff Hubert and members of the Texas Sub-Class are "consumers," the Products are "goods," and GNC was engaged in "trade or commerce" as those terms are defined by § 17.45 of the DTPA.

283.     GNC has violated section 17.50(a)(1) and 17.46(b)(24) of the TDTPA by failing to disclose to Plaintiff and members of the Texas Sub-Class that the Products containing picamilon, BMPEA, or *acacia rigidula* are unlawful dietary supplements, and misrepresenting that picamilon, BMPEA, or *acacia rigidula* are lawful dietary ingredients.

284.     GNC's omissions were intended to induce Plaintiff Hubert and members of the Texas Sub-Class to purchase Products that they otherwise would not have purchased, or pay more for the Products than they otherwise would have paid.  Plaintiff Hubert and members of the Texas Sub-Class relied upon GNC's omissions to their detriment, purchasing Products they otherwise would not have purchased, or purchased the Products at a price they otherwise would not have paid.

285.     GNC has also violated section 17.50(a)(3) of the TDTPA by selling Products containing picamilon, BMPEA, or *acacia rigidula*.   In addition, by selling Products with unlawful ingredients and not so advising Plaintiff Hubert and Texas Sub-Class members, GNC's conduct constitutes an unconscionable course of action, as GNC took advantage of Plaintiff and the Texas Sub-Class members' lack of knowledge to a grossly unfair degree.

286.     GNC's conduct was also false, misleading, deceptive, and unfair in that it violated the prohibition against false or misleading labeling in Texas's Food, Drug, and Cosmetic Act, Tex. Health & Safety Code Ann.§ 431.001, *et seq*.

287.     As a direct and proximate result of GNC's conduct, Plaintiff Hubert and other members of the Texas Sub-Class have been harmed in that they purchased Products they otherwise would not have, and/or paid more for the Products than they otherwise would have. Meanwhile, GNC has sold more Products than it otherwise could have and charged inflated prices for the Products unjustly enriching itself thereby.

288.     GNC is liable to Plaintiff and members of the Texas Sub-Class for damages in amounts to be proven at trial, including attorneys' fees recoverable pursuant to § 17.50(d) of the TDTPA, costs, and treble damages.

289.     Pursuant to §17.50 of the TDTPA, Plaintiff and the Texas Sub-Class seek damages, a declaration that GNCs conduct is unlawful, and an order requiring GNC to adequately disclose the extent and nature of their unlawful acts with respect to the Products outlined herein.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Nationwide Class and State Sub-Classes, respectfully request that this Court:

a.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Classes as defined above;

b.    Appoint Plaintiffs as the representatives of the Classes;

c.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the members of the Classes are entitled;

d.    Award pre-judgment and post-judgment interest on such monetary relief;

e.    Grant appropriate injunctive and declaratory relief, including, without limitation, an order that requires GNC to recall any products containing picamilon, BMPEA, or *acacia rigidula*, and to provide Plaintiffs and members of the Classes with appropriate curative notice regarding the existence and cause of the Products' noncompliance with federal and state law and subsequent health hazards;

f.    Award reasonable attorneys' fees and costs; and

g.    Grant such further relief that this Court deems appropriate.

Dated:  October 6, 2017                    Respectfully submitted,


                                           */s/ Shanon J. Carson*　　　　　　　　　
                                           Shanon J. Carson, Esquire (Pa. ID No. 85957)
                                           Arthur Stock, Esquire (Pa. ID No. 64336)
                                           **Berger & Montague, P.C.**
                                           1622 Locust Street
                                           Philadelphia,  PA  19103
                                           Telephone: (215)875-4656
                                           Facsimile:  (215) 875-4604
                                           scarson@bm. net
                                           astock@bm.net

                                           Gary E. Mason, Esquire
                                           Benjamin Branda, Esquire
                                           **Whitfield Bryson & Mason, LLP**
                                           1625 Massachusetts Avenue, NW, Ste. 605
                                           Washington, DC 20036
                                           Telephone: (202) 429-2290
                                           Facsimile:  (202) 429-2294
                                           gmason@wbmllp.com
                                           bbranda@wbmllp.com

                                           *Co-Lead Counsel*

                                           D. Aaron Rihn, Esquire
                                           **Robert Peirce & Associates, P.C.**
                                           707 Grant Street
                                           Suite 2500
                                           Pittsburgh, PA  15219-1918
                                           Telephone:  (412) 281-7229
                                           Facsimile:  (412) 281-4229
                                           arihn@peircelaw.com

Gregory F. Coleman, Esquire
Mark E. Silvey, Esquire
Lisa A. White, Esquire
**Greg Coleman Law, P.C.**
First Tennessee Plaza
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0090
Facsimile: (865) 522-0049
greg@gregcoleman.law
mark@gregcolemanlaw.com
lisa@gregcolemanlaw.com

John Yanchunis, Esquire
Marcia Valladares, Esquire
Patrick A. Barthle II, Esquire
**Morgan & Morgan**
**Complex Litigation Group**
201 North Franklin Street
7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
jyanchunis@forthepeople.com
mvalladares@forthepeople.com
pbarthle@forthepeople.com

Edward A. Wallace, Esquire
Mark R. Miller, Esquire
Amy E. Keller, Esquire
**Wexler Wallace, LLP**
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
eaw@wexlerwallace.com
mrm@wexlerwallace.com
aek@wexlerwallace.com

Alfred G. Yates, Jr., Esquire
Gerald L. Rutledge, Esquire
**Law Office of Alfred G. Yates, Jr., P.C.**
429 Forbes Avenue
519 Allegheny Building
Pittsburgh, Pennsylvania 15234
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
yateslaw@aol.com

Janine Pollack, Esquire
Michael Liskow, Esquire
**Wolf Haldenstein Adler Freeman & Herz LLP**
70 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
pollack@whafh.com
liskow@whafh.com

Theodore B. Bell, Esquire
Carl Malmstrom, Esquire
**Wolf Haldenstein Adler Freeman & Herz LLP**
One South Dearborn St.
Suite 2122
Chicago, IL 60603
Telephone: (312) 984-0000
Facsimile: (312) 212-4401
tbell@whafh.com
malmstrom@whafh.com

Charles E. Schaffer, Esquire
**Levin, Fishbein, Sedran & Berman**
510 Walnut Street
Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com

Robert K. Shelquist, Esquire
Craig S. Davis , Esquire
Rebecca A. Peterson, Esquire
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington  Avenue South
Suite 2200
Minneapolis,  MN  55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
rkshelquist@locklaw.com
cdavis@locklaw.com
rapeterson@locklaw.com

Charles J. LaDuca, Esquire
Brendan Thompson, Esquire
**Cuneo Gilbert & Laduca, LLP**
8120 Woodmont Avenue
Suite 810
Bethesda,  MD  20814
Telephone:  (240) 483-4292
Facsimile:  (202) 789-1 813
charles@cuneolaw.com
brendant@cuneolaw.com

J. Barton Goplerud, Esquire
Brian O. Marty, Esquire
**Hudson Mallaney Shindler & Anderson**
5015 Grand Ridge Drive
Suite 100
West Des Moines, Iowa 50265
Telephone:   (515) 223.4567
Facsimile:  (515) 223.8887
jbgoplerud@hudsonlaw.net
bommiy@hudsonlaw.net

Jonathan Shub, Esquire
**Kohn, Swift & Graf, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA  19107
Phone:  (215) 238-1700
Facsimile:  (215) 238-1700
jshub@kohnswift.com

Nick Suciu, III, Esquire
**Barbat Mansour & Suciu PLLC**
1644 Bracken Rd
Bloomfield Hills, MI 48302
Phone: (313) 303-3472
Facsimile: (313) 474-8585
nicksuciu@bmslawyers.com

Eric H. Gibbs, Esquire
Andre M. Mura, Esquire
Caroline Corbitt, Esquire
**Girard Gibbs LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Phone: (415) 981-4800
Facsimile: (415) 981-4846
ehg@girardgibbs.com
amm@girardgibbs.com
ccc@girardgibbs.com

Adam M. Moskowitz, Esquire
**Kozyak Tropin & Throckmorton, LLP**
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Phone: (305) 372-1800
Facsimile: (305) 372-3508
amm@kttlaw.com

*Attorneys for Plaintiffs*

795487